# 12-3981-CV

## United States Court of Appeals

*for the*

## Second Circuit

In Re PROSHARES TRUST SECURITIES LITIGATION

MARK KARASICK, STEVEN S. NOVICK, SUSAN ASAI, STEPHEN C. HERMAN,
CHARLES SANKOWICH, MICHAEL A. HYMAN, HOWARD SCHWACK,
FRANCISCO JAVIER DE LION DIAZ, RENE LACROIX, ANTHONY KOURI,
ANTHONY ALEXANDER, JAY BILYEU, JUDY BILYEU, MICHAEL ERIC
CODLIN, WENDY ROCKWELL-GOFF, ROBERT SCHUMACHER, JAMES
HERSHMAN, DOROTHY HERSHMAN, SCOTT TESSLER, RICHARD RHOADS,
MARTIN GARY NORRIS, DOROTHY LOWELL, NANCY HITCHINS, THOMAS
TRUONG, EDWARD CISNEROS, CHRIS HONCIK, STEPHEN SHOAP, DMITRI
ROUTSKI, ELENA LAVENDER-BOWEN, DAVID BOWMAN, DAVID CHOW,
MARK EVERETT BROWN, JONATHAN DEAN, LAWRENCE LEWIS SINSEL, JR.,
KENNETH L. KRAMER, LAWRENCE I. WEINER, JOHN E. KILLOUGH, ALAN
PARKER, SCOTT A. SMELTZ, HOWARD SCHWACK, DOUGLAS JONES,
STEPHEN HERMAN, on behalf of themselves and all others similarly situated,
STEVEN SCHNALL, SHERRI SCHNALL, on behalf of themselves,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
PLAINTIFFS-APPELLANTS

CHRISTOPHER LOVELL
LOVELL STEWART HALEBIAN
  JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

JACOB H. ZAMANSKY
ZAMANSKY & ASSOCIATES LLC
50 Broadway, 32nd Floor
New York, New York 10004
(212) 742-1414

*Lead Counsel for Plaintiffs-Appellants*

– v. –

PROSHARES TRUST, PROSHARE ADVISORS LLC, SEI INVESTMENTS
DISTRIBUTION CO., MICHAEL L. SAPIR, LOUIS M. MAYBERG, RUSSELL S.
REYNOLDS, III, MICHAEL WACHS, SIMON D. COLLIER, PROSHARES TRUST
II, EDWARD KARPOWICZ, WILLIAM E. SEALE, CHARLES TODD, BARRY
PERSHKOW,

*Defendants-Appellees.*

# TABLE OF CONTENTS

I.    JURISDICTION ................................................................1

II.   STATEMENT OF ISSUES PRESENTED ...................................1

III.  STATEMENT OF THE CASE ...............................................2

     A.    Parties and Plaintiffs' Claim ................................................2

     B.    The Decision.................................................................6

IV.  STATEMENT OF FACTS...................................................12

     A.    Proceedings Below and Defendants' Motion to Dismiss...................12

           1.    The Allegations And Reasonable Inferences from Plaintiffs' Complaint...................................................................14

               a.    The Large Losses From A Correct Judgment About The Market....................................................................17

               b.    The Excess Daily Index Volatility ................................21

               c.    The Inherent Facts .........................................23

               d.    The Materialization Facts ..............................24

V.    STANDARD OF REVIEW.................................................29

VI.  SUMMARY OF ARGUMENT..............................................30

VII. ARGUMENT................................................................33

     A.    Standards ...................................................................33

           1.    FRCP 8(a) and 12(b)(6) ..........................................33

2.    The Purpose Of The Section 11 Claim And This Court's
Decisions Imposing A "Minimal" Pleading Burden To
State A Section 11 Claim ..........................................................34

B.    The Undisclosed Facts Here Are Much More Material, And The
Difference Between Those Facts And The Disclosures Are Much
Greater, Than That Which Has Sufficed To Sustain Material
Omissions In This Court's Prior Cases ................................................37

1.    The Decision Erred By Eliminating The Most Important
Alleged Representations In The Registration Statement From
The Decision's Considerations Of What The Registration
Statement Meant To A Reasonable Investor ...........................37

2.    The Decision Erred By Failing To Consider The Corrective
Disclosures And SEC Rule Violations .....................................39

3.    The Decision Otherwise Erred By Finding That
General Statements About Daily Investment Objective
Sufficiently Disclosed To A Reasonable Investor The
Material Facts Here ..................................................................42

a.    Materialization Facts .....................................................42

b.    The Subject Matter, The Probability, The Magnitude And
The Investor Useful Circumstances Involved In The
"Diverge Significantly" Disclosure Are Much Different
From Those Involved In The Inherent Facts .................42

C.    The Wedge Graphs And Associated Text Did Not Render The
Materialization Facts Or Inherent Facts So Obviously Unimportant
As To Be Found Immaterial At The Pleading Stage ..........................46

1.    Pre-9/28/07 Purchases...............................................................47

2.    By Burying The Wedge Graphs In The Statement Of
Additional Information, The ProShares Trust Defendants
Omitted To State Material Facts In Violation Of SEC
Requirements ............................................................................47

3.    The Decision's Inferences And Findings Of What The

Wedge Graphs Showed, Are Erroneous Because They Failed To Consider The One Year, Three Year, Five Year And Ten Year Presentations ....................................................50

4.      The Decision Failed To Consider Plaintiffs' Allegations That The Wedge Graphs Were Materially Amended After The Class Period So As To Begin To Indicate Both That Losses Would Occur From Short-Term Excess Daily Index Volatility, And The Large Magnitude Of Annual Losses At The Actual Levels Of Volatility That Had Existed During The Class Period................................................................51

        a.      Daily And Short-Term Volatility Meant Rapid Losses ...........................................................51

        b.      The Large Magnitude Of The Short Term Losses .........55

5.      The Decision's "Crux" Finding, Apparently Concedes That The Few Entries In The Wedge Graph Did Not Give Rise To Inferences Of The Foregoing Material Facts............................57

D.      The Decision Erred By Finding Plaintiffs' Allegations of Knowledge Implausible........................................................58

CONCLUSION ....................................................................60

# TABLE OF AUTHORITIES

## Cases

*Anderson News, LLC v. American Media, Inc.,* 680 F.3d 162 (2d Cir. 2012) ........33

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...................................... 33, 34

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001) .....................45

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994)...............................................................................34

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,*
   No. 99 Civ. 12046 (WHP), 2001 WL 300733, (S.D.N.Y. 2001) ........................56

*DeMaria v. Anderson*, 318 F.3d 170, (2d Cir. 2003)...................................... *passim*

*Fadem v. Ford Motor Co.*, 352 F.Supp.2d 501 (S.D.N.Y. 2005)...........................40

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985).......................................... 33, 44

*Greenapple v. Detroit Edison Co.,* 618 F.2d 198 (2d Cir.1980) ...........................35

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)............................... 36, 37

*Hunt v. Alliance N.Am. Gov't Income Trust Inc*,
   159 F.3d 723(2d. Cir. 1998) ..................................................................... 32, 43

*In re Charles Schwab Corp. Sec. Litig.*, No. 08-1510,
   2009 WL 1371409 (N.D.Cal. May 15, 2009)......................................................49

*In re Direxion Shares ETF Trust*, 279 F.R.D. 221 (S.D.N.Y. 2012)............ 8, 13, 46

*In re Initial Public Offering Sec. Litig.,* 358 F.Supp.2d 189 (S.D.N.Y. 2004)........56

*In re Morgan Stanley Information Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ................................................................48

*In re Oppenheimer Rochester Funds Group Sec. Litig.,*
   838 F.Supp.2d 1148 (D.Colo. 2012)............................................... 13, 49

*In re ProShares Trust Sec. Litig.*, No. 09 Civ 6935 (JGK), - F.Supp.2d -,
   2012 WL 3878141 (S.D.N.Y. Sept. 7, 2012) ............................................ 1, 9, 12

*In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) ...........58

*In re Regeneron Pharms., Inc. Sec. Litig.,* No. 03 Civ 3111 (RWS),
   2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) .........................................55

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001)................................39

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
   941 F.Supp. 326 (S.D.N.Y. 1996) ........................................................40

*In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193 (E.D.N.Y. 2000).................36

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158 (S.D.N.Y. 2003)......40

*Iowa Pub. Employees' Retirement Sys. v. MF Global, Ltd.*,
   620 F.3d 137 (2d Cir. 2010) ................................................................58

*Litwin v. Blackstone Group, LP*, 634 F.3d 706 (2d Cir. 2011).................. 36, 37, 59

*Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.*,
   936 F.2d 759 (1991)............................................................................35

*Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292 (2d Cir. 2003) ....................29

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) .......................................................................... 33, 44

*P. Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004)..........................58

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
538 F.Supp.2d 662 (S.D.N.Y. 2008) ...................................................................46

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
681 F.3d 114 (2d Cir. 2012) ......................................................................... 45, 46

*Rafton v. Rydex Series Funds,* No. 10 Civ. 01171,
2011 WL 31114 (N.D. Cal. Jan. 5, 2011)..............................................................8

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)....................................................55

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .......................................39

**Statutes**

15 U.S.C. §77k.......................................................................................................1, 3

15 U.S.C. §77k(a) .....................................................................................................39

15 U.S.C. §77o...........................................................................................................39

15 U.S.C. §77v ...........................................................................................................1

28 U.S.C. §1331 .........................................................................................................1

**Rules**

17 C.F.R. §229.503 ..................................................................................................26

17 C.F.R. §230.408 ................................................................. 9, 35, 39

17 C.F.R. §274.11A ................................................................. 14, 26

**Other Authorities**

Form N-1-A, Registration Form for Registered Open-End Management
    Investment Companies (SEC 2052)......................................................25

*N-1A General Instructions*  Part C pp.6-7 .............................................59

SEC Form N-1A, Item 4 .......................................................................58

## I.  JURISDICTION

The United States District Court for the Southern District of New York had federal question jurisdiction over Plaintiffs-Appellants' ("Plaintiffs") claims that Defendants violated Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k and 77o.  28 U.S.C. §1331; 15 U.S.C. §77v.  This Court has jurisdiction over this appeal from a final judgment of dismissal dated September 12, 2012.  Special Appendix ("SPA")-27.  Plaintiffs timely filed their Notice of Appeal on October 3, 2012.  Joint Appendix ("A")-1011.

Such judgment was based upon the Opinion and Order of the Honorable John G. Koeltl dated September 7, 2012 (the "Decision").  SPA-1-26; *In re ProShares Trust Sec. Litig.*, No. 09 Civ 6935 (JGK), - F.Supp.2d -, 2012 WL 3878141, at *4 (S.D.N.Y. Sept. 7, 2012).

## II. STATEMENT OF ISSUES PRESENTED

1.    (a) **Inherent Characteristic Facts**.  Whether it is material to a reasonable investor to be told of the circumstances in which such investor will necessarily suffer quick and potentially large losses from a correct judgment about the market if the investor acts on that judgment by investing in Defendants' securities?

      (b) **Materialization Facts**.  Whether it is material to a reasonable investor to be told that such circumstances have materialized and, if they do not change, then losses, including potentially large losses, will necessarily soon result from a correct judgment about the market?

2.    Whether the Decision erred by finding that a mutual fund's generalized statements relating to its "daily investment objective"

adequately disclosed to a reasonable investor the allegedly omitted material facts?

3.     Whether the Decision erred by finding that a reasonable investor would necessarily engage in certain operations of mind to infer from a few numerical entries in a table accompanied by benign text, the "crux" of the allegedly rapid large losses and other omitted material facts?

4.     Whether the Decision erred by finding that Plaintiffs' allegation that Defendants knew that, if current market circumstances continued, then losses, including potentially large losses, would necessarily soon result, was implausible because Defendants were not "clairvoyant" and could not predict future market circumstances?

5.     Whether the Decision otherwise erred by finding, contrary to Plaintiffs' allegations and on a Rule 12(b)(6) motion, that the pertinent mix of disclosures that the Decision did consider, rendered the undisclosed facts immaterial?  This includes whether the Decision erred:

(a) by demoting and excluding from consideration the allegedly misleading statements in the most important part of the prospectus because they appeared in areas that were mandated by the Securities and Exchange Commission ("SEC")?

(b) by promoting to the highest level of importance and relying exclusively on statements and a few entries placed in the Statement Of Additional Information ("SAI") in violation of SEC requirements?

(c) by failing to consider Plaintiffs' arguments that the SEC prohibits disclosing important information that is required to be in the prospectus, in the SAI?

(d) by failing to consider Defendants' numerous new corrective disclosures made only after the large investor losses had occurred, which indicated that the previous mix of disclosures had been insufficient and had failed to disclose the material facts?

## III.  STATEMENT OF THE CASE

### A. <u>Parties and Plaintiffs' Claim</u>

This is a non-fraud securities class action under Section 11 of the Securities Act, 15 U.S.C. §77(k).  ¶291-305, A-999-1004.  It is brought by lead plaintiff Mark Karasick and twenty-eight other plaintiffs against Defendants ProShares Trust, ProShares Trust II and the persons who are legally responsible under Section 11 for the registration statements (hereinafter sometimes referred to as "registrations") filed by either ProShares Trust[1] or ProShares Trust II[2] with the SEC in order to sell their respective exchange traded fund ("ETF") securities to the public.  Third Amended Consolidated Complaint ("TAC") ¶1, fn.1 (A-887), and Second Amended Complaint ("AC"), Ex. D (A-478-80) (listing each ETF class security). Plaintiffs purchased such ETF securities pursuant to such registrations and lost money.

Plaintiffs alleged that Defendants' registrations suffered from two common omissions.

1. Prior to Defendants' multiple corrective disclosures belatedly made beginning on the last day of the August 6, 2006-June 23, 2009 class period ("Class Period"), all of Defendants' registrations failed to disclose the

---

[1] The ProShares Trust I Defendants are ProShares Trust, Louis M. Mayberg, President; Michael L. Sapir, Trustee, Chairman; Russell S. Reynolds, III, Trustee; Michael Wachs, Trustee; Simon D. Collier, Treasurer; and Charles S. Todd, Treasurer; and ProShare Advisors LLC, which serves as investment advisor to each and every fund and performs various management and control functions. ¶¶1,fn.1,62-74,89-90 (Docket Entry ("D.E.")188-2);A-887,905-11,915.

[2] The ProShares Trust II Defendants are ProShares Trust II, Louis M. Mayberg, Principal Executive Officer; Edward Karpowicz, Principal Financial Officer. ¶¶1,fn.1,62-74,91-92, 301 (D.E.188-2);A-887,905-11,915,1002-03.

Inherent Facts relating to the inherent vulnerability of Defendants' ETFs to excess daily index volatility circumstances. *See* Statement of Facts ("Facts") ¶14, setting forth the Inherent Facts, and ¶8, defining excess daily index volatility circumstances.

2. After the excess daily index volatility circumstances had materialized from June 2008 forward, Defendants' registrations all also omitted to disclose the Materialization Facts which are set forth at Facts Par.15. Essentially, these were that, if current market circumstances continued, investors necessarily would soon suffer losses (potentially large losses) from a correct judgment about the market that they chose to act on through Defendants' ETFs rather than one of the alternative investments available.

Plaintiffs alleged that inherent risks of rapid, potentially large losses were required by the SEC to be separately disclosed as a Principal Risk in the Principal Risks section of the prospectus part of Defendants' registrations. *See* Facts Par. 1, 14-18 *infra*. Defendants allegedly violated such SEC requirements in all of their registrations throughout the Class Period (a) by failing to disclose the Inherent Facts (until Defendants' belated multiple corrective disclosures beginning on the last day of the Class Period) and, (b) from June 2008 forward, by failing to disclose the Materialization Facts.

The foregoing common omissions allegedly rendered misleading the names of each ETF and specified statements common to Defendants' registrations. Throughout the Class Period, Defendants' registrations disclosed between twenty and forty-four separate principal risks. Most of these were generic risks which, in

reality, were truisms common throughout the investment world and well known to reasonable persons.  ¶123, 167; A-925, 952-54.  Always failing to address the critical issuer-specific risks of excess daily index volatility that caused billions of dollars or losses during the latter half of 2008 and first part of 2009, Defendants' "Principal Risk" factor disclosures fell into two categories (until the multiple corrective disclosures made on the last day of the Class Period).

First, from the August 6, 2006 start of the Class Period until September 2007 Defendants' registrations merely spoke only of a "daily investment objective" of each ETF and that the results "may diverge significantly" from perfect correlation. ¶191, 199; A-970, 973.  These general statements of up or down divergence from perfect correlation, failed to address the specific risks in the Inherent Facts and the Materialization Facts.

Second, from September 2007 until their corrective disclosures on June 23, 2009, Defendants' registrations included a "correlation risk" factor in the Principal Risks portion of the prospectus.  (During this time, ProShares Trust demoted the "may diverge significantly" language to the Statement of Additional Information ("SAI") and replaced it in the prospectus with the prominent, repeated statements described next.  ¶231, A981-83. )  In the "correlation risk" section of the registrations, Defendants repeatedly stated that holding Defendants' ETF for one year would produce results that likely were "greater or less than" a perfect annual

correlation.  ¶32, A-895.  Defendants prominently accompanied such statement

with specific textual statements and line graphs depicting annual deviations of

between 0.6% and 2.2% from perfect correlation in so-called uptrending,

downtrending, and flat or trendless markets.  Fact ¶6.

These statements were misleading and did not present the Principal Risks of

Defendants' ETFs because Defendants failed to disclose (a) the Inherent Facts until

at least the last day of the Class Period and (b) the Materialization Facts from June

2008 forward.

In the SAI for ProShares Trust and in the prospectus for ProShares Trust II,

Defendants also made certain wedge graph disclosures.  These were allegedly

misleading, were amended after the Class Period, failed to disclose any of the

Materialization Facts, and further obscured and failed to disclose the Inherent

Facts.  *See* "Decision" next below.

B. **The Decision**

The Decision granted F.R.Civ.P. 12(b)(6) dismissal with prejudice by

making essentially three findings of fact that were contrary to the Complaint.  In

making the findings, the Decision

(a) excluded from consideration the Principal Risks factor statements that it

should have promoted to the highest level of consideration; (b) promoted to the

highest level of consideration the SAI statements that it should have found to be in

violation of the SEC requirements and either excluded or demoted; (c) failed to consider the substance of any allegedly misleading statements; and (d) failed to consider Defendants' alleged violations of SEC disclosure requirements.

The Decision also failed to consider Defendants' multiple belated corrective disclosures.  The Decision failed to consider that, if such new disclosures were sufficiently important to be made when the excess daily volatility risks no longer actually existed, then such disclosures clearly were much more material and should much more have been made when such excess daily index volatility risks did exist, *i.e.*, from June 2008 – May 2009.  Finally, the Decision failed to consider the fact that, by making the disclosure when the risk did **not** exist, Defendants impliedly confirmed that the Inherent Facts should have been disclosed throughout the Class Period. This included during those times prior to June 2008 when the excess daily index volatility risk was not actually in existence.

Based upon the foregoing errors in methodology, the Decision made its three findings

**Main Finding**: **All registration statements from August 6, 2006 - June 23, 2009.** The Decision found that Defendants (a) disclosed a "daily" investment objective, and (b) stated that the results from holding Defendants' ETFs for more than a day "may diverge significantly" from perfect correlation. Decision, pp. 17-20;SPA-17-20.  The Decision also found that the foregoing disclosures rendered

the allegedly omitted facts immaterial.  *Id.*; *see* Issues Presented ##1-2; Argument Point B.

**Subsidiary Finding: August 6, 2006 – June 23, 2008**.  The Decision forthrightly acknowledged that the other mutual fund case decisions to consider "daily investment objective" disclosures, have found them to be insufficient to warn of the specific risks present in those cases.  Decision, pp. 18-20 (SPA-18-20) citing to *In re Direxion Shares ETF Trust,* 279 F.R.D. 221 (S.D.N.Y. 2012) ("*Direxion*") and *Rafton v. Rydex Series Funds,* No. 10 Civ. 01171, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011) ("*Rydex*").  But the Decision reasoned that there were less "contra-indicating" factors that cut against the "daily investment objective" representations here than were present in the prior cases.  Decision, pp. 18-19;SPA-18-19.  Plaintiffs respectfully disagree as to *Direxion*, which has 1% of the part of the ETF market of which ProShares has 99%. ¶¶7,62,110;A-888,905-06,923.  Thus, *Direxion* involved quite similar claims.  The *Direxion* analog to ProShares' misleading graphs and statements that repeatedly showed a 0.6% - 2.2% deviation from **annual** perfect correlation as the Principal Risk (Facts Par. 6), consisted of statements and graphs that showed a 36% annual deviation from perfect correlation.  Arg. Pt. B *infra*; Plaintiffs' Feb. 24, 2012 Letter to the Hon. John G. Koeltl, p. 2.

With regard to Defendants' numerous allegedly misleading statements about the benign and positive results of holding their ETFs for "one, three, five, and ten year" periods (*see* Facts Par. 6*infra*), the Decision found that such statements did not follow immediately after the "daily investment objective" statements.  Decision p.19;SPA-19.  Plaintiffs do not read the Decision to find that the allegedly misleading statements were buried or submerged.  *See* fn. 5-8 *infra*.  In any event, the misleading statements repeatedly were made in the most important portion of the registration, the Principal Risks portion of the prospectus.  Also, the Decision found that the allegedly misleading statements

> were included pursuant to SEC requirements.  The plaintiffs point to no case that holds information that the SEC requires must be specifically identified, qualified, or tempered.

*In re ProShares*, 2012 WL 3878141, at *8.  *See* Issues Presented #4(a).  The Decision did not mention Plaintiffs' citations to the unqualified language of Section 11 and *DeMaria v. Anderson*, 318 F.3d 170 (2d Cir. 2003) ("*DeMaria*") nor *DeMaria's* citation and Plaintiffs' citation to 17 C.F.R. §230.408.  *See* Arg. Pt. B4.  Opp.Mem (D.E. 169, p.6,fn.7;*see* A-39); Tr. Oral Arg. (D.E. 207, 41:8-20);*see* A-44.  Plaintiffs' Oral Argument Slides, p. 13; Plaintiffs' February 24, 2012 Letter to the Hon. John G. Koeltl Replying to Defendants' Letter to the Court dated February 21, 2012, p. 2.

Whether based on its foregoing reasoning or not, the Decision entirely failed throughout to express any consideration of the substance of Defendants' allegedly misleading statements.  Decision, *passim*;SPA-1-26. Plaintiffs argue that the Decision stood the purpose and letter of Section 11 on their head by discounting or failing to consider the misleading statements (regardless of whether the SEC does or does not require a presentation on the subject matter covered by such statement). Arg. B 4-5 *infra*.

Plaintiffs argue that the subject matter, the magnitude, the probability of loss, and the investor useful information of disclosing the circumstances in which rapid potentially large losses would occur, are all much different in the Inherent Facts and the Materialization Facts than those in the limited disclosures that Defendants made.  Arg. Pt. "B" *infra*.  Under this Court's jurisprudence, this finding by the Decision should be vacated.  *Id.*

**Second Finding: All registration statements from September 28, 2007 – June 23, 2009**.  The Decision found that a few numerical entries buried within a wedge graph of 153 entries, "graphically illustrated" what the Decision found to be the "crux" of the allegedly undisclosed facts "in plain English."  Decision pp. 19-21;SPA-19-21; Issue Presented #3.  Plaintiffs argue that the wedge graphs did not at all disclose or touch on the Materialization Facts.  Arg. Pt. "C" *infra*.  Plaintiffs further argue that the wedge graphs and accompanying text, which were corrected

after the Class Period, did not disclose the Inherent Facts, including the potentially rapid and large losses, and the circumstances in which such potentially rapid and large losses could occur.  *Id*.

**Third Finding: All registration statements filed from July 2008 forward**.

Plaintiffs had alleged that, beginning in June 2008, daily index volatility spiked to high levels that were significantly in excess of index performance. ¶¶22-24,47,61,133-153;A-893,900-01,904-05,929-44.  These "excess daily index volatility" circumstances were the vulnerability of Defendants' undisclosed mathematical formula. They transformed Defendants' Ultrashort ETF into an Ultralong ETF and made quick losses certain.  *See* Facts Par. 4-5 and fn. 4.  If such circumstances continued, they necessarily would soon cause losses, as Defendants' mathematical formula clearly told them, from correct judgments about the market. *See* Facts Par. 7-8.

Defendants allegedly knew and could simulate from their mathematical formula "exactly what was going to happen to investors **for each market scenario**," including the continuation of the actual, existing current daily volatility circumstances. (¶¶22-24,47(e);A-892)(emphasis supplied).  "If index volatility" continued at current levels (¶22;A-892) or "did not subside" (¶47(e);A-900-901), then investors necessarily would (and did) soon suffer losses, including large

11

losses from correct judgments about the market.  ¶¶98,127,132,157,169,189;A-917,926-29,946,954,969.

Instead of the "if market conditions continue" allegation that Plaintiffs did make, Plaintiffs respectfully submit that the Decision misapprehended Plaintiffs' allegations as positing a material omission to predict future market performance. Decision p. 18-23;SPA-18-23.  *In re ProShares*, 2012 WL 3878141, at *10-12.  At any rate, the Decision found Plaintiffs' allegations to be "implausible" because, absent "clairvoyance", the market movements "could not be known in advance." Decision, p. 23;SPA-23.  But Plaintiffs alleged that the high risk conditions had already materialized and were in existence.  Plaintiffs plausibly alleged that (and only that) Defendants knew that the **continuation** of actual, existing circumstances would (and in fact did) **necessarily** soon cause losses (including large losses) from correct judgments about the market.  *Id.*

## IV.  <u>STATEMENT OF FACTS</u>

### A.  Proceedings Below and Defendants' Motion to Dismiss

After these actions were consolidated and a lead plaintiff appointed, Plaintiffs filed the Second Amended Consolidated Class Action Complaint.  A-53. Based on a subsequent change in law, Plaintiffs were permitted to file the Third Amended Consolidated Class Action Complaint which was filed by the Plaintiffs

on August 29, 2011.  A-882-1009.  The motion to dismiss was then deemed to

apply to the TAC which included the exhibits from the AC.  D.E.199;A-1010.

Defendants moved to dismiss Plaintiffs' claims under F.R.Civ.P. Rule

12(b)(6). D.E.163-165; *see* A-38.  Plaintiffs opposed the motion.  D.E.169;*see* A-

39.  Defendants replied.  D.E.172;*see* A-39.  The Court granted leave to amend

based on a change in law not pertinent here.  A-1010.  Defendants' motion to

dismiss was then deemed, on consent, to be addressed to the amended complaint.

*Id*.

Shortly before oral argument, Plaintiffs submitted a supplemental authority

letter in response to *Direxion*, *In re Oppenheimer Rochester Funds Group Sec.*

*Litig*., No. 09-md-02063-JLK-KMT, MDL No. 2063, 2012 WL 171035 (D. Colo.

Jan. 20, 2012)("*Oppenheimer*"), and other decisions.  Plaintiffs' Jan. 30, 2012

Supplemental Authority Letter to the Hon. John G. Koeltl Regarding Certain

Decisions.  Oral argument was held and a transcript made.  Feb. 2, 2012 Minute

Entry; Transcript (D.E.207);*see* A-43-44.  Plaintiffs submitted a letter motion to

correct the transcript and respond to matters raised at oral argument concerning the

*Direxion* decision and related issues.  Plaintiffs' Feb. 16, 2016 Letter to the Hon.

John G. Koeltl to Correct the Transcript re the Oral Argument, And to Take

Judicial Notice of Certain Statements Made By Defendants' Counsel.  Defendants

did not object to the correction of the transcript but both objected and responded to

the substance of the letter.  Defendants' Feb. 21, 2012 Letter to the Hon. John G.

Koeltl in Response to Plaintiffs' Letter to the Court. Plaintiffs replied.  Plaintiffs'

Feb. 24, 2012 Letter to the Hon. John G. Koeltl Replying to Defendants' Letter to

the Court dated February 21, 2012.

**1.  The Allegations And Reasonable Inferences From Plaintiffs' Complaint**

a. <u>**Defendants' registrations filed with SEC**</u>.  Between August 6, 2006 and

June 23, 2009 ("Class Period"), Defendants ProShares Trust and ProShares Trust II

filed registration statements with the SEC for forty-four exchange traded funds

("ETFs") in order to sell shares in each to the public.  ¶1,fn.1 (A-887); AC, Exs. B,

C (A-474-477) (specifying the date of each registration statement in which the

common omissions are made); AC, Ex. D (A-478-480) (specifying the name of

each ETF that is a class security).

b. From the start of the Class Period to the end, ProShares Trust, an open

end investment company, made a continuous offering of shares in each of what

grew to be 38 ETFs from the time it introduced such ETF forward.  ¶¶83,299;A-

914,1001.  These continuous offerings were made pursuant to ProShares'

continually effective Registration Statement as amended by Amendment Nos. 1-13

filed with the SEC under SEC Form N-1A.  *See* 17 C.F.R. §274.11A;Form N-1-A,

Registration Form for Registered Open-End Management Investment Companies

(SEC 2052)("Form N-1A"); AC, Exs. A-D;A-176-480.  These registrations all

failed to disclose the same common Inherent Facts in Facts Par. 7 below, and the registrations filed from June 2008 forward all also failed to disclose the Materialization Facts as defined in Facts Par. 15 below. These omissions rendered the name of each ETF and specified common statements therein misleading.  Also, the omission of the material facts violated applicable SEC disclosure requirements.

c. From November 17, 2008 to the end of the Class Period, ProShares Trust II, a commodity pool, made a continuous offering of shares in what grew to be six of its ETFs from the time it introduced each ETF forward.  These continuous offerings were made pursuant to the ProShares Trust II continuously effective registration statement and amendments filed with the SEC on SEC Form S-1 and S-3.  ¶¶62(b),85-86,91(A-906,914-15); AC, Ex. D(A-478-480).  These registrations had the same common omissions, misleading statements and SEC violations as did ProShares Trust (except that ProShares Trust II did place the wedge graphs in the prospectus).

2.  **Defendants' three types of leveraged ETFs were each based on an underlying stock index or other benchmark**.  The shares of Defendants' ETFs that were subject to the foregoing registrations, traded on securities exchanges like stocks.  ¶¶81-82;A-913-14.  However, the price of each ETF tracked the price or the inverse of the price of an index of stocks (such as the Dow Jones U.S. Real

Estate Index) or of a commodity (such as gold or silver) or the price of some other benchmark (such as the Dow Jones – AIG Crude Oil Sub-Index).  *Id.*

Defendants' ETFs were of three types.  One type, named **Inverse ETFs**, was designed to produce the opposite result of the movement of the index or other underlying benchmark. ¶¶9,11;A-889.  If the underlying benchmark **increased** by 1%, the Inverse ETF sought to **decrease** by 1%.  The second type, named **Ultra Long ETF**[3] sought to double the result of the underlying benchmark.  If the benchmark increased by 1%, the Ultra Long fund was supposed to increase by 2%. ¶94;A-916.  Third, **Ultra Short ETFs** sought to produce twice the inverse of the results of the underlying benchmark. *Id.*  If the underlying benchmark **increased** by 1%, the Ultra Short fund sought to **decrease** by 2%. *Id.*

3.  **Circumstances in which the statements in the registration statement were made**.  Defendants represented that the Inverse ETFs and Ultrashort ETFs were useful for hedging against declines in the price of the index.  ¶¶95,104,130;A-916,921,926.  But the core basic reason for investing in Defendants' ETFs was the investor's judgment about the direction of the market. ¶10;A-889. If the investor's judgment was that the stock or other item was going to decline in price, the investor could hedge against (or profit from) such declines by purchasing the

---

[3] To be "**long**" an item in the investment world, is to profit from **increases** in the price of that item.  To be "**short**" an item in the investing world, is to profit from **declines** in the price of that item.

inverse ETFs or the UltraShort ETFs.  ¶¶9,93-94;A-889,916.  If the investor thought that the stock or other item was going to increase in price, the investor could obtain a greater gain by purchasing the UltraLong ETF.  *Id*.

4. Defendants operated their ETFs pursuant to or in accordance with an undisclosed mathematical formula[4] that created a risk that rendered misleading the names of Defendants' ETFs and numerous statements in Defendants' registrations.  ¶¶12-20,33,112-127,132,157;A-890-91,895-96,923-29,946-47.  A fundamental characteristic of leveraged ETFs and such formula is both counterintuitive and (Plaintiffs believe) unique in the investment world.  That is, in certain market circumstances (described at ¶¶7-8), Defendants' ETFs would necessarily produce quick, potentially very large losses from the investor's **correct judgment** about the direction of the market.  ¶¶12-17,152;A-889-90,943-44.

## a. The Large Losses From A Correct Judgment About The Market.

---

[4] Defendants' ETFs sought investment results, before fees and expenses, that corresponded to (or approximately to) the following mathematical formula which Defendants failed to disclose: $(1 + R_T^{index})^x \cdot e^{\frac{(x - x^2)\sigma^2 T}{2}}$

¶113;A-923.  This formula has two parts:  (1) a return and (2) a multiplier.

¶115;A-924.  The return is $(1 + R_T^{index})^x$.  For x outside the range zero to one, this is never less than 1+xR.  ¶116;A-924.  The multiplier is $e^{\frac{(x - x^2)\sigma^2 T}{2}}$.  ¶117;A-924.  The longer the holding period and more pronounced the day-to-day volatility of the underlying index, the more the deviation from the expected correlation. ¶¶115-121;A-924.

5. Plaintiffs alleged examples of these quick, potentially large losses, including as follows:

| Name of Fund | Holding Period | Perfect Correlation | Actual Results | Total Deviation From Perfect Correlation |
|---|---|---|---|---|
| FXP Ultra Short Fund tracked the FTSE/Xinhua China 25 Index ¶140;A-932-33. | 2 ½ months | **73.27% gain** on index decline of 36.63% | **50.84% decline** | 73.27 + 50.84 = 124.11% |
| EEV Ultra Short Fund tracked the MSCI Emerging Markets Index ¶141;A-933-34. | 3 months | **76.33% gain** on index decline of 38.16% | **46.03% decline** | 76.33 + 46.03 = 122.36% |
| DUG Ultra Short Fund tracked the Dow Jones U.S. Oil & Gas Index ¶142;A-934-35. | 3 months | **47.74% gain** on index decline of 23.87% | **24.18% decline** | 47.74 + 24.18 = 71.92% |
| SKF Ultra Short Fund tracked the Dow Jones U.S. Financials Index ¶139;A-932. | 3 months | **45.68% gain** on index decline of 22.84% | **17.3% decline** | 45.68 + 17.30 = 62.98% |
| EUM Inverse Fund tracked the MSCI EM Index ¶176;A-¶960. | 3 months | **25.63% gain** on index decline of 25.63% | **21.93% decline** | 25.63 + 21.93 = 47.56% |
| Lead Plaintiff Mark Karasick ¶138;A-931 | 4 ½ months | **10% gain** on index decline of 5% | **55.0% decline** | 55.0 + 10.0 = 65.0% |

6. During the Class Period, however, Defendants made many misleading statements about 0.6 – 2.2% annual divergence (rather than the 50 – 125% divergence in 2-4 months, *see* above) from perfect correlation. ¶¶37-38;A-897-98.

In fact, Defendants presented these results in and as representative of the Principal Risks of the fund section of the registration.  Defendants affirmatively undertook to describe and explain the effects of investing in and holding ProShares' leveraged ETFs for time periods of one year, three years, five years, and ten years by:

(a)    representing "that for periods greater than one day" the "performance of a fund [tends] **to be either greater than or less than** the index performance" extrapolated from the daily result (¶32(emphasis supplied);A-895);

(b)    repeatedly stating and implying that the representative results of holding Defendants' ETFs for one year period in "uptrending", "downtrending" and "flat or trendless" markets would be a divergence of between **0.6% and 2.2%** from a perfect correlation to the index (¶¶37-38;A-897-98);

(c)    otherwise making numerous disclosures that enabled and encouraged investors to hold ProShares for extended periods of time (¶¶101-102;A-918-20);

(d)    illustrating the amount of money that investors could save in holding ProShares' ETFs for a ten year period (¶102;A-918-20);

(e)    providing sections showing the amount of returns for each ETF over a period of one year (*Id.*);

(f)    describing the impact on investment results of  dividends – the receipt of  which required holding past times of ex-dividend dates (*Id.*);

(g)    describing the calculation of net long term capital gains on the performance of the ETFs held for extended periods (*Id.*);

(h)    estimating the costs of investing $10,000 in the ETFs for periods  of one or three **years**  assuming a 5% **annual return**, not a daily return (*Id.*); and

(i)    otherwise making numerous disclosures that enabled and encouraged investors to hold ProShares for extended periods of time.  ¶¶101-102;A-918-20.

7.  The inherent risk of Defendants' mathematical formula and leveraged ETFs was **un**known in the investment world and extremely important for an investor to know: if the investor made a correct judgment about the market, the investor would necessarily suffer quick, potentially large losses by acting on that judgment through an investment in Defendants' ETFs in certain market circumstances. ¶¶98,127,132,157,169,189;A-917,926-29,946-47,954-55,970. Obviously, **losses** are a common risk and consequence when an investor makes an **in**correct judgment about the market.  Defendants' ETFs fully shared this risk with all other investments. ¶20;A-891 (there were no "must win" conditions in Defendants' ETFs).  But Defendants' mathematical formula and ETFs suffered from an important additional inherent risk that was virtually unknown in the investment world.  That is, an investor who was correct in their judgment of the market would **necessarily** suffer quick losses, including potentially large losses, in

certain market circumstances. ¶98,127,132,157,169,189;A-917,926-29,946-47,954-55,970.

### b. The Excess Daily Index Volatility.

8.   The Excess Daily Index Volatility Circumstances in which Defendants' undisclosed formula necessarily caused a correct judgment about the market to produce quick, potentially large losses.  The rhythms of Defendants' mathematical formula had an inherent vulnerability to the actual, current day-to-day volatility of the price of the underlying index benchmark.  ¶¶98,127,132,157,169,189;A-917,926-29,946-47,954-55,970.  Volatility means the day-to-day percentage change in the price of the index.  ¶11;A-889.  Specifically, **whenever** the actual current day-to-day volatility of the index significantly exceeds its performance over a period of time, then Defendants' formula **automatically and necessarily causes the price of the ETF to move in the opposite direction** from what the name of the ETF signifies.  ¶33;A-895-96.  Index performance means the percentage change in the price of the index over the period in question.

¶¶6,19,32;A-888,891,895.  The excess index volatility circumstances

> locked the investor into an unexpected "must lose" situation.  It defeated the main reasons for the investment.  It meant that she lost regardless of whether the underlying index moved in her favor, moved against her, or was unchanged.

¶33;A895-96.

9. Historical volatility and historical average volatility were not pertinent to and did not affect Defendants' mathematical formula. Rather, the circumstances in which the daily index volatility significantly exceeds the change of the price in the underlying index, caused the price of the ETF to move in the opposite direction to that which the name of the fund implied. These circumstances are hereinafter sometimes referred to as "excess daily index volatility" circumstances.

10. **Excess daily index volatility was not rare**.  These excess volatility circumstances, and volatilities of in excess of 40% had occurred hundreds of times in the equities, silver and gold markets alone between 1973 and the start of Class period.  ¶¶45,266-68;A-900,992. (They actually began to occur regularly during the Class period from June 2008 forward as volatilities of 45% to well over 100% increasingly appeared.  ¶134;A-929-30.)

11. Defendants could run their mathematical formula to simulate the outcomes that resulted from any scenario of index volatility and index performance.  ¶¶25,119-123;A-892-93,924-25.  As Defendants well knew from before the first day that they sold the ETFs and going forward, in excess daily index volatility circumstances, *when the investor was right on the direction of the market*, the investor necessarily suffered losses (including potentially large losses)

by acting on that judgment through an investment in Defendants' ETF. There were many alternatives available to investors that did not suffer from this defect. ¶¶96-97,103-111;A-917,921-23.

12. The excess daily index volatility risk was critical to an investor who was considering whether to execute their judgment about the market through purchases of Defendants' ETFs or one of the alternative means. ¶¶96-97,103-111;A-917,921-23.

13. Plaintiffs alleged that Defendants should have disclosed, in the Principal Risks portion of the prospectus part of their registration statements, the excess daily index volatility risk, its consequences, and the circumstances in which it would arise.

**c. The Inherent Facts**

14. **<u>Inherent Facts.</u>** Plaintiffs alleged that Defendants should have disclosed in plain English the fact that their ETFs possessed the inherent characteristic (and highly anomalous, and counter-intuitive) risk of producing quick potentially large losses from a correct judgment about the market in certain market circumstances. ¶124-25;A-925. Defendants should have similarly disclosed the circumstances in which these losses occurred. ¶27-28,154,189-190;A-894,945,969-70. Also, Defendants should have disclosed the potentially large magnitude of the losses that could occur.

23

¶¶189,263;A-969,991.  Plaintiffs alleged that the excess daily index volatility risk, in combination with other specified facts, created a long term "underperformance bias" in Defendants' ETFs and made them totally dysfunctional in circumstances in which index volatilities were high.  ¶¶250-262;A-988-91.  In such circumstances, the Inverse ETF on the index would lose, the UltraLong ETF on the same index would lose, and the Ultrashort ETF on such index would lose.  ¶¶98,127,132,157,169,189;A-917,926-29,946-47,954-55,970.

**d**. **The Materialization Facts**

15.  **Materialization Facts**.  Further, from June 2008, Defendants especially should have disclosed the important fact that, as Defendants well knew, the circumstances that triggered these risks had materialized. *See* ¶¶98,127,132,157,169,189;A-917,926-29,946-47,954-55,969.  If such circumstances did not dissipate, then losses (potentially large losses) would soon necessarily follow from a correct judgment about the market. ¶¶16,44,47(e),127;A-890,899-901,926.  *See* below.  From June 2008 forward index volatilities of .45 - .99 were common in the indices tracked by Defendants' ETFs. ¶¶133-134;A-929-30. Defendants knew that, if they continued, losses would soon result from a correct judgment about the market.  ¶134;A-929-30.  Defendants' mathematical formula told Defendants to the day when, if current actual volatility

circumstances continued, their ETFs would become dysfunctional and an investor necessarily would lose from a correct judgment **about the market**.  ¶¶22-25;A-892-93.  Defendants knew that the **continuation of such market** circumstances would soon necessarily (i) deprive investors of any opportunity to profit from a correct judgment about the direction of the index if the investor chose to act on that judgment by investing in Defendants' ETFs, and (ii) cause losses, including very large, rapid losses from correct judgments about the market that were acted upon through investments in Defendants' ETFs.  ¶¶16,44,52(d),127,133,177;A-890,899-900,903,926,960.  Defendants failed to disclose these facts.

16.  Instead, Defendants, outside of the registrations, congratulated themselves about increased "hedging" use of their ETFs beginning in Autumn 2008. ¶¶1,28,150;A-887,892-93,941. But these attempts to hedge against price declines instead produced as Defendants knew they would if current volatility tends continued, large losses rather than the gains that could have offset other losses. *See* the table of losses in sub-point "a" above.

17.  The SEC provides that the prospectus is the most important disclosure document and requires that the Principal Risks portion of the prospectus summarize the risks and the circumstances that are likely to cause losses.  The prospectus is the most important document for mutual funds and must contain all "essential" information. ¶¶4,27-39,50,131,269-275;A-888,894-98,902,926-27,992-

95.  The Principal Risks portion of the Prospectus part of the Registration Statement is where the SEC requires issuers of securities to summarize the important risks of loss, and the circumstances in which losses are likely to occur. ¶¶27,88,91,99,131-32;A-894,915,917,926-29.  SEC Form N-1A, General Instructions, p. 7 and Item 4, 17 C.F.R. § 274.11A; SEC Forms S-1 and S-3;*see* Regulation S-K, Item 503, 17 C.F.R. §229.503.

18.  Plaintiffs alleged that Defendants should have disclosed the Inherent Facts and the Materialization Facts in the Principal Risks portion of the registrations.

19.  **By not disclosing the Inherent Facts and the Materialization Facts, Defendants grew their ETFs to $20,000,000,000 in shares outstanding**. ¶¶7,126;A-888,925.  Because the amount of Defendants' fees is based on the amount of ETF shares outstanding, Defendants were able to generate $500,000,000 in fees after their successful sales of their ETFs. ¶¶7-8,126;A-888,925.

**Large investor losses in the latter half of 2008 and part of 2009**.  But the undisclosed facts and continued excess daily index volatility circumstances caused investors to suffer large losses.  ¶¶15-17,22-23,26,54,133-136,213,250-52,259;A-890-94,903,929-30,977,988,990.  After Defendants had received large, life-changing amounts of fees, Defendants belatedly began, on the last day of the Class period, to reveal critical facts about the inherent characteristics of their ETFs.  ¶¶7-

8,289;A-888,998-99.  These disclosures (and more) should have been made in Defendants' first registration on August 30, 2006 and all subsequent ones.  These numerous belated new disclosures, while still incomplete, showed the various inadequacies and omitted facts in Defendants' disclosures during the Class Period.

20.  **Defendants' corrective disclosures**.  For the first time, Defendants began, on the last day of the Class period, to reveal critical facts about the inherent characteristics of their ETFs.  ¶8;A-888-89.  These disclosures (and more) should have been made in Defendants' first registration and all subsequent ones.  These belated new disclosures, while still misleading, included those at Facts Par. 179-232;A-966-83:

a. In a July 31, 2009 Amendment No. 16 to the ProShares Trust I Registration Statement at p. 410, Defendants belatedly acknowledged that "[t]he greater the volatility, given a particular index return, the greater the downside deviation will be of a fund's longer-term performance from a simple multiple (*e.g.*, 3x, -3x) of its index's longer-term return. ¶180;A-967.  As shown in the first example, it is even possible that a fund may move in the **opposite** direction as the index." [emphasis supplied]¶181;A-967.  This was the **first** time that Defendants stated that their ETF would move in the "opposite" direction of that which its name signified.

b. Defendants also disclosed in Amendment No. 14 to the ProShares Trust I Registration Statement dated June 23, 2009 that: "[i]n general, during periods of higher index volatility, compounding will cause longer term results to be less than three times (or minus three times) the return of the index. **This effect becomes more pronounced as volatility increases. Conversely, in periods of lower index volatility, fund returns over longer periods can be higher than three times (or minus three times) the return of the index.** Actual results for a particular period, before fees and expenses, are also dependent on the magnitude of the index return in addition to the index volatility." ¶183(emphasis supplied);A-967-68. This casually upset three years' worth of prior disclosures.

c. Defendants stated for the first time: "Daily objective leveraged funds if used properly and in conjunction with the **investor's views on the future direction and volatility of the markets can be** useful tools for investors...." ¶¶185-186;A-968-69 (July 31, 2009 Amendment No. 16 to Registration Statement, p. 410). These ho-hum, declarative sentences constituted a seismic shift in Defendants' presentation of their ETFs. For the first time, investors were now told that volatility was as important or more important than the direction of the index, to the ETFs' price movements. This confirmed that the names of the ETFs and the many prior statements were misleading.

d. In addition to creating volatility disclosures, Defendants also emphasized after the Class Period that holding for more than a day without (what Defendants called) rebalancing the portfolio created important risks.  For example, in the July 31, 2009 Registration Statement Amendment No. 16 at p. 410, Defendants stated for the first time that their ETFs were suitable for investors "…who want to manage their exposure to various markets and market segments **and who are willing to monitor and/or periodically rebalance their portfolios**." *Id*. at 410 (emphasis supplied); *see* ¶¶185-186;A-968-69.  The chilling "implied negative" of the above disclosure was the material fact that investors who did not know the undisclosed formula or otherwise could not "rebalance", should not even be investing in Defendants' ETFs.

e. Defendants also made the additional corrective disclosures alleged at ¶¶179-188;A-966-69, including those described at Arg. Pt. C4 *infra*.

Further facts, including facts relating to Defendants' "daily investment objective" and wedge graph statements, are developed in the Statement of Case and Argument.

## V.    STANDARD OF REVIEW

Dismissal of a complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) is reviewed de novo. *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

## VI.    SUMMARY OF ARGUMENT

The differences between the Inherent Facts (Facts Par. 14) and the disclosures here are greater, and the differences between the Materialization Facts (Facts Par. 15) and the disclosures here are much greater, than those which have sufficed to sustain material omissions in this Court's prior decisions. Arg. Pt. B - D *infra*. Likewise, the Inherent Facts are more material and the Materialization Facts are much more material than those which have sufficed to sustain materiality in this Court's prior decisions. *Id*. For these core reasons, the Decision must be reversed.

Defendants' multiple new corrective disclosures belatedly made on the last day of and after the Class Period not only reinforce the foregoing conclusions. They impliedly confirm that Defendants themselves realized that their prior disclosures had been woefully insufficient and had omitted the newly disclosed material facts. Facts Par. 20. Further, if Defendants were going to belatedly disclose all of these important facts **after** the high index volatility conditions had subsided, then such facts were clearly more material and more needed to be disclosed when the high volatility conditions existed and before then. Arg. Pt. C *infra*.

The Decision erred as a matter of law by excluding from the Decision's consideration of whether the Defendants' registrations were misleading,

Defendants' positive statements about holding for various times between one year and ten years, including Defendants' alleged misleading statements. Arg. Pt. B *infra*. Separately, the Decision erroneously reasoned that, because the placement of the misleading statements was not immediately adjoined to the daily investment objective statement, they should be demoted from consideration. The Decision likewise erred by failing to consider that the Principal Risk portion of the prospectus is the most important portion of the registration, *not* one that should be disregarded.

Not only did the Decision erroneously demote what it should have promoted to the highest level. *See* above. The Decision also erred by promoting to the highest level the buried SAI disclosures that the Decision should have demoted or found to be in violation of SEC requirements. Thus, the Decision erred by relying, from September 2007 forward, exclusively on ProShares Trust statements that were made only in the SAI. The Decision further erred by failing to express consideration of Plaintiffs' arguments that important facts required to be disclosed in the prospectus, may not be submerged in the SAI. If the inferences that Defendants now rely on to have disclosed the important risks that caused billions of dollars of losses truly arose from the statements in the SAI (and Plaintiffs dispute that any such inferences arose from the SAI statements), then the Decision should have found that ProShares Trust **blatantly** violated SEC disclosure rules.

When the foregoing errors, and the facts and issues that the Decision failed to consider, are corrected and considered, the following is clear.

**Materialization Facts**.  The Materialization Facts were not disclosed in the slightest by Defendants' daily investment objective or wedge graph statements.

**Inherent Facts**.  Contrary to the Decision, the pre-September 2007 registration statements' disclosure of a "daily investment objective" and possible significant divergence from perfect correlation, involved an obviously different subject matter, probability of loss, magnitude of loss, and far less investor useful information than did the Inherent Facts.  Arg.  Pt. B3; *Hunt v. Alliance N.Am. Gov't Income Trust Inc.* 159 F.3d 723(2d. Cir. 1998) (the subject matter of the risk was distinct from what had been disclosed).

The imminence and large magnitude of the Inherent Facts, and the circumstances in which they would arise, particularly in the short term, were not disclosed at all by the wedge graphs.  Arg. Pt. C *infra*.  The misleading shortcomings and omissions in the wedge graph were each addressed (if not entirely remedied), by Defendants' multiple corrective disclosures on and after the last day of the Class Period. *Id*.

The Decision also erred by finding implausible Plaintiffs' allegations that Defendants knew that, if current circumstances continued, losses (including large losses) necessarily would soon result.  Arg. Point D *infra*.  Far from requiring

"clairvoyance", these losses arose from actual market conditions of which Defendants were extremely well aware. *Id*.

Thus, Defendants' disclosures did not render the undisclosed facts "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985); *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) ("*Operating Local 649*"); Arg. Pt. "B"-"D".

## VII.  ARGUMENT

### A. **Standards**

#### 1.  **FRCP 8(a) and 12(b)(6)**

Plaintiffs' complaint alleges sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility is factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556.  **Even if** the Defendants' requested ultimate inference is **more** plausible than Plaintiffs', dismissal must still be denied if Plaintiffs' allegations raise a plausible inference of Defendants' liability.  *Anderson News, LLC v. American Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012).

As before *Twombly*, accept all factual allegations as true, draw all reasonable inferences in Plaintiffs' favor, and construe the complaint in the light most favorable to Plaintiffs.

Because Plaintiffs do not plead any claim sounding in fraud, "short and plain statement" notice pleading standards of Fed. R. Civ. P. 8(a) apply. The Decision resolved the motion under FRCP 8(a). Decision, pp. 2-3;SPA-2-3.

### 2. The Purpose Of The Section 11 Claim And This Court's Decisions Imposing A "Minimal" Pleading Burden To State A Section 11 Claim.

In order to respond to the Great Depression and deleterious consequences of the 1929 stock market crash, Congress did not choose to prohibit stock markets or investments. Instead, Congress chose to impose a philosophy of useful disclosure, sometimes called *caveat venditor* or "seller beware." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994). Thus, issuers of securities are required, in order to sell securities to the public, to file with the SEC a registration statement describing the risks of investing in those securities. *See* Section 5 of the Securities Act, 15 U.S.C. §77e.

Specifically, the registration statement (a) must make a presentation on each of the subject matters required by the SEC for the particular type of securities issuance, and (b) must further disclose any further information required to make the statements made not misleading. Complaint ¶30;A-894-95; 17 C.F.R.

§230.408(a) (same); *DeMaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003)

("*DeMaria*")(same) c*iting to* 17 C.F.R. §230.408.

In order to deter and provide redress for misleading statements in registration statements, Congress enacted Section 11 of the Securities Act.  It provides a private claim for persons who suffer losses from purchasing pursuant to a registration statement "any part" of which contains the following.

> In case any part of the registration statement … contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . [may sue the issuer, directors of the issuer and other signatories of the registration statement].

15 U.S.C. §77k(a).  Consistent with the unqualified "any part" language of Section 11, this Court's jurisprudence has repeatedly reasoned that an omitted fact or a misleading presentation includes those presentations of facts that are either "submerged,"[5] "slighted,"[6] "buried,"[7] or "obscured."[8] Still, in evaluating whether a presentation is misleading, this Court has repeatedly reasoned that the registration statement "as a whole" should be considered.  *E.g., DeMaria,* 318 F.3d at 180. Also, where presentations in the registration are mandated by the SEC, the registration statement must

---

[5] *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (1991).
[6] *Id.*
[7] *DeMaria v. Anderson*, 318 F.3d at 180.
[8] *Greenapple v. Detroit Edison Co.,* 618 F.2d 198, 205 (2d Cir.1980).

add any further facts necessary to make the presentations not misleading.

*DeMaria,* 318 F.3d at 180.

The Supreme Court and this Court have adopted low standards for

Section 11 liability:

> Section 11 of the 1933 Act…. was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.  **If a plaintiff purchased a security issued pursuant to a registration statement, he [or she] need only show a material misstatement or omission to establish his *prima facie* case.**

[Emphasis added] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82

(1983).

> "So long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, the general rule [is] that an issuer's liability ... is absolute."

*Litwin v. Blackstone Group*, 634 F.3d 706, 715-716 (2d Cir. 2011) ("*Litwin*")

(internal citations omitted).

Section 11 claims "'place[] a relatively minimal burden on a plaintiff,'

requiring only that the plaintiff allege that he purchased the security and that the

registration statement contains false or misleading statements concerning a

material fact.'" *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201

(E.D.N.Y. 2000)(quoting *Herman & MacLean*, 459 U.S. at 381-82).  This Court

recently held that where, as here,

> "…the principal issue is materiality, an inherently fact-specific
> finding, the burden on plaintiffs to state a claim is even lower."

*Litwin,* 634 F.3d at 718.

> ### B.   The Undisclosed Facts Here Are Much More Material, And The Difference Between Those Facts And The Disclosures Are Much Greater, Than That Which Has Sufficed To Sustain Material Omissions In This Court's Prior Cases

The Decision found:

> However, the registration statements at issue stated in plain English
> that the ETFs' objectives were daily only, that it was mathematically
> impossible for the ETFs to achieve their goals for periods longer than
> one day, and that the ETFs' value could "diverge significantly" from
> the underlying index when the ETFs were held for longer than one
> day.  This was the precise risk that the plaintiffs allege later
> materialized: the plaintiffs held the ETFs for long periods of time
> beyond one day, and their value diverged significantly from the
> expected daily result causing large losses.

Decision, pp. 17-18;SPA-17-18.  The subject matter, the investor-useful disclosure

of circumstances, and the magnitude and probability of loss provided by the

Inherent Facts and Materialization Facts are much different from those provided by

the "daily investment objective" and "may diverge significantly" disclosures relied

upon by the Decision.  *See* sub-point "3" *infra*.  First, though, the Decision erred

by excluding from consideration or failing to consider important facts.

> ### 1.   The Decision Erred By Eliminating The Most Important Alleged Representations In The Registration Statement

**From The Decision's Considerations Of What The
Registration Statement Meant To A Reasonable Investor**

The Decision did not analyze any of Plaintiffs' allegations that Defendants' statements were misleading. Decision, *passim*;SPA-1-26, *passim*. This includes Defendants' numerous statements about the positive results of holding Defendants' ETFs for periods of one year, three years, five years and ten years. ¶¶29,101-102,148,170-74,A-894,918-20,940,955-58. The Decision specifically failed to mention or analyze Defendants' repeated, prominent misstatements and line graphs showing the Principal Risks as being a 0.6% - 2.2% deviation from perfect annual correlation resulted in "downtrending," "uptrending" or "trendless" market. *Id*.

The Decision expressed two reasons for not considering these representations. First, they were not made immediately adjacent to the daily investment objective statement.[9] Fairly read, though, the Decision did not find that the statements were submerged or buried. In all events, these particular allegedly misleading statements were made in the most important part of the registration statements, the Principal Risks portion of the Prospectus. *Decision* at 20-24;SPA-20-24; Facts Par. 6**.**

Second, the Decision reasoned that such statements

---

[9] As Plaintiffs argued, if Defendants placed the wedge graph in the prospectus for the few Proshares Trust II ETFs issued during late 2008 - 2009, Defendants should have placed such wedge graph in the Proshares Trust prospectus as well.

> were included pursuant to SEC requirements.  The plaintiffs point to
> no case that holds information that the SEC requires must be
> specifically identified, qualified, or tempered.

Decision, p. 20;SPA-20.  Respectfully, Plaintiffs did cite repeatedly to the

unqualified language of Section 11, to this Court's *DeMaria* decision, and (once)

to the SEC disclosure rule, 17 C.F.R. § 230.408, on which *DeMaria* relied. *See*

*oral argument transcript,* 41:8-41:20 D.E. 207. They each require that any and

every presentation of information in the registration statement must add the facts

necessary to make the presentation on it not misleading; this would include, in the

Decision's words, information "to qualify or temper" the presentation.  The

Decision stood Section 11 and the disclosure philosophy of the federal securities

laws on their heads, by excluding from the total mix of information allegedly

misleading statements because they may have been made in the SEC-mandated

sections of the registrations.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450

(1976).

### 2.    The Decision Erred By Failing To Consider The Corrective Disclosures And SEC Rule Violations.

This Court and lower courts in this Circuit have repeatedly held that post-

class period statements,[10] especially corrective disclosures to a registration

---

[10] *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any
information that sheds light on whether class period statements were false or
materially misleading is relevant.").

statement made in subsequent registration statements, are pertinent to whether the

disclosures during the class period were adequate[11] or other elements are

sufficiently alleged.

The corrective disclosures belatedly for the first time

(a) disclosed a semblance of the investor useful circumstances when daily

index volatility had affected the results of the ETF (¶¶179-88;A-967-69),

(b) promoted index volatility to a higher or equal status as index

performance in the reasons for considering an investment (¶¶ *Id.*),

(c) stated that investors who did not know how to "rebalance," which was

not defined, were not suitable to purchase Defendants' ETFs at issue (¶¶ *Id.*), and

(d) warned that divergences could and would happen in as little of a matter

of days. *Id.*

Also, *see* "C4" *infra* (describing further corrective disclosures in the wedge

graphs). Thus, the high number, the new substance, and the multiple aspects of the

corrective disclosures changed the total mix of information in the registrations for

the reasonable investor with respect to: the necessity, quickness and size of **losses**

---

[11] *Fadem v. Ford Motor Co.*, 352 F.Supp.2d 501, 509 n. 5 (S.D.N.Y. 2005)
(relying on *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F.Supp.
326, 331 n. 7 (S.D.N.Y. 1996); *In re Vivendi Universal, S.A. Sec. Litig.*, 381
F.Supp.2d 158, 181 (S.D.N.Y. 2003); *In re TCW/DW N. Am. Gov't Income Trust
Sec. Litig.*, 941 F.Supp. 326, 331 (S.D.N.Y. 1996) (the court found that the
consequences of extension risk, which were "clearly articulate[d]" in the later-filed
post-class period prospectus, constituted a material omission and should have been
disclosed in the earlier prospectus at issue).

(not just downward divergence from perfect correlation); investor useful

circumstances, investor suitability, the need to "rebalance" (*see* p. 54 *infra*), and

other important facts.

Reasonable investors very much would have liked to know the corrective

disclosures *before* the billions of dollars in losses in late 2008 rather than *after*.

Further, if Defendants were making all these disclosures in their registration

statement *after* index volatility had greatly subsided and returned to pre-June 2008

levels, then a reasonable juror could find that, as Plaintiffs alleged, Defendants

clearly should have been making such disclosures from June 2008 forward when

the high volatility conditions existed.  In reality, Defendants should have made

such disclosures from the inception of their ETFs in August 2006.

### b.    Defendants' Failure To Have A Separate Principal Risk For Excess Daily Index Volatility, Violated SEC Disclosure Requirements.

As extensive as Defendants' corrective disclosures have been, they have

been made under a cloud of investor complaints and litigation.  Plaintiffs have

alleged that Defendants have always been required to have included a separate

"Principal Risk" factor in their prospectus for excess daily index volatility.  Facts

Par. 1, 17; ¶¶22-24,27-31,54,180,189,217-18;A-892-94,903,969,977-78.  "Loss"

has a special place under the securities laws, and risks of losses, especially rapid

and large losses, are required to be disclosed as principal risks.  *Id.*; *See, e.g.*, *SEC*

*v. Tecumseh Holdings Corp.*, 765 F.Supp.2d 340, 353-54 (S.D.N.Y. 2011) (defendants found liable for false and misleading statements for making only generic investment risk warnings when defendants should have disclosed they had been operating at a loss, but no such disclosure was made in the "Risk Factors" section of the prospectus).

> **3.    The Decision Otherwise Erred By Finding That General Statements About Daily Investment Objective Sufficiently Disclosed To A Reasonable Investor The Material Facts Here**

### a. Materialization Facts

The Decision did not find that the daily investment objective, and related disclosures, tipped off investors to the Materialization Facts.  Decision *passim*.  Any such finding would have been clearly erroneous.  Instead, the Decision addressed the Materialization Facts in other ways.  *See* Points C-D *infra*.

> **b.    The Subject Matter, The Probability, The Magnitude And The Investor Useful Circumstances Involved In The "Diverge Significantly" Disclosure Are Much Different From Those Involved In The Inherent Facts.**

"Diverge significantly" is not a **synonym** for "loss."  Instead, "diverge significantly" refers only to outperforming or underperforming the result involved in a perfect correlation.  Its subject matter, strictly speaking, is also a mixed subject matter.  It may be better than a perfect correlation, or it may be worse.  Its subject matter is NOT, "precisely" or otherwise, even an underperformance.  *Contrast*

Decision, p.7-8,17-18,21-22;SPA-6-7,17-18,21-22.  Much less is its subject matter, precisely or otherwise, a "loss".  *Id.*  Its subject is, firstly, that either a putative gain or putative loss could be made larger or smaller.  It **could**, conceivably, mean that a small loss could be turned into a small gain, and vice versa.  But it actually does not go so far as to speak to "losses" or "gains."[12]

More obviously, "diverge significantly" does not include **mandatory** losses. Nor does it speak to **large** losses nor **rapid** losses.  But, the foregoing are the subject matter of the Inherent Facts.  For this reason alone, the Decision erred in finding, contrary to the Complaint, that the "may diverge significantly" language and associated statements disclosed, "precisely" or otherwise, the Inherent Fact. *See Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728-29 (2d Cir. 1998) ("language contained in the prospectus does not necessarily foreclose liability because *it warned investors of a different contingency than that which plaintiffs allege was misrepresented*.  The prospectuses warned that the Fund's hedging maneuvers might fail, not that the Fund would have no opportunity to use hedging maneuvers.  *Plaintiffs allege the prospectuses were misleading as to the latter*.")[emphasis supplied]; *Operating Local 649,* 595 F.3d at 86 (correctly disclosing the overall amount of the fee was a different subject matter from and did

---

[12] They depend first upon whether the investor is right about the market and by how much.  And it clearly does not indicate that significant losses could be turned into significant gains or vice versa.

not disclose the investor-useful information of the breakdown of the sharing of the fee and whether the mutual fund manager earned its share of them).

The Decision similarly erred by apparently recharacterizing Plaintiffs' allegations as being focused on **any** losses from investing for more than a day. [13]

Next is the utility and usefulness to the investor. The subject matter of the statement that results "may diverge significantly" up or down from perfect correlation, does nothing to disclose to the investor the circumstances in which even a downward divergence (let alone a loss), as compared to an upward divergence, will occur. Much less does it tell the investor when a loss will necessarily soon occur. But disclosing the omitted facts does usefully provide the circumstances in which such a loss will definitely occur, *i.e.,* the subject matter that is useful to investors. For this reason as well, the Decision erred in finding that the generalized statement was the same as the specific omitted facts.

The probability of loss and the magnitude of loss involved in the Inherent Facts are each much different from those in "may diverge significantly" from a

---

[13] *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ("First, the Complaint alleged that the facts not disclosed were problems. The court's view that the facts may not really have been problems was not so much a ruling as to the adequacy of the pleading as it was an evaluation of the materiality of the nondisclosures. Materiality is a mixed question of law and fact… Even if the court itself had felt that the facts characterized by the Complaint as adverse were clearly *not* problems (which is farther than the court went), it could not properly, on this Complaint, determine as a matter of law that reasonable minds could not differ as to whether the undisclosed facts would be important to a reasonable investor.")

perfect correlation.  As described above, the latter involves an equally probable over-performance or underperformance; the former provides a definite loss. Because of the great difference in the probability of loss involved, the Decision further erred in finding that the general statement was precisely otherwise the same as the omitted material facts. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d Cir. 2001) ("As materiality in such a circumstance is determined by considering both the probability of an event and its potential magnitude, a relatively improbable event of sufficient magnitude could potentially be material, *since a fact finder might find it likely to have been viewed by a reasonable investor as significantly altering* the total mix of information available.") (emphasis supplied).

Similarly, the magnitude of the loss involved in the Inherent Facts (expressly warning that the losses may potentially be large losses), is much greater than that implied by "may diverge significantly" from perfect correlation.  *See Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) ("We have little difficulty concluding that Panther has adequately alleged that the **disclosures concerning a problem of this magnitude were inadequate** and

failed to comply with [prospectus risk factor disclosure requirements]") (emphasis supplied).[14]

*__Direxion__*.  The Decision did not find that there were less "contraindicating" factors here than in *Direxion*.  Instead, the Decision relied upon the placement of the contraindicating statements to exclude them from consideration.  Decision pp. 19-20.  This rationale was erroneous.  *See* "B.1" above.  *Direxion's* prominent line graph showing a 36% annual deviation shows far less contraindication than Defendants' repeated prominent statements about 0.6%-2.2% annual deviation.  But, this "contraindicating factor" vocabulary relates only to determining the degree of risk disclosed, not to any (non-existent) binary choice either to day trade or to avoid the ETF altogether.

### C.    The Wedge Graphs And Associated Text Did Not Render The Materialization Facts Or Inherent Facts So Obviously Unimportant As To Be Found Immaterial At The Pleading Stage

The Decision failed to express consideration of the substance of any of Defendants' one year, three year, five year, or ten year presentations that were in the ProShares Trust prospectus, including the misleading ones concerning "greater

---

[14] The Decision mistakenly relied on the vacated decision of the District Court as support for its finding that Defendants need not have disclosed the magnitude of the risk.  SPA-9-10, Decision at *9-10, citing *Panther Partners Inc. v. Ikanos Communications, Inc*., 538 F.Supp.2d 662,664 (S.D.N.Y. 2008), *vacated and remanded*, 681 F.3d 114 (2d Cir. 2012).

or less" than, and 0.6% - 2.2% divergence from, perfect annual correlation.

*Compare* ¶¶37-38;A-897-98 *with* Decision *passim*.  But the Decision did express

consideration of, and chose to rely heavily on, the substance of a one year

presentation that involved a few numerical entries made in wedge graphs that

related to **and only to** the results of **holding the ETF for one year**:

> the wedge graphs, which appeared in all of the registration statements **after September 28, 2007**, **illustrate graphically** the exact "must lose" scenarios that **form the crux of the plaintiffs' claim**, specifically that at **high enough** levels of volatility an ETF investor who holds shares **for a longer period of time** may experience **significant losses** even when the investor has correctly guessed the direction of the underlying index.

Decision, p.22 [emphasis added]; SPA-22.

### 1.    <u>Pre-9/28/07 Purchases</u>.

The wedge graphs disclosed nothing to pre-September 28, 2007 purchasers

because they were not used until that date.

### 2.    **By Burying The Wedge Graphs In The Statement Of Additional Information, The ProShares Trust Defendants Omitted To State Material Facts In Violation Of SEC Requirements**

The ProShares Defendants argued that the tip-off inferences of the risks

which caused billions of dollars in investor losses, arise from the wedge graphs

buried in their Statement of Additional Information.  ¶¶37-38,41,44,47,62,83-

88,91,218,232;A-897-901,905-06,914-15,978,983.[15]  Plaintiffs disagree that the

wedge graphs give rise to such inferences.  *See* sub-points "3" – "5" *infra*.

Defendants violated SEC requirements by failing to disclose, in the

"principal risks" portion of the prospectus, the Inherent Facts and the

Materialization Facts.  Facts Par.1; A-894,¶¶27-28; See also ¶50;A-902 ('buried

facts' not stated in the Prospectus may not be incorporated by reference into the

Prospectus when such facts were originally required to be in the Prospectus");

¶216;A-977; ¶¶43-44, 47,50,54,131(c),188,216-18,228-229,271-274;A-899-

903,926-27,969,980,993-95 (ProShares buried information in the SAI, and the

location of so-called wedge graphs was important because they were buried in the

Statements of Additional Information and excluded from the prospectus for the 38

ETFs issued by ProShares Trust).

But the Decision failed to express any consideration of Plaintiffs' foregoing

arguments.  Decision *passim*.  The ProShares Trust Defendants were required to

disclose information in the "Principal Risks" portion of the prospectus part of their

registrations, not the SAI.  SEC Form N-1A and 17 C.F.R.§230.421, *accord, e.g.,*

---

[15] These tables **were** presented by Proshares Trust II in its prospectus.  ¶188; A-
969.  They appeared after the one-year graphs and prominent statements
emphasizing greater or less results than, and 0.6% - 2.2% annual deviation from,
perfect correlation. *Id.,* p.20;SPA-20.  As Plaintiffs argued, if Defendants placed
the wedge graph in the prospectus for the few ProShares Trust II ETFs issued
during 2008, Defendants should have placed such wedge graph in the ProShares
Trust prospectus as well. ¶¶37-38,41,44,47,62,83-88,91,218,232;A-897-901,905-
06,914-15,978,983.

*In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 363 (2d Cir. 2010)(Form N-1A requires prospectus disclosure of those risks "to which the Fund's particular portfolio as a whole is expected to be subject"); *In re Oppenheimer Rochester Funds Group Sec. Litig.*, 838 F.Supp.2d 1148 (D.Colo. 2012)(inverse floaters' leverage ratio inadequately disclosed by requiring calculation of data found at page 132 of SAI); *see In re Charles Schwab Corp. Sec. Litig.*, No. 08-1510, 2009 WL 1371409 (N.D.Cal. May 15, 2009). Unlike the prospectus, the SAI is required to be provided to investors, but is made available only upon request.

The SEC has promulgated detailed regulations regarding the disclosure requirements for mutual funds. Among other things, such companies must file a registration statement and prospectus with the SEC that contains a prospectus summarizing the Principal Risks. See SEC, Form N-1A Registration for open-end management companies (2007), *available at* http://www.sec.gov/about/forms/formn-1a.pdf. The prospectus is the document provided to potential investors.

The prospectus is considered by the SEC to be the "most complete source of information about a fund" and serves as "a fund's primary disclosure document." Registration Form Used By Open-End Management Investment Companies (Mar. 23, 1998) (codified at 17 C.F.R. pt. 230), *available* at 1998 WL 123859. Per SEC

49

regulations, the prospectus contains only "information that is *necessary* for an average or typical investor to make an investment decision," and "focus[es] its contents on information that is *essential* to an investment in the fund." *Id.* (emphasis added). These regulations demonstrate that the SEC considers it to be of overriding importance that investors be accurately informed of the Principal Risks in the prospectus.

Proshares Trust omitted to include in the Principal Risks portion of the ProShares Trust prospectus, what Defendants claim to be the information that permits inferences of the "essential" facts. Instead, Proshares Trust buried same in the Statement of Additional Information. Therefore, the Proshares Trust Defendants "omitted to state a material fact required to be stated", within the meaning of those terms in Section 11.

### 3. The Decision's Inferences And Findings Of What The Wedge Graphs Showed, Are Erroneous Because They Failed To Consider The One Year, Three Year, Five Year And Ten Year Presentations

The Decision made its wedge graph findings that were contrary to the Complaint, based on a pre-discovery vision that excluded the other one year, three year, five year and ten year tables. This unbalanced focus violated controlling law. *DeMaria,* 318 F.3d at 180. This is especially true as to ProShares Trust registrations. The EXCLUDED statements were made in its prospectus. But the

only statements the Decision considered, were wedge graphs "submerged" in

Proshares Trust's SAI.

If a pre-discovery materiality determination were to be attempted, it needed

to consider and be based on the alleged misleading statements in the ProShares

Trust prospectus, and exclude the SAI information altogether.  *Id.*  For this reason

alone, the Decision's findings regarding the wedge graphs are in error.

Alternatively, the Decision should at least have considered the net meaning or

import of the totality of the other presentations **and** the wedge graph.  *DeMaria*,

318 F.3d at 180.

> **4.    The Decision Failed To Consider Plaintiffs' Allegations That The Wedge Graphs Were Materially Amended After The Class Period So As To Begin To Indicate Both That Losses Would Occur From Short-Term Excess Daily Index Volatility, And The Large Magnitude Of Annual Losses At The Actual Levels Of Volatility That Had Existed During The Class Period**

> **a.    Daily And Short-Term Volatility Meant Rapid Losses**

The wedge graphs were accompanied by one benign textual example[16] and

were multi-column matrices of multiple horizontal rows of **ANNUAL** performance

numbers, vertical rows of **ANNUAL** volatilities up to 40%, with 153 total outcome

for each level.  In the multiple rows of 153 numbers included in each of the three

wedge graphs, there were only a very few numerical presentations from which it

---

[16] Sept. 28, 2007 Registration Statement, Statement of Additional Information, p. 17 (excerpt)) (D.E.165-1, Robert Skinner Decl., Ex. 1, p. 11);A-504.

could be inferred that, **for a one year holding period**, the rhythms of Defendants'
undisclosed mathematical formula would produce losses when the investor had
been right on the market and the index had a low annual performance.[17] But even
these few entries failed to address or indicate the fact that excess actual **day-to-day
index volatility** over index performance could cause divergence and losses in the
short term. ¶¶225,227,239;A-979-80,985.

Historical volatility, historical average volatility, and annual volatility --- all
of which Defendants referred to in their SAI --- were simply **not** what guided
Plaintiffs' establishment of positions or investments for each ETF. ¶¶266-268;A-
992. In fact, losses from a correct judgment about the market could (and did)
occur quickly in a matter of weeks or months if such judgment was acted upon
through an investment in Defendants' ETFs in excess **day-to-day index** volatility

---

[17] **ProShares Ultra ETFs (2x)** had 153 data entries, and **only two show annual
opposite movement**, and then at very low loss rates: at an annual index
performance of 5%, an Ultra investor would lose 2.5% at a 35% annual volatility
rate and 6.1% at a 40% annual volatility rate. ¶¶26(a)-(b),34-39, 47(e), 157(e),
169(e), 178, 206-10, 217;A-893-94,896-98,900-01,946-47,954-55,961-966,975-78.
The **ProShares Inverse ETFs (-1x)** table had 153 data entries, and **only six show
annual opposite movement**, again at very low loss rates. ¶¶26(a)-(b),34-39, 47(e),
157(e), 169(e), 178, 206-10, 217;A-893-94,896-98,900-01,946-47,954-55,961-
966,975-78. The **ProShares UltraShort ETFs (-2x)** had 153 data entries, and
**only eleven show opposite movement**. ¶¶26(a)-(b),34-39, 47(e), 157(e), 169(e),
178, 206-10, 217;A-893-94,896-98,900-01,946-47,954-55,961-966,975-78. Out of
**459 data points** provided in the three "wedge graphs," **only 19 data points (or
only 4.2%) show opposite movement**; most at low levels. ¶¶26(a)-(b),34-39,
47(e), 157(e), 169(e), 178, 206-10, 217;A-893-94,896-98,900-01,946-47,954-
55,961-966,975-78.

circumstances. ¶¶16-18,22-26,32-33,41,44-45,47,52(d),123-126,132(j),157-159,169(e),178-180,196-198,218,225,227, 262;A-890-96,898-903,925,929,946-47,955,961-67,972,979-80,991.[18]   But Defendants did not explain in the wedge graph (or anywhere else) until their corrective disclosures (a) that annual volatility was not determinative, (b) that their ETFs' returns could diverge in two days, and (c) that quick, potentially large short-term loss would soon occur if **day-to-day** volatility was significantly higher than index performance.  ¶¶52(f),123,225;A-902-03,925, 979.  *Contrast*, SEC Form N-1A, Item 4.

During the Class Period, Defendants failed to provide any guidance (a) as to how the rhythms of Defendants' mathematical formula worked over periods of less than a year (¶218;A-978[19]) and (b) as to how any estimation of performance for any specified period of time less than a year could be interpolated or otherwise guestimated from the annualized numbers contained in the multiple columns.  ¶218;A-978.

---

[18] Whatever **annual** volatility leavened out to, was irrelevant to whether large losses were sustained in the first, weeks or months of the investment.  ¶¶101-02,170-74;A-894,918-20,955-58..  If they were sustained, an investor could not keep holding for a year.  *Id.*

[19] It bears noting that if an investor had guessed that 1/365 of the annual deviation would have occurred each day or that 1/12 would have occurred each month or that 1/2 would have occurred each 6 months, these inferences would have all been underestimates and wrong under Defendants' formula.)

Thus, Defendants themselves belatedly corrected, after the Class Period, the textual presentation accompanying the wedge graphs so as also to add the new disclosure of the following previously undisclosed facts:

> … "A one year period is used for **illustrative** purposes only. [i.e., annual volatility is not what drives the rhythms of Defendants undisclosed mathematical formula] Deviations from the index return times the fund multiple can occur over **periods as short as two days**."

July 31, 2009 Amendment No. 16 to Registration Statement, p. 407 (emphasis supplied). ¶185;A-968.  Defendants earlier had simply presented the wedge graph columns of numbers **solely** in terms of a **one year** holding period.  ¶¶34,44,102,188,216,218;A-896,899-900,918-20,969,977-78.

Further refuting the notion that annual presentations were adequate, Defendants made other, similar corrective disclosures.  *See* Facts Par. 20.  If, as here, Defendants were not going to disclose the consequences of their mathematical formula, then the SEC encourages the issuer of mutual fund securities to describe the persons who may be suitable to use their ETFs. Defendants did that.  ¶186.  They disclosed for the first time that: (1) index volatility is so important to the way that Defendants' ETFs operate, that the investor must also form a view on index volatility (in addition to forming a view on index performance) in order to invest in Defendants' ETFs; and (2) even then,

the ETFs are only suitable for investors who know how to "monitor and rebalance" their investment. ¶¶186-188;A-968-69.

### b. The Large Magnitude Of The Short Term Losses

Third, Plaintiffs alleged that, until Defendants' corrective disclosures after the Class Period, the wedge graphs failed to disclose the important, large magnitude, from even the annual volatility levels in excess of 40% index volatility. ¶¶26(c),44-45,52(f),98, 127,132-136,157,169,177,216-220,249-252, 266-268; *see* ¶138 (50% loss in two months);A-893,899-900,902-03,917,926-30,946-47,954-55,960,977-78,988,992.

From June 2008 forward, such high actual day-to-day index volatility levels of 45-99% were becoming increasingly common. ¶¶134-137;A-929-30. But, until their corrective disclosures after the Class Period, Defendants artificially maintained a 40% cap on the annual volatility in the wedge graph even though (a) current actual volatilities were far above that, and (b) it was current on-going actual volatility that determined short-term results. *See supra*. ¶¶26,44-45,134,219;A-893-94,899-900,929-30,978. Not until after the end of the Class Period, when volatility levels **had substantially subsided**, did Defendants finally alter their wedge graphs. They then showed for the first time that the high levels of losses from correct judgments about the market at **annual** levels of volatility of 40-100%. ¶¶44,188;A-899-900,969.

Limiting the wedge graphs to 40% volatility was improper in any circumstances. Facts Par. 10 (higher volatility had existed hundreds of times during 1978-2006 for oil, gold, silver and equities above). But limiting the wedge graph to 40% volatility from June 2008 forward was especially misleading because it clearly understated the risks **when current index volatility well exceeding 40% had actually materialized**. ¶¶22-23,26(c),44-45;A-892-94,899-900. As Defendants knew (but others not privy to Defendants' mathematical formula did not know), Defendants thereby *deprived the public of information that would be material to a reasonable investor about the magnitude of risks in the current market conditions*. ¶¶46,219;A-900,978.

These actual, existing higher levels of volatility, caused much more rapid losses and a much greater magnitude of losses because Defendants' undisclosed mathematical formula was geared to the **power** of the volatility. ¶¶119-25;A-924-25. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *In re Regeneron Pharms., Inc. Sec. Litig.,* No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2005) ("A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability pursuant to the bespeaks caution doctrine.") (citation omitted); *In re Initial Public Offering Sec. Litig.,* 358 F.Supp.2d 189,

211–12 (S.D.N.Y. 2004) (holding generalized warnings about potential problems with email system were not sufficient given allegation that email system was failing at the time of the offering); *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,* No. 99 Civ. 12046 (WHP), 2001 WL 300733, at *8 (S.D.N.Y. 2001) ("[W]arnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.").

### 5. The Decision's "Crux" Finding, Apparently Concedes That The Few Entries In The Wedge Graph Did Not Give Rise To Inferences Of The Foregoing Material Facts.

The Decision did not mention Plaintiffs' allegations that the wedge graphs were misleading.  But the Decision, as Plaintiffs read it, did not make findings, impliedly or otherwise, that a reasonable investor would have gone through operations of mind or made inferences to try to guess facts touching on each of the foregoing important omitted facts recounted above.

Even if the reasonable investor had discovered and committed to memory the few negative entries in the wedge graphs, the wedge graphs did not illustrate, "graphically" or otherwise, anything about the misleading omissions previously recounted above.   These include:

(a) the certainty and rapidity of short term losses;

(b) the large magnitude of losses;

(c) the fact that excess daily index volatility caused losses (and historical averages were irrelevant); and

(d) An investor would necessarily lose a substantial portion of their investment in a very short period of time, from a correct judgment about the market by purchasing Defendants' ETFs in the excess daily volatility circumstances existing from June 2008 forward. ¶¶47(e),138, 140,149-153;A-901,931-35,940-45.

Omitting all these material facts while burying some information in a few entries in a table (that was itself buried in the SAI for 38 of the ETFs), was helpful to sell $20 billion worth of ETF securities. But it was insufficient to render the omitted material facts so obviously unimportant as to be found immaterial at the pleading stage.

### D.  The Decision Erred By Finding Plaintiffs' Allegations of Knowledge Implausible

The Decision found:

The plaintiffs' assertion that ProShares knew in advance through a mathematical formula that large losses would occur is implausible. Whatever formula was used for the ETFs, it would necessarily rely on inputs from the underlying index or benchmark, and those inputs could not be known in advance. It is not a material omission to fail to predict future market performance.

*Decision at p*. 23;SPA-23. Respectfully, Defendants needed no "clairvoyance" or "prediction" to use the "data inputs" from current market circumstances to simulate

their continuation into the future.  ¶¶16,22-24,26-39,266-69;A-890,893-898,992. The materialized, actual circumstances --- which Defendants well knew --- were headed straight for the Honorable Milton Pollack's "Grand Canyon" metaphor.  *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (Pollack, J.) (fraud is committed by "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

From June 2008 forward, Defendants described in their continuously effective registrations the risks of holding their ETFs for more than one day.  But Defendants failed to say that the actual present course was necessarily headed for losses, potentially Grand Canyon losses, from even a correct judgment about the market.  ¶¶6,47,98,127,132;A-889,900-01,917,926,928-29; *Iowa Pub. Employees' Retirement Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (allegations regarding failure to disclose applicability of MF Global's risk-management system to employee accounts specified actionable material omissions of known present fact and "was ascertainable when the challenged statements were made"); *P. Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("Historical or present fact- knowledge within the grasp of the offeror- is a different matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same

time disclaim those misrepresented facts with cautionary language"); *see* also

*Litwin v. Blackstone Group, LP*, 634 F.3d 706, 718-719 (2d Cir. 2011) (the

particular known trend might have reasonably been expected to materially affect

defendant's investments).  *Id.* at 718-19.

This finding was erroneous.

## CONCLUSION

The Decision and judgment should be reversed and vacated.


**LOVELL STEWART HALEBIAN
JACOBSON LLP**


*/s/ Christopher Lovell*
Christopher Lovell
Victor E. Stewart
Ian T. Stoll
Benjamin M. Jaccarino
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

**ZAMANSKY & ASSOCIATES LLC**
Jacob H. Zamansky
Edward H. Glenn, Jr.
Kevin D. Galbraith
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Lead Counsel for Plaintiffs*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein (bernstein@bernlieb.com)
Sandy A. Liebhard (liebhard@bernlieb.com)
U. Seth Ottensoser (ottensoser@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
Brian Lehman (lehman@bernlieb.com)
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**GILMAN AND PASTOR, LLP**
Kenneth Gilman (kgilman@gilmanpastor.com)
Rene Potkay (rpotkay@gilmanpastor.com)
16 14th Avenue
Wareham, MA  02571
Telephone: (508) 291-8400
Facsimile: (508) 291-3258

**Wolf Haldenstein Adler Freeman & Herz LLP**
Mark C. Rifkin
Gustavo Bruckner
270 Madison Avenue
New York , NY 10016
212-545-4600
Fax: 212 545-4653
rifkin@whafh.com
Bruckner@whafh.com

**Pomerantz Haudek Block Grossman & Gross
LLP** Jeremy Alan Lieberman
100 Park Avenue, 26th Floor
New York , NY 10017
(212)-661-1100
Fax: (212)-661-8665
jalieberman@pomlaw.com

**Stull Stull & Brody**

James Elliot Lahm
6 East 45th Street, 5th Floor
New York , NY 10017
212-687-7230
Fax: 212-4902022
ssbny@aol.com

jlahm@ssbny.com


**Wolf Popper LLP**
Robert C. Finkel
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Fax: (212) 486-2093
*Additional Class Counsel*

**Ackerman, Link & Sartory**
Thomas R. Grady
Dana E. Foster
222 Lakeview Avenue
Suite 250
West Palm Beach, Fl 33401
(561) 838-4100
Fax: (561) 838-5305
trgrady@alslaw.com
afoster@alslaw.com

**Timothy J. Dennin, P.C.**
Timothy John Dennin
316 Main Street
Northport , NY 11768
(631) 261-0250
Fax: 631 261-0395
secatty@denninlaw.com

**Shalov Stone Bonner & Rocco LLP**

Ralph M. Stone
260 Madison Avenue, 17th Floor
New York, New York 10016
(212) 239-4340
Fax (212) 239-4310
www.lawssb.com

*Counsel for Individual Plaintiffs*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,155 words, excluding parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times Roman font.

Dated:  December 17, 2012                    Respectfully submitted,


*/s/ Christopher Lovell*

**SPECIAL APPENDIX**

**i**

## SPECIAL APPENDIX
## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable John G. Koeltl,
   Granting Defendants' Motion to Dismiss
   Plaintiffs' Third Amended Consolidated Class
   Action Complaint, dated September 7, 2012,
   Appealed From ...................................................... SPA-1

Clerk's Judgment That for the Reasons Stated in the
   Court's Opinion and Order, dated
   September 7, 2012, Defendants' Motion to
   Dismiss Plaintiffs' Third Amended Consolidated
   Class Action Complaint is Granted, dated
   September 12, 2012, Appealed From .................... SPA-27

United States District Court
Southern District of New York

───────────────────────────

09 Civ. 6935 (JGK)

IN RE PROSHARES TRUST SECURITIES          OPINION AND ORDER
LITIGATION

───────────────────────────

JOHN G. KOELTL, District Judge:

     This is a putative class action brought by a group of

investors (collectively, the "plaintiffs") in forty-four

exchange-traded funds ("ETFs") offered by ProShares.  The funds

have daily investment objectives tied to an underlying benchmark

index.  The plaintiffs assert securities fraud claims pursuant

to Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C.

§§ 77k & 77o.  Two plaintiffs also assert a breach of contract

claim under New York law.  The defendants—ProShares Trust,

ProShares Trust II, ProShares Advisors LLC, SEI Investments

Distribution Co., Michael Sapir, Louis Mayberg, Edward Karpowicz,

William Seale, Simon Collier, Charles Todd, Russell Reynolds,

and Michael Wachs (collectively, "ProShares")—have moved to

dismiss the plaintiffs' Third Amended Complaint pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure.


                              I.

     In deciding a motion to dismiss pursuant to Rule 12(b)(6),

the Court accepts the allegations in the complaint as true, and

SPA-2

draws all reasonable inferences in the plaintiffs' favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556,
566 (S.D.N.Y. 2007). The Court's function on a motion to dismiss
is "not to weigh the evidence that might be presented at a trial
but merely to determine whether the complaint itself is legally
sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985). The Court should not dismiss the complaint if plaintiffs
have stated "enough facts to state a claim to relief that is
plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S.
544, 570 (2007). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009). While the Court should construe the factual allegations
in the light most favorable to the plaintiff, "the tenet that a
court must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." Id.

When claims under Section 11 of the Securities Act "are
premised on allegations of fraud," they must also satisfy Rule
9(b) of the Federal Rules of Civil Procedure. Rombach v. Chang,
355 F.3d 164, 171 (2d Cir. 2004). Rule 9(b) requires that the
complaint "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state

2

where and when the statements were made, and (4) explain why the statements were fraudulent." Id. (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)). If they sound in negligence, however, claims under Section 11 need only satisfy the less rigorous requirements of Federal Rule of Civil Procedure 8(a). See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 718 (2d Cir. 2011), cert. denied, 132 S. Ct. 242 (2011); see also Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 402 (S.D.N.Y. 2011).

## II.

The following facts are undisputed unless otherwise noted.

SPA-4

## A.

The defendants ProShares Trust and ProShares Trust II (collectively, the "ProShares Trusts") are Delaware Trusts. (Third Am. Compl. ("TAC") ¶ 62.)  During the class period, which began on August 6, 2006, and ran through June 23, 2009, ProShares Trust operated as an open-ended investment company under Section 8 of the Investment Company Act, 15 U.S.C. § 80a-8, and was registered with the Securities Exchange Commission ("SEC").  (TAC ¶¶ 2, 62(a), 84.)  ProShares Trust II was organized on October 9, 2007 as a publicly-traded commodity pool, and was registered by 2008 with the Commodity Futures Trading Commission ("CFTC").  (TAC ¶¶ 62(b), 85.)  The ProShares Trusts offer for sale various ETFs, which are listed on the New York Stock Exchange.  (TAC ¶¶ 62(a), (b).)  The defendant ProShare Advisors LLC ("ProShare Advisors") serves as an investment advisor to the ETFs, and, among other things, exercises control over the ETFs' management and redemption.  (TAC ¶¶ 62(c)-63.) The individual defendants in this case were either officers or trustees of one of the entities during the class period, and signed one or more of the registration statements at issue in this case. (TAC ¶¶ 65-74, 90, 92.)  The defendant SEI Investments Distribution Co. is the distributor and principal underwriter for the ETFs.  (TAC ¶ 64.)

4

An ETF is similar to an indexed mutual fund.  It trades like a stock, and it often tracks a specific index, sector, commodity, or currency.  (TAC ¶¶ 81-82.)  Unlike mutual funds, ETFs generally sell shares directly to investors, and typically issue shares in large blocks called "creation units."  (TAC ¶ 82(a).)  Initial investors purchase creation units by exchanging a basket of securities similar to the type of securities being tracked by the ETF, or, less frequently, with cash.  (TAC ¶ 82(b).)  Investors may then split up the creation unit and sell shares of the ETF on a secondary market or may sell the creation unit back to the ETF at a later date.  (TAC ¶ 82(c)-(d).)

ProShares created and operated three types of ETFs: "Inverse ETFs," the goal of which was for the net asset value of the fund to replicate the inverse movement of a specific index over the period of one day; "Ultra Long ETFs," the goal of which was for the fund's value to double the performance of a specified index or benchmark over the period of one day; and "Ultra Short ETFs," the goal of which was for the fund's value to double the inverse of the performance of a specified index or benchmark over the period of one day.  (TAC ¶ 93.)  All three types of ETFs are leveraged, meaning that the mechanism through which they attempt to achieve their goal involves incurring debt through borrowing.  (TAC ¶ 93.)

**B.**

ProShares Trust filed its first registration statement on June 19, 2006.  (See, e.g., Skinner Decl. Ex. 1, at 1.) ProShares Trust II filed its first registration statement on November 17, 2008. (See, e.g., Skinner Decl. Ex. 2, at 1.)  The class period in this case begins in August 2006 and runs through 2009.  (TAC ¶ 2.)  The plaintiffs allege that 21 registration statements filed by ProShares Trust and 5 registration statements filed by ProShares Trust II contained material misstatements or omissions constituting a Section 11 violation. (Am Compl. Exs. A-B.)

The registration statements did include some material that attempted to explain the effects of investing in the ProShares ETFs for a period of greater than one day.  (See generally TAC ¶ 102.)  For example, the registration statements described, for each individual ETF, the fees associated with selling a $10,000 investment after a period of 1 year, 3 years, 5 years, and 10 years, at a 5% annual rate of return.  (See, e.g., Skinner Decl. Ex. 3, at 24.)

However, each registration statement filed by ProShares indicated in its overview, and throughout, that the ETFs' goals were to provide "daily" results matching the "daily" performance of a given index or benchmark. (Skinner Decl. Exs. 1-2; see also TAC ¶ 100.)  Each registration statement filed by ProShares

indicated that the ETFs' returns for a period of greater than one day would not, and could not, match the cumulative returns of the underlying index.  For example, it is undisputed that each statement explained that "[t]he Funds do not seek to achieve their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results."  (Skinner Decl. Ex. 1, at 4; Skinner Decl. Ex. 2, at 2-3.)  ProShares's registration statements also explained that "[o]ver time, the cumulative percentage increase or decrease in the net asset value of [a given ETF] may diverge significantly from the cumulative percentage increase or decrease" of the underlying index or benchmark.  (Skinner Decl. Ex. 1, at 5-6, 8; Skinner Decl. Ex. 2, at 4.)  ProShares's pre-September 2007 registration statements also explained that, "over time, the use of leverage, combined with the effect of compounding, will have a more significant impact on [a given ETF's] performance compared to the index underlying its benchmark than a fund that does not employ leverage."  (Skinner Decl. Ex. 1, at 8-9.)  In its September 28, 2007, registration statement, and thereafter, ProShares disclosed that "for periods greater than one day, the use of leverage tends to cause the performance of a [given ETF] to be either greater than or less than the index performance . . . ."

(Skinner Decl. Ex. 1, at 9-10; see also Skinner Decl. Ex. 2, at 5-6.)

Each of the registration statements specifically warned that the ETFs used techniques, like leverage, that could be considered "aggressive" and "speculative," and that these aggressive techniques "may expose [a given ETF] to potentially dramatic changes (losses) in the value of its portfolio holdings." (Skinner Decl. Ex. 1, at 14-15; see also Skinner Decl. Ex. 2, at 10-11 ("Financial instrument trading prices are volatile and even a small movement in market prices could cause large losses.").)

Each of ProShares's registration statements warned in some form that "[l]everage creates . . . the risk of magnified losses during adverse market conditions," (see, e.g., Skinner Decl. Ex. 1, at 14-15). Moreover, the prospectus to the first registration statement from June 26, 2006, explained that "volatility [in equity markets] may cause the value of an investment in a Fund to decrease." (TAC ¶ 225.) Beginning with the September 28, 2007 Registration Statement, ProShares disclosed in greater detail how "volatility" might negatively impact an ETF's performance. (Skinner Decl. Ex. 1, at 10-14; see also Skinner Decl. Ex. 2, at 6-10.) The post-September 2007 registration statements included so-called "wedge graphs," that graphically illustrate that, at high levels of index volatility,

an investor might bet correctly on the overall direction of the market and still experience double digit losses by holding the funds for longer periods.  (See, e.g., Skinner Decl. Ex. 1, at 10-13; Skinner Decl. Ex. 2, at 6-10.)  For example, the wedge graphs included in the Statement of Additional Information ("SAI") appended to the September 28, 2007 registration statement indicate that at high enough levels of volatility, the "Ultra Short ETF"—whose purpose was to return twice the inverse of the daily performance of an underlying index—a five percent decrease in the index over the course of a year would lead not to a ten percent increase in the value of the ETF, but to a loss of thirty percent or more of the ETF's value.  (See Skinner Decl. Ex. 3, at SAI 20.)  The wedge graphs indicate that, as volatility increases, the potential losses to the ETFs over periods longer than one day increase, even in cases where the underlying index performs as the ETF investor expected over that period.  (See, e.g., Skinner Decl. Ex. 3, at SAI 19-20.)

### c.

The plaintiffs allege that ProShares had an as yet undisclosed mathematical formula from which it could be determined, in advance, that there was a "must lose" risk that, at high enough levels of volatility, investors who held ETFs for periods longer than one day could quickly lose a large portion

SPA-10

of their investment, no matter which direction the underlying index or benchmark moved.  (TAC ¶¶ 112-32; 156-57; 165-74.)

The plaintiffs allege that this "must lose" risk materialized "[d]uring the latter half of 2008 and the first five months of 2009."  (TAC ¶ 133.)  The plaintiffs allege that the ProShares ETFs experienced substantial losses over varying periods during this time, despite their underlying indexes having moved in a direction that the investors expected to be favorable during the period.  (TAC ¶¶ 133-55; 158-64; 175-76.)  For example, with respect to the Ultra Shorts, the Dow Jones U.S. Financials Index experienced a 52% decline over the 18-month period between January 2008 and June 2009.  However, rather than experiencing a 104% gain, the SKF Ultra Short Fund, which tracked the Dow, experienced a 61% decline over that 18 month period.  (TAC ¶ 150.)  With respect to the Ultra Longs, the plaintiffs allege that, for example, the Dow experienced a 5.9% gain over the four month period between January 15 and April 9, 2009.  However, rather than experiencing an 11.8% gain, the UYG Ultra Long Fund, which tracked the Dow, experienced an 11.8% decline over that four month period. (TAC ¶ 161.)  With respect to the inverse ETFs, the plaintiffs allege that, for example, the MSCI Emerging Markets Index (the "MSCIEM Index") experienced a 25.63% decline over the three month period between September 17 and December 16, 2008.  However, rather than experiencing an

25.63% gain, the EUM Fund, which tracked the MSCIEM Index,
experienced a 21.93% decline over that three month period.  (TAC
¶ 176.)

Many of the plaintiffs in this case purchased shares of
various ETFs during the 2008-2009 period when the markets were
most volatile.  (TAC ¶ 177.)

### D.

The plaintiffs allege that, beginning in the summer of 2009,
ProShares added new language to the registration statements for
its new ETFs.  The plaintiffs allege, for example, that in a
June 23, 2009, prospectus to a registration statement relating
to "UltraPro" products that were based on 300% leverage or
inverse leverage, ProShares stated that "[i]n periods of higher
market volatility, the volatility of the benchmark may be at
least as important to the Fund's return for the period as the
return of the benchmark."  (TAC ¶ 179; see also TAC ¶¶ 180-83.)
The plaintiffs allege that the new registration statements also
explicitly explained that "[d]eviations from the index return
times the fund multiple can occur over periods as short as two
days," and that the one-year period described in the
registration statement was "used for illustrative purposes
only."  (TAC ¶ 185; see also TAC ¶¶ 184, 186-88.)

11

The class period alleged in this case ended on June 23, 2009.  (TAC ¶ 2.)

### E.

The plaintiffs filed this lawsuit in August 2009.  In July 2010, this Court appointed lead counsel and the plaintiffs filed an Amended Consolidated Class Action Complaint shortly thereafter.  The plaintiffs filed a Second Amended Complaint in January 2011.  After the defendants moved to dismiss the Second Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court, in November 2011 granted the plaintiffs' motion for leave to amend. The Court deemed the plaintiffs' Third Amended Complaint filed, and deemed the defendants' previous motion as directed against the plaintiffs' Third Amended Complaint.  See Order, In re ProShares Trust Secs. Litig., No. 09 Civ. 6935 (S.D.N.Y. Nov. 10, 2011), ECF No. 199.  That motion is now before the Court.

### III.

### A.

Section 11(a) of the Securities Act provides that any signatory to a registration statement, director of the issuer of securities, or underwriter with respect to such securities, among others, may be held liable to purchasers of registered

Case: 12-3981   Document: 39   Page: 88   12/17/2012   796191   102

**SPA-13**

securities if the registration statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a)(2006).

Section 11 imposes "a stringent standard of liability on the parties who play a direct role in a registered offering." In re Flag Telecom Holdings, Ltd. Secs. Litig., 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009) (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983)) (internal quotation marks omitted).  To establish a prima facie claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement."  In re Flag Telecom Holdings, Ltd. Secs. Litig., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), abrogated on other grounds, 574 F.3d 29 (2d Cir. 2009). Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." Herman & MacLean, 459 U.S. at 382; see also Goldman Sachs & Co. v. GS Mortgage Sec. Grp., No. 11-2762-cv, slip op. at 17-18 (2d Cir. Sept. 6, 2012); Hutchison v. Deutsche Bank Sec., Inc., 647 F.3d 479, 484 (2d Cir. 2011) (quoting Litwin, 634 F.3d at 715-16).

Section 11 does not require pleading or proof that a defendant acted with intent to defraud or even knew that

13

misrepresentations or omissions had been made.  See Litwin, 634
F.3d at 715-16 (quoting In re Morgan Stanley Info. Fund. Sec
Litig., 592 F.3d 347, 360 (2d Cir. 2010)); see also Rombach, 355
F.3d at 169 n. 4 ("Neither Section 11 nor Section 12(a)(2)
requires that plaintiffs allege the scienter or reliance
elements of a fraud cause of action.").  Loss causation is not
an element of a Section 11 claim and need not be pleaded to
state a claim.  See 15 U.S.C. § 77k; see also Hutchison, 647
F.3d at 484 ("[P]laintiffs alleging violations of Sections 11
and 12(a)(2) need not plead scienter, reliance, or loss
causation" (quoting In re Morgan Stanley, 592 F.3d at 359))
(internal quotation marks omitted).  Instead, Section 11
provides for a loss causation affirmative defense to liability.
See Goldman Sachs Co., No. 11-2762-cv, slip op. at 18 n.8; In re
Morgan Stanley, 592 F.3d at 360 n.7.

**B.**

Motions to dismiss Securities Act claims relying on
misrepresentations are analyzed under Federal Rule of Civil
Procedure 9(b) to the extent that they rely on allegations of
fraud, but under Federal Rule of Civil Procedure 8 otherwise.
See Litwin, 634 F.3d at 715.

In the Third Amended Complaint, the plaintiffs assert that
ProShares "knew, or . . . should have known" about various

material misstatements or omissions in the registration

statements at issue.  (See, e.g., TAC ¶¶ 294-95.)  The

plaintiffs also assert that ProShares "purposefully misled" the

plaintiffs into thinking that the market prices for the ETFs

would be higher than they actually were.  (TAC ¶ 296.)  The

plaintiffs have not "specifically pled alternate theories of

fraud and negligence".  See City of Roseville, 814 F. Supp. 2d

at 425 (quoting In re Refco, 503 F. Supp. 2d at 633).  They do

"not assert any claim of negligence . . . nor . . . specify any

basis for such a claim" separate from their fraud-based

allegations.  See id. (quoting In re Refco, 503 F. Supp. 2d 611,

633 (S.D.N.Y. 2007)).  However, the parties do not vigorously

dispute the issue of whether Rule 9(b) or Rule 8 should govern

this Court's review of the plaintiffs' Section 11 claims. It is

plain that, if under Rule 8 the plaintiffs have failed to state

a claim, the analysis under Rule 9(b) is irrelevant.  Therefore,

the Court will consider the plaintiffs' allegations of a Section

11 violation under Rule 8.

Accordingly, the issue is whether the plaintiffs have

plausibly alleged a material misstatement or omission in any of

the registration statements at issue.

15

SPA-16

### C.

"To state a claim under Section[] 11 . . . a plaintiff must allege that the defendants had a legal obligation to disclose the allegedly omitted information." In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig., 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003) (citing 15 U.S.C. § 77k). An omission is material (and thus must be disclosed) if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996); see also In re Cosi, Inc. Securities Litigation, 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005).

Generally, materiality is a "mixed question of law and fact" left to the finder of fact to determine. TSC, 426 U.S. at 450. However, the question of materiality may be decided as a matter of law on a motion to dismiss if the alleged omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." Feinman, 84 F.3d at 540-41 (quoting Goldman, 754

16

F.2d at 1067).  Moreover, when the omitted information concerns

a contingent or speculative event, "the materiality of those

events depends on a balancing of both the indicated probability

that the event will occur and the anticipated magnitude of the

event in light of the totality of the company activity."

Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir.

2001 (quoting Basic, 485 U.S. at 238) (internal quotation marks

omitted); In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp.

2d 171, 196 (S.D.N.Y. 2003).  When a registration statement

warns of the exact risk that later materialized, a Section 11

claim will not lie as a matter of law.  See Panther Partners,

Inc. v. Ikanos Communic'ns, Inc., 538 F. Supp. 2d 662,

672 (S.D.N.Y. 2008) ("An accurate statement coupled with the

precise disclosure of a risk later realized cannot adequately

form the basis for a securities claim"), aff'd, 681 F.3d 114 (2d

Cir. 2012).

   The thrust of the plaintiffs' Section 11 claim is that the

registration statements omitted the risk that the ETFs, when

held for a period of greater than one day, could lose

substantial value in a relatively brief period of time,

particularly in periods of high volatility.  However, the

registration statements at issue stated in plain English that

the ETFs' objectives were daily only, that it was mathematically

impossible for the ETFs to achieve their goals for periods

longer than one day, and that the ETFs' value could "diverge significantly" from the underlying index when the ETFs were held for longer than one day.  This was the precise risk that the plaintiffs allege later materialized: the plaintiffs held the ETFs for long periods of time beyond one day, and their value diverged significantly from the expected daily result causing large losses.  The plain language of the registration statements "addresse[d] the relevant risk directly," and a reasonably prudent investor would have understood that the ETFs could not meet their goal for any period longer than one day and might in fact produce very different results if held for a longer period. See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 360-61 (2d Cir. 2002).

Relying on several recent cases involving similar types of funds, the plaintiffs argue that the registration statements as a whole impliedly encouraged investors to hold the ETFs for periods of longer than one day. This reliance is misplaced. Here, the ETFs' registration statements did not contain penalties or enticements that would have encouraged investors to hold the ETFs beyond a period of one day.

The defendants marketed the ETFs involved in Rafton v. Rydex Series Funds, No. 10 Civ. 01171, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011), "as appropriate for '[i]nvestors who expect the value of the Long Treasury Bond to go down and want investment

gains when it does so' and for investors that want 'benefits' in a 'rising interest rate environment,'" and subjected investors "to a sales charge if they sold shares within a year or eighteen months of purchase." Id. at *8. Under those circumstances, the court found that it was "not necessarily unreasonable [to believe] that an investment with a daily objective is also appropriate as a long-term investment, especially where the particular investment at issue includes charges for shorter term sales, but not for longer term sales." Id. In the present case involving the ProShares funds, there is no allegation of such penalty charges, which send a strong signal that long-term holding is encouraged and indeed required to avoid a penalty.

The ETFs at issue in In re Direxion Shares ETF Trust, 279 F.R.D. 221 (S.D.N.Y. 2012), contained references to the "daily" nature of the ETFs, but also contained "contra-indictors, signifying that holding for longer than a day was appropriate." Id. at 232. For example, the statements at issue noted, immediately after describing the funds' daily objective, that "pursuit of daily leveraged investment goals means that the return of a Fund for a period longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period." Id. The court denied a motion to dismiss because those statements "undercut" the emphasis on the "daily" nature of the ETFs. Id. at 232-33. Here, the

plaintiffs point to no such language in the registration
statements that specifically contemplates an investment strategy
of holding for longer than one day.  Further, the warnings in
the Registration Statements in this case were clear and specific
that the funds did not seek to achieve objectives over a period
of time greater than one day because mathematical compounding
prevented the funds from achieving such results.

The various projections regarding the ETFs' performance
over 1, 3, 5, and 10 year intervals fall far short of
undercutting the emphasis on the daily nature of the ETFs.  In
Direxion, the contra-indicators at issue immediately followed
the plain representations about the ETFs' nature and limitations.
See id.  Here, however, the 1, 3, 5, and 10 year projections
appear nowhere near the clear statements in the overview and
throughout the registration statements that the ETFs' objectives
are daily only.  Moreover, the defendants represent, and the
plaintiffs do not refute, that these projections were included
pursuant to SEC requirements.  (Feb. 2, 2012 Hrg. Tr. at 43-44;
Skinner Decl. Ex. 5 (SEC Form N-1A), at 16-17); see also 17
C.F.R. § 274.11 (2012).  The plaintiffs point to no case that
holds that information that the SEC requires must be
specifically identified, qualified, or tempered.

The plaintiffs argue that the registration statements
contained omissions because they did not disclose the magnitude

of the risk, namely that particularly during periods of high

volatility an ETF investor could be correct about the direction

of the underlying index and nonetheless lose money.  However, a

registration statement need not disclose every possible

permutation of the risk, nor "predict the precise manner in

which the risks will manifest themselves."  In re AES Corp. Secs.

Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993); see also Panther

Partners, 538 F. Supp. 2d at 664 ("The securities laws do not

require clairvoyance in the preparation of offering documents;

these documents are not guarantees of an offering's subsequent

success, nor do they insure investors against the vicissitudes

of technology and industry, nor the volatility of the stock

market itself.")  Rather, the standard is whether a reasonably

prudent investor, having read the statement, would have

understood the specific risk at issue.  See Basic, Inc., 485 U.S.

at 231-32.  It is not possible to read the registration

statements—even those issued before the wedge graphs were added

in September 2007—without understanding that the ETFs were

particularly risky and speculative and were intended to meet

their stated goal only over the course of a single day.  While

the plaintiffs allege that, during certain periods, some

plaintiffs lost money while guessing correctly on the direction

of the underlying index, this possibility is plainly consistent

with the significant divergence that was disclosed in the

**SPA-22**

registration statements.  (Skinner Decl. Ex. 1, at 5-6).
Moreover, the registration statements plainly disclosed that
because the ETFs were leveraged, such divergences if they
resulted in losses, might be "magnified."  (Skinner Decl. Ex. 1,
at 13.)  In addition, the wedge graphs, which appeared in all of
the registration statements after September 28, 2007, illustrate
graphically the exact "must lose" scenarios that form the crux
of the plaintiffs' claim, specifically that at high enough
levels of volatility an ETF investor who holds shares for a
longer period of time may experience significant losses even
when the investor has correctly guessed the direction of the
underlying index.

The materiality analysis may not be conducted using "20/20
hindsight." Panther Partners, 538 F. Supp. 2d at 668 (quoting
In re Unicapital, 149 F. Supp. 2d 1353, 1363 (S.D. Fla. 2001));
see, e.g., Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)
(Friendly, J.) ("[T]he complaint is an example of alleging fraud
by hindsight.").  In this case, the plaintiffs allege that the
risks materialized beginning in 2008—after the wedge graphs had
been included in the registration statements.  ProShares's
addition of detail on the risks of volatility, which literally
painted a picture of the possibility of "must lose" scenarios at
high enough levels of volatility before the high volatility
period in which the risk actually materialized supports the

22

conclusion that, at the time the registration statements were issued, they were candid with respect to the risks that would concern a prudent investor.

The plaintiffs' assertion that ProShares knew in advance through a mathematical formula that large losses would occur is implausible. Whatever formula was used for the ETFs, it would necessarily rely on inputs from the underlying index or benchmark, and those inputs could not be known in advance. It is not a material omission to fail to predict future market performance. See Panther Partners, 538 F. Supp. 2d at 664; see, e.g., I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir. 1991).

In short, the disclosures in the registration statements accurately conveyed the specific risk that the plaintiffs assert materialized: when investors held the ETFs for periods longer than one day the funds' performance widely diverged from the performance of the underlying indices sometimes resulting in losses despite the overall direction of the underlying indices. That the plaintiffs held the ETF shares over long periods of time, despite the language in the registration statements, is not enough to support a cause of action. Cf. Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 8 (2d Cir. 1996) ("Not every bad investment is the product of misrepresentation."). The

defendants' motion to dismiss the Section 11 claim is therefore **granted.**

## IV.

The plaintiffs also allege violations of Section 15 of the Securities Act against the individual defendants based on their control of the institutional defendants.

"Section 15 imposes joint and several liability on 'every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under. . . . 15 U.S.C. § 77 o(a))." " <u>Hutchison</u>, 647 F.3d at 490 (alterations and internal quotation marks omitted). "To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants." <u>Id.</u> (citation omitted). If a plaintiff fails to plead a § 11 claim, any § 15 claim "necessarily fails." <u>See</u> <u>id.</u> Accordingly, the motion to dismiss the plaintiffs' Section 15 claims against the individual defendants must be **granted.**

## V.

Two of the plaintiffs, Steven and Sherri Schnall, also assert a state law breach of contract claim. This Court previously consolidated that claim with the federal claims against ProShares. <u>Schnall v. Proshares Trust</u>, No. 10 Civ. 3042,

24

2010 WL 1962940, at *2 (S.D.N.Y. May 17, 2010).  This claim is "based on the same registration statement" as the Section 11 claim.  Id. at *1.

Because the plaintiffs have failed to state a Section 11 claim based upon a misrepresentation or omission in the registration statement any breach of contract action based on the same registration statement must fail.  The plaintiffs have failed to point to any promise that was made that was breached. See Capital Mgmt. Select Fund Ltd. v. Bennett, 680 F.3d 214, 225-26 (2d Cir. 2012); see, e.g., Finkel v. Putnam Convertible Opportunities, 162 F.3d 1147, No.97-7901, 1998 WL 642464, at *2 (2d Cir. 1998) (unpublished table decision).  Accordingly, the motion to dismiss the contract claim is **granted.**

### CONCLUSION

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, they are either moot or without merit.

For the reasons explained above, the motion to dismiss the plaintiffs' Third Amended Complaint is **granted**.  The clerk is directed to enter judgment accordingly, to close this case, and to close all pending motions.

SO ORDERED.

Dated:     New York, New York
           September 7, 2012

                                    _____
                                         John G. Koeltl
                                    United States District Judge

**SPA-27**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __9/12/12__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
IN RE PROSHARES TRUST SECURITIES
LITIGATION
-------------------------------------------------------X

09 **CIVIL** 6935 (JGK)
**JUDGMENT**

      The defendants - ProShares Trust, ProShares Trust II, ProShares Advisors LLC, SEI

Investments Distribution Co., Michael Sapir, Louis Mayberg, Edward Karpowicz, William Seale,

Simon Collier, Charles Todd, Russell Reynolds, and Michael Wachs (collectively, "ProShares") -

having moved to dismiss the plaintiffs' Third Amended Complaint pursuant to Fed. R. Civ. P.

12(b)(6), and the matter having come before the Honorable John G. Koeltl, United States District

Judge, and the Court, on September 7, 2012, having rendered its Opinion and Order granting the

motion to dismiss the plaintiffs' Third Amended Complaint, and directing the Clerk to enter

judgment accordingly, to close this case, and to close all pending motions, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated September 7, 2012, the motion to dismiss the plaintiffs' Third

Amended Complaint is granted; accordingly, this case is closed.

**Dated:** New York, New York
       September 12, 2012

                   **RUBY J. KRAJICK**
                 _____
                     Clerk of Court
    **BY:**
                 _____
                     **Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____