# 12-3981

## United States Court of Appeals for the Second Circuit

In Re PROSHARES TRUST SECURITIES LITIGATION

MARK KARASICK, STEVEN S. NOVICK, SUSAN ASAI, STEPHEN C. HERMAN, CHARLES SANKOWICH, MICHAEL A. HYMAN, HOWARD SCHWACK, FRANCISCO JAVIER DE LION DIAZ, RENE LACROIX, ANTHONY KOURI, ANTHONY ALEXANDER, JAY BILYEU, JUDY BILYEU, MICHAEL ERIC CODLIN, WENDY ROCKWELL-GOFF, ROBERT SCHUMACHER, JAMES HERSHMAN, DOROTHY HERSHMAN, SCOTT TESSLER, RICHARD RHOADS, MARTIN GARY NORRIS, DOROTHY LOWELL, NANCY HITCHINS, THOMAS TRUONG, EDWARD CISNEROS, CHRIS HONCIK, STEPHEN SHOAP, DMITRI ROUTSKI, ELENA LAVENDER-BOWEN, DAVID BOWMAN, DAVID CHOW, MARK EVERETT BROWN, JONATHAN DEAN, LAWRENCE LEWIS SINSEL, JR., KENNETH L. KRAMER, LAWRENCE I. WEINER, JOHN E. KILLOUGH, ALAN PARKER, SCOTT A. SMELTZ, HOWARD SCHWACK, DOUGLAS JONES, STEPHEN HERMAN, on behalf of themselves and all others similarly situated, STEVEN SCHNALL, SHERRI SCHNALL, on behalf of themselves,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANTS-APPELLEES

ROPES & GRAY LLP
Robert A. Skinner
Nick W. Rose
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000

ROPES & GRAY LLP
Douglas H. Hallward-Driemeier
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948
Tel: (202) 508-4600

*Counsel for Defendants-Appellees ProShares Trust, ProShares Trust II, ProShare Advisors LLC, SEI Investments Distribution Co., Michael Sapir, Louis Mayberg, Edward Karpowicz, William Seale, Ph.D., Simon Collier, Charles Todd, and Barry Pershkow*

— v. —

PROSHARES TRUST, PROSHARE ADVISORS LLC, SEI INVESTMENTS
DISTRIBUTION CO., MICHAEL L. SAPIR, LOUIS M. MAYBERG, RUSSELL S.
REYNOLDS, III, MICHAEL WACHS, SIMON D. COLLIER, PROSHARES TRUST
II, EDWARD KARPOWICZ, WILLIAM E. SEALE, CHARLES TODD, BARRY
PERSHKOW,

*Defendants-Appellees,*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Arthur H. Aufses III
Steven S. Sparling
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 715-7000

*Counsel for Defendants-Appellees Russell Reynolds and Michael Wachs*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, defendants ProShares Trust, ProShare Advisors LLC, and SEI Investments Distribution Co. hereby disclose as follows:

1.     ProShares Trust and ProShare Advisors LLC have no parent corporation;

2.     No publicly held corporation owns 10% or more of the stock in ProShares Trust or ProShare Advisors LLC; and

3.     SEI Investments Distribution Co. is a wholly-owned subsidiary of SEI Investments Company, which is a publicly held corporation.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUE .................................................................... 1

STATEMENT OF THE CASE ..................................................................... 1

STATEMENT OF FACTS ........................................................................ 3

    A.    The Defendants .................................................................. 3

    B.    Structure And Operation Of ETFs ....................................... 4

    C.    The Registration Statements At Issue ................................... 5

        i.    The ETFs Have Daily Investment Objectives .............................. 7

        ii.    The ETFs Do Not Seek To Achieve Their Objectives For Longer Than One Day ......................................................... 8

        iii.    Compounding Prevents The ETFs' Cumulative Returns From Matching A Multiple Of The Cumulative Returns Of The Index For Longer Periods ........................................................ 9

        iv.    Leverage Amplifies The Effect Of Compounding On Cumulative Returns ...................................................................... 10

        v.    Volatile Markets Further Amplify The Effects Of Compounding And Leverage On Cumulative Returns ......................................... 11

        vi.    The Funds Use Aggressive And Speculative Investment Techniques ....... 13

SUMMARY OF ARGUMENT ................................................................... 13

ARGUMENT .................................................................................. 17

I.    THE DISTRICT COURT CORRECTLY HELD THAT THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MIS-REPRESENTATIONS OR OMISSIONS IN THE PROSHARES REGISTRATION STATEMENTS ......................................... 18

    A.    Proshares' Registration Statements Fully Disclosed The Daily Nature Of The Investment Objectives And The Risks Regarding Cumulative Returns Over Longer Periods ............................................................... 19

    B.    Plaintiffs' Arguments Contradict The Plain And Explicit Language Of The Disclosures ....................................................................... 21

        i.    The Alleged "Inherent Facts" Regarding Potential Investment Losses In The Funds Were Repeatedly Disclosed ................................. 22

            (a)    A Reasonable Investor Would Have Known That "Opposite Direction" Movement Was Possible ................................. 22

            (b)    The Registration Statements Adequately Disclosed The Potential Magnitude Of The Divergence ........................ 24

i

Table of Contents (continued)

Page

(c)     The Wedge Graphs Clearly And Accurately Disclosed The
Specific Risks That Plaintiffs Allege Occurred ............................26

ii.     The Alleged "Materialization Facts" Regarding Supposedly Known
And Inevitable Losses Do Not Support Plausible Claims ........................28

(a)     Proshares Disclosed The Potential Effects Of Index Volatility.....29

(b)     Plaintiffs Cannot Establish Liability By Alleging Supposed
"Must-Lose" Circumstances ..........................................................30

(c)     Plaintiffs Cannot Establish Liability By Comparing
"Anticipated" And "Actual" Cumulative Returns During
Periods Selected With Hindsight ...................................................35

iii.    The So-Called "Contra-Indicators" Alleged By Plaintiffs Did Not
Suggest To Investors That Cumulative Returns In The Funds Would
Track The Benchmark For Periods Longer Than One Day ......................40

iv.     Proshares Disclosures Differentiate Its Registration Statements From
Those Of Other ETF Companies ...............................................45

v.      The 2009 Registration Statement Disclosures Do Not Establish Or
Support Liability For Earlier Statements ....................................47

vi.     The Placement Of Certain Disclosures In The Statement Of Additional
Information Does Not Negate Their Impact ................................50

II.    PLAINTIFFS HAVE FORFEITED THEIR BREACH OF CONTRACT CLAIM ............. 54

CONCLUSION ....................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acito v. IMCERA Grp., Inc.,*
47 F.3d 47 (2d Cir. 1995) ...................................................................48

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009).......................................................................17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) ...............................................................17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)...........................................................................17

*DeMaria v. Anderson,*
318 F.3d 170 (2d Cir. 2003) ........................................................44, 45

*Denny v. Barber,*
576 F.2d 465 (2d Cir. 1978) ..............................................................48

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) ........................................................18, 37

*Greenapple v. Detroit Edison Co.,*
618 F.2d 198 (2d Cir. 1980) ........................................................48, 50

*Greenberg v. ProShares Trust,*
No. L-1101-09, 2011 WL 2636990 (N.J.Super.A.D. July 7, 2011) ..................42

*Halperin v. eBanker USA.com, Inc.,*
295 F.3d 352 (2d Cir. 2002) ............................................19, 20, 22, 44

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,*
159 F.3d 723 (2d Cir. 1998) ..............................................................53

*Hutchison v. Deutsche Bank Secs. Inc.,*
647 F.3d 479 (2d Cir. 2011) ..............................................................18

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) ..........................................................25, 52

*In re AES Corp. Sec. Litig.*,
  825 F. Supp. 578 (S.D.N.Y. 1993) ....................................................25

*In re AIG Advisor Grp. Secs Litig.*,
  309 F. App'x. 495 (2d Cir. 2009) .....................................................53

*In re Charles Schwab Corp. Sec. Litig.*,
  838 F. Supp. 2d 1148 (D. Col. 2012).................................................54

*In re CIT Grp., Inc. Secs. Litig.*,
  349 F.Supp.2d 685 (S.D.N.Y. 2004) ..................................................49

*In re Direxion Shares ETF Trust*,
  279 F.R.D. 221 (S.D.N.Y. 2012)..................................45, 46, 47, 53

*In re Morgan Stanley Info. Fund Secs. Litig.*,
  592 F.3d 347 (2d Cir. 2010) .....................................................53, 54

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
  838 F. Supp. 2d 1148 (D. Col. 2012).................................................54

*In re Scholastic Corp. Secs. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ..............................................................49

*In re Time Warner Inc. Secs. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ................................................................18

*Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir 1994) ...............................................................39

*Krouner v. Am. Heritage Fund, Inc.*,
  899 F. Supp. 142 (S.D.N.Y. 1995) ....................................................49

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986) ..............................................................25

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ............................................................31

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) ..............................................................................passim

*Press v. Quick & Reilly*,
    1997 WL 458666 (S.D.N.Y. Aug. 11, 1997)......................................................53

*Rafton v. Rydex Series Funds*,
    No. 10-cv-01171, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011) .............................41

*Retained Realty, Inc. v. McCabe*,
    376 F.App'x. 52 (2d Cir. 2010) ........................................................................54

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .....................................................................19, 22

*SEC  v. Tecumseh Holdings Corp.*,
    838 F. Supp. 2d 1148 (D. Col. 2012)................................................................54

*SEC v. Geon Indus., Inc.*,
    531 F.2d 39 (2d Cir. 1976) ...............................................................................48

*Smyth v. Upjohn Co.*,
    529 F.2d 803 (2d Cir. 1975) .............................................................................49

*Spicer v. Chicago Bd. Options Exch., Inc.*,
    No. 88-cv-2139, 1992 WL 380929 (N.D. Ill. Dec. 10, 1992) ...........................44

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S 438 (1976)...........................................................................................18

*White v. Melton*,
    757 F.Supp. 267 (S.D.N.Y. 1991) ....................................................................53

**STATUTES**

15 U.S.C. § 77k .......................................................................................................18

15 U.S.C. § 77k(a) ......................................................................................18, 31, 36

15 U.S.C. § 77s(a)...................................................................................................44

Investment Company Act of 1940 ...........................................................................3

Securities Act of 1933, Section 11....................................................................passim

Securities Act of 1933, Section 15..............................................................................2

**OTHER AUTHORITIES**

17 C.F.R. § 230.408 ....................................................................................44

17 C.F.R. § 274.11A .....................................................................................5

48 Fed. Reg. 37928, 37929 (1983) ........................................................52

Fed. R. Evid. 407 ........................................................................................48

Fed. R. Civ. P. 12(b)(6)............................................................2, 17, 20

## STATEMENT OF JURISDICTION

Defendants agree with plaintiffs' statement that this Court has jurisdiction over the appeal in this case.

## STATEMENT OF THE ISSUE

Whether the district court correctly held that defendants' disclosures in the operative registration statements for their exchange-traded funds adequately conveyed the investment risk that the plaintiffs assert later materialized, namely that when investors held the funds for periods longer than one day, the funds' cumulative performance could significantly diverge from the cumulative performance of their underlying benchmarks.

## STATEMENT OF THE CASE

Plaintiffs purport to bring a class action on behalf of investors in forty-four exchange-trade funds ("ETFs") with daily investment objectives tied to an underlying benchmark index.[1]  In the operative Third Amended Consolidated Class Action Complaint ("Third Amended Complaint"), plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933, as amended (the "Securities Act"), alleging that the registration statements at issue contained material misstatements and omissions relating to the risk that the funds would not achieve

---

[1] Defendants are ProShares Trust, ProShares Trust II, ProShare Advisors LLC, SEI Investments Distribution Co. ("SIDCO"), Michael Sapir, Louis Mayberg, Edward Karpowicz, William Seale, Simon Collier and Charles Todd (collectively, "ProShares"), together with defendants Russell Reynolds and Michael Wachs (the "Independent Trustees").

their stated objectives for periods longer than a day.  Plaintiffs also assert a breach of contract claim under New York law.

Plaintiffs filed their first complaint, *Novick v. ProShares Trust et al.*, No. 09-cv-6935 on August 5, 2009.  More than 30 additional individual complaints were filed over the next several months, each bringing Section 11 claims against ProShares Trust, ProShare Advisors, SIDCO, and the individual defendants, and Section 15 claims against the individual defendants.  The district court consolidated all the related pending actions and later appointed a lead plaintiff. Plaintiffs filed their Amended Consolidated Class Action Complaint on Sept. 24, 2010.  After defendants moved to dismiss, plaintiffs elected to amend their complaint in an attempt to address defendants' arguments.  Plaintiffs filed a Second Amended Consolidated Class Action Complaint on January 31, 2011, and defendants moved to dismiss the new pleading on March 17, 2011.  Plaintiffs filed a Third Amended Consolidated Class Action Complaint (the "Complaint") on November 10, 2011, adding ProShare Advisors as a Section 15 defendant. Defendants' then-pending Motion to Dismiss the Second Amended Complaint was deemed to be directed against the Third Amended Complaint.

On September 7, 2012, the district court (Koeltl, J.) dismissed all of plaintiffs' claims pursuant to Rule 12(b)(6) for failure to state a claim.  *See* Special Appendix ("SPA") 24-25.  In dismissing plaintiffs' Section 11 and Section 15

claims, the district court held that "the disclosures in the registration statements accurately conveyed the specific risk that the plaintiffs assert materialized" (SPA-23) and that "[i]t is not possible to read the registration statements . . . without understanding that the ETFs were particularly risky and speculative and were intended to meet their stated goal only over the course of a single day."  SPA-21. In dismissing plaintiffs' breach of contract claim, the court observed that "plaintiffs have failed to point to any promise that was made that was breached." SPA-25.  Plaintiffs filed a Notice of Appeal on October 5, 2012.

## STATEMENT OF FACTS

### A.    The Defendants

Defendants ProShares Trust and ProShares Trust II (together, the "ProShares Trusts") are Delaware statutory trusts.    ProShares Trust is an open-end management investment company registered with the SEC under the Investment Company Act of 1940, as amended (the "1940 Act").  *See, e.g.*, Joint Appendix ("App") 672 (9/28/07 Registration Statement ("RS")).[2]  ProShares Trust II is a

---

[2] All the registration statements cited herein are referenced in the Complaint.  For ProShares Trust, the prospectus and statement of additional information ("SAI") comprising its registration statement typically have separate, non-sequential page numbering; thus, page number references to the SAI portion of a registration statement are cited herein as "at SAI ＿".    ProShares Trust II's registration statements do not contain (and are not required to contain) a separately numbered SAI and are cited as "(PS II)".  All ProShares registration statements are publicly available on the SEC's website at http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001174610&owner=exclude&count=40&hidefi

publicly offered commodity pool regulated by the Commodity Futures Trading Commission ("CFTC"). App-905; ¶62(b). Each of the forty-four ETFs at issue (the "Funds") is organized as a separate series of one of the Trusts. App-905-906; ¶62(a)-(c). ProShares Trust has operated since 2006 and ProShares Trust II has operated since 2008. App-654; App-914, ¶85. Defendant ProShare Advisors LLC ("ProShare Advisors") serves as the investment advisor for ProShares Trust and its ETFs. App-524 (9/28/07 RS at 2). Nonparty ProShare Capital Management LLC ("PCM") is the sponsor, commodity pool operator, and commodity trading advisor for ProShares Trust II and its ETFs. App-1002; ¶300. Defendant SIDCO serves as the distributor for the ETFs in both Trusts.    App-909; ¶64. Each of the eight individual defendants is named because, in his role as an officer or trustee of one of the foregoing entities, he allegedly signed one or more of the registration statements in question. App-910-911; ¶¶65-72.

**B.    <u>Structure and Operation of ETFs</u>**

ETFs are similar in many ways to traditional open-end mutual funds (or traditional commodity pools), but with some significant differences. For example, whereas traditional mutual fund shares are purchased by investors directly from the fund itself and later "redeemed" or sold back directly to the fund, ETF shares are generally bought and sold by investors on the secondary market. An ETF typically

---

lings=0   or   http://www.sec.gov/edgar/searchedgar/companysearch.html.     An exemplar registration statement is included in the Joint Appendix (App-522).

is comprised of a portfolio of securities designed to track an underlying benchmark or index. A *leveraged* ETF seeks to deliver a multiple of the performance of the index it tracks on a daily basis.[3] An *inverse* ETF seeks to deliver the opposite of the daily performance of the index it tracks. A *leveraged inverse* ETF thus seeks a daily return that is a multiple of the opposite of the daily performance of the index it tracks.[4] Each of the ETFs at issue in this case is leveraged, meaning they use a variety of derivative instruments such as swaps and futures contracts to magnify the effect of market movements in an effort to achieve their investment objective. *See, e.g.*, App-528-529 (9/28/07 RS at 6-7).

### C.    <u>The Registration Statements at Issue</u>

ProShares Trust's registration statements are filed with the SEC on Form N-1A. *See* 17 C.F.R. § 274.11A; App-778 (Form N-1A, *Registration Form for Registered Open-End Management Investment Companies* (SEC 2052) ("Form N-1A")); App-914-915, ¶87. ProShares Trust II files its registration statements with the SEC using Forms S-1 and S-3. *See, e.g*, App-915, ¶91. Under the federal securities laws, the registration statement of a mutual fund is comprised of its

---

[3] For example, ProShares Trust offers the Ultra S&P 500, a fund designed to provide daily investment results of double the daily performance of the S&P 500 Index. App-547 (9/28/07 RS at 24).

[4] ProShares Trust offers the UltraShort Russell 2000, a fund designed to seek daily investment results that correspond to twice the inverse of the daily performance of the Russell 2000 Index. App-602 (9/28/07 RS at 79).

prospectus, its statement of additional information ("SAI"), and certain other information, including exhibits and undertakings.  App-915, ¶89.  The 1940 Act also mandates that ProShares Trust send shareholders semi-annual reports listing, among other things, the amounts and values of the securities and other instruments held by each fund.  The Trusts' semi-annual and annual reports are all incorporated by reference into the prospectuses, and are filed with the SEC using form N-CSR. *See, e.g.,* 12/29/06 RS at 337.

Plaintiffs purport to assert Section 11 and 15 claims with respect to alleged misstatements and omissions in the registration statements listed in Exhibit B and C to the Complaint.  App-474, 476.  The disclosures relevant to the Complaint are similar across all registration statements.[5]  Throughout the putative class period, the operative registration statements for the Trusts clearly disclosed that (i) ProShares ETFs have *daily* investment objectives; (ii) the Funds do *not* attempt to achieve their objectives for periods longer than a day; (iii) compounding *prevents* the Funds' cumulative returns from matching the cumulative returns of the index for periods longer than one day, and may cause a significant divergence; (iv) leverage (which all the ETFs at issue utilize) amplifies the effects of

---

[5]  For the convenience of the district court, the relevant disclosures from each of the registration statements were gathered in disclosure appendices that are reproduced in the Joint Appendix.  *See* App-493 (Disclosure Appendix A, ProShares Trust); App-509 (Disclosure Appendix B, ProShares Trust II).  The full registration statements are available on the SEC's website.

compounding on cumulative returns; (v) volatile markets further amplify the effects of compounding and leverage on cumulative returns; and (vi) the Funds use aggressive and speculative investment techniques.

### i.     *The ETFs Have Daily Investment Objectives*

Each registration statement disclosed repeatedly that each ProShares ETF has an investment objective of tracking (inversely and/or by a multiple) its respective index for one day.  For example, the earliest registration statement listed by plaintiffs in Exhibit B to the Complaint states that ProShares ETFs "seek to provide daily investment results" that corresponded to the "daily performance of their applicable indexes."  App-494 (6/19/06 RS at 6, 24).  This information was repeated in each subsequent operative registration statement throughout the class period for both ProShares Trusts.  *See, e.g.*, App-495 (12/29/06 RS at 4, 108, 74); App-495 (9/28/07 RS at 6, 19, 66); App-495-496 (9/29/08 RS at 6, 21, 66); App-511 (11/21/08 RS (PS II) at 1-2).[6]  This daily objective was also reiterated in the information section for *each individual fund*.  *See, e.g.*, App-494 (6/19/06 RS at 7) ("[SSO] seeks daily investment results . . . that correspond to twice (200%) the daily performance of the S&P 500 Index"); 9/28/07 RS at 20 ("[QQQ] seeks daily investment results . . . that correspond to twice (200%) the daily performance of

---

[6] For space considerations, only a subset of the registration statements is cited here. Disclosure Appendices A and B (App-493 and App-509) demonstrate that similar disclosures are contained within the other operative registration statements.

the NASDAQ-100 Index.").  Indeed, the phrase "daily investment" appears over 250 times in each of the operative registration statements, including on the *very first page* (after the table of contents).  *See, e.g.*, App-495 (12/29/06 RS at 4); App-495 (9/28/07 RS at 6); App-495 (9/29/08 RS at 6); App-511 (11/21/08 RS (PS II) at 1).

> ### ii. *The ETFs Do Not Seek To Achieve Their Objectives For Longer Than One Day*

The registration statements throughout the class period also specifically stated that the Funds did not seek to achieve their respective investment objectives for periods longer than one day.  For example, the December 2006 registration statement stated in clear and explicit terms that "[t]he Funds do not seek to achieve their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results."  App-497 (12/29/06 RS at 313).  That same admonition was repeated in later registration statements.  *See, e.g.*, App-497 (9/28/07 RS at 6) (same); App-512 (11/21/08 RS (PS II) at cover, 1-2) (same).  And the annual reports sent to shareholders, which were incorporated by reference into the Funds' registration statement, reiterated that warning.  The report stressed that "ProShares ETFs are designed to provide either 200%, -200% or -100% of index performance on a daily basis (before fees and expenses)," and warned: "[a] common misconception is that the Funds also should provide 200%, -200% or -100% of index performance over

8

longer periods, such as a week, month or year. However, the Fund returns over longer periods are generally less than or greater than the returns that would result from such an expectation." App-498 (5/31/08 N-CSR at 2).

### iii. *Compounding Prevents The ETFs' Cumulative Returns From Matching A Multiple Of The Cumulative Returns Of The Index For Longer Periods*

The registration statements further explained that compounding prevents the Funds from achieving cumulative returns that match the cumulative returns of the index (or the inverse or stated multiple thereof) for periods longer than a day. The December 2006 registration statement made clear that, "[w]hile close tracking of any Fund to its benchmark may be achieved on any single trading day, over time the cumulative percentage increase or decrease in the net asset value of the Shares of a Fund may diverge significantly from the cumulative percentage decrease or increase in the benchmark due to a compounding effect." App-499 (12/29/2006 RS at SAI 16); *see also* App-499 (9/28/07 RS at SAI 18) (same); App-499 (9/29/08 RS at SAI 17) (same); App-513 (11/21/08 RS (PS II) at 4, 22) (same). Investors were specifically warned that they "should not expect" the Funds' cumulative returns to match those of the index (or the inverse or stated multiple thereof) for periods longer than a day, and that such divergence may be "significant[]." *See, e.g.*, App-498-499 (12/29/06 RS at 8) ("Over time, the cumulative percentage increase or decrease in the net asset value of the Fund *may diverge significantly*

9

from the cumulative percentage increase or decrease in the multiple of the return of the underlying Index due to the compounding effect of losses and gains on the returns of the Fund.  Consequently, *for periods greater than one day, investors should not expect the return of the Fund to be twice the return of the underlying Index.*") (emphases added).

### iv.    *Leverage Amplifies The Effect Of Compounding On Cumulative Returns*

Compounding affects the cumulative returns of any investment, including accounts that earn a simple rate of interest. The effect of compounding on cumulative returns is *amplified* in a fund that uses leverage, as the ProShares ETFs do.  The registration statements clearly disclosed that the use of leveraging techniques, combined with compounding, meant that the fund's intended correlation to the benchmark could not be sustained "over a period of time greater than one day."  App-502 (12/29/06 RS at 318).  The registration statements emphasized that "[o]ver time, the use of leverage, combined with the effect of compounding, will have a more significant impact on a Fund's performance compared to the index underlying its benchmark than a fund that does not employ leverage.  Therefore, the return of the index over a period of time greater than one day multiplied by a Fund's specified multiple or inverse multiple (*e.g.*, 200% or -200%) will not generally equal a Fund's performance over that same period."  *Id.*; *see also* App-502 (9/28/07 RS at 8) ("[T]here is a special form of correlation risk

10

that derives from these Funds' use of leverage, which is that for periods greater than one day, the use of leverage tends to cause the performance of a Fund to be either greater than or less than the index performance times the stated multiple in the fund objective"); App-502 (9/29/08 at 9) (same); App-514 (11/21/08 (PS II) at 23-24) (same).  This warning is repeated in the annual reports sent to shareholders. *See, e.g.*, App-503 (5/31/08 N-CSR at 328).

**v.**     ***Volatile Markets Further Amplify The Effects Of Compounding And Leverage On Cumulative Returns***

Moreover, the registration statements also disclosed that volatile markets could make the effects of compounding and leverage even more pronounced.  *See, e.g.*, 12/29/06 RS at 317 ("The equity markets are volatile, and the value of securities . . . correlated with the equity markets may fluctuate dramatically from day to day.  This volatility may cause the value of an investment in a Fund to decrease."); 9/28/07 RS at 9 (same); 9/29/08 RS at 11 (same); App-515 (11/21/08 RS (PS II) at 4) ("[P]rice volatility, which is exacerbated by the use of leverage, may possibly cause the total loss of an investor's investment."); App-515 (11/21/08 RS (PS II) at 22) ("It is possible to lose money over time when an underlying benchmark is up (down) for the corresponding Ultra (UltraShort) Fund due to the effects of daily rebalancing, volatility, and compounding.").

Starting in 2007, before the period of volatility that is the focus of plaintiffs' Complaint, the registration statements supplemented this clear risk disclosure by

including so-called "wedge" graphs to demonstrate numerically how increased index volatility will increase the likelihood that an ETF will underperform if held for longer periods of time. *See* App-504-505 (9/28/07 RS at SAI 18-20) (three examples of a wedge graph); App-506 (9/29/08 RS at SAI 17-19) (same); App-516-518 (11/21/08 RS (PS II) at 24-26) (same); *see also infra* pg. 24 (reproducing color example). These wedge graphs specifically disclosed that in periods of high volatility, ETFs held over an extended period could move in the *opposite direction* of the benchmark index. *See, e.g., infra* pg. 24 (showing, for example, possible opposite direction movement starting at 20% volatility and increasing as volatility rises); *see also* App-505 (second graph). This volatility risk was reinforced in the annual reports sent to shareholders. *See, e.g.*, App-506 (5/31/08 N-CSR at 328) ("In general, given a particular index return, increased volatility of the index will cause a decrease in the performance relative to the index performance times the stated fund multiple."); App-506 (5/31/08 N-CSR at 2) ("Fund returns over longer periods are generally less than or greater than the returns that would result from such an expectation. . . . This is due to several factors, but a significant one is index volatility and its effect on fund compounding. In general, periods of higher index volatility will cause the effect of compounding to be more pronounced, while periods of lower index volatility will produce a more muted or even positive effect."); App-506 (5/31/08 N-CSR at 6) ("Daily volatility for the U.S. equity

markets increased from a year ago. . . .   At a given index return level, increased

volatility tends to negatively impact performance over time.").

### vi. *The Funds Use Aggressive And Speculative Investment Techniques*

Finally, the registration statements also disclosed that the use of "aggressive"

and "speculative" techniques like leverage could result in dramatic changes and

losses to an investor.  *See, e.g.*, App-507 (12/29/06 RS at 7) ("The [Funds] use

investment techniques and financial instruments that may be considered

aggressive. . . .   Such techniques may expose the Fund to potentially dramatic

changes (losses) in the value of its portfolio holdings . . ."); App-508 (9/28/07 RS

at 7-8) ("The Funds use investment techniques that may be considered

aggressive. . . . Such instruments, particularly when used to create leverage, may

expose the Funds to potentially dramatic changes (losses or gains) in the value of

the instruments . . ."); App-508 (9/29/08 at 8) (same); App-519 (11/21/08 RS (PS

II) at 19) ("Using leverage and/or short positions should be considered to be

speculative and could result in the total loss of an investor's investment.").

## SUMMARY OF ARGUMENT

Plaintiffs' claims all fail as a matter of law because the Complaint identifies

no material misstatement or omission of fact.  The very risks plaintiffs describe in

the Complaint were clearly and consistently explained in the Funds' registration

statements.  Shareholders were informed that "[t]he Funds do not seek to achieve

13

their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results." The registration statements went on to explain that this compounding effect is amplified by the use of leverage and further amplified during periods of high volatility, and that in periods of extreme volatility, results could even occur in the opposite direction of "expected" returns. In light of these disclosures, no investor could reasonably believe that the ETFs' cumulative returns would track the cumulative returns of the underlying index over time – instead, investors were specifically told that they "should not expect" that outcome. As the district court properly concluded, plaintiffs have no plausible claim that they were misled about this basic feature of the ETFs.

Plaintiffs assert several theories of liability in an attempt to plead around the clear disclosures regarding cumulative returns, and the district court properly rejected each of them. Plaintiffs allege that the registration statements failed to warn that an investor could lose money even if "correct" about the direction of market movement, and how large those losses could be. But as the district court recognized in rejecting this hindsight pleading, ProShares' disclosures that the Funds' cumulative returns "may diverge significantly" from those of the benchmarks due to the effects of compounding, leverage and volatility – supplemented by the numerical examples of this divergence featured in the wedge

14

graphs – put investors on ample notice of these risks.  The registration statements were required to be accurate and forthcoming about the nature of the Funds and their prospective risks when issued.  They were not required to predict the future.  Nor were they required to specify in advance the precise numerical effect that future volatility, compounding, and leverage would have on the cumulative returns of the ETFs under different circumstances, as plaintiffs now insist they could and should have done.

Plaintiffs attempt to mask their hindsight pleading by alleging that ProShares actually *knew in advance* (and misleadingly failed to disclose) the likely magnitude and direction of investor losses.  The alleged source of ProShares' knowledge is an "undisclosed mathematical formula" (App-889-890; ¶12) that supposedly gave ProShares the ability to "project to the day exactly when such opposite performance and such losses would begin to occur in every market scenario." App-892; ¶25.  But even taking as true plaintiffs' allegations that the "undisclosed formula" would yield returns for the Funds if given all the necessary numerical inputs, ProShares was not obligated to disclose specific *predictions* regarding the Funds' cumulative returns in 2008-2009.  As described by plaintiffs, the formula calculates a fund share's return as a function of several variables, including when the share was purchased, the length of time the share was held, and the degree of market volatility during that holding period – inputs that could only be known *after*

*the fact* and that would be different for each investor. ProShares cannot possibly be required to have known in advance and disclosed the investment results of each possible permutation of these factors.

In any event, plaintiffs' allegations of undisclosed "must lose" conditions in volatile markets are facially implausible and, in fact, contradicted by facts of which the Court may take judicial notice. Even within the periods cherry-picked by plaintiffs because of their high volatility, there were dates on which investors could have purchased and sold ProShares ETFs and made handsome profits, even outperforming the purported "expected" cumulative return. Without a crystal ball, defendants could not have known, in advance, whether investors who purchased on a particular date would gain or lose if they held for more than a day. Given that, ProShares disclosed textually and graphically the effects of compounding, leverage, and volatility – and the increasing volatility being experienced during the class period – so that investors were aware of the risks of holding the Funds for longer than one day and could adjust their individual portfolios accordingly.

The rest of plaintiffs' arguments fail for similar reasons, as discussed below. In the face of the clear disclosures regarding the effects of compounding, leverage and volatility on cumulative returns over time, plaintiffs cannot plausibly allege that a reasonable investor was misled about the nature of the Funds' daily investment objective and the risks regarding cumulative returns for periods longer

than a day.  The district court's reasoned rejection of these arguments should be affirmed.

## ARGUMENT

When challenged by a motion to dismiss, plaintiffs' factual allegations must be sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  To survive a motion to dismiss under *Twombly*, a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level."  *Id.* at 555.  It is not enough for a plaintiff to plead facts that are "merely consistent with" a right to relief; a plaintiff must allege facts "plausibly suggesting" liability.  *Id.* at 557.  While the court must take all well-pleaded facts as true in deciding a motion to dismiss under Rule 12(b)(6), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court may consider documents referenced in the complaint and those relied on in bringing the complaint, and a court may also consider legally required public disclosure documents filed with the SEC.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  A court may also take judicial notice of certain undisputed, publicly available information – such as historical stock prices – without

converting a motion to dismiss into a motion for summary judgment. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

## I. THE DISTRICT COURT CORRECTLY HELD THAT THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MISREPRESENTATIONS OR OMISSIONS IN THE PROSHARES REGISTRATION STATEMENTS

To state a claim under Section 11 of the Securities Act, a plaintiff must allege that an offering document contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).  To state a claim based on an omission, a plaintiff must demonstrate that the omission is material and that defendants had a legal obligation to disclose the allegedly omitted information.  *See* 15 U.S.C. § 77k; *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.").  For an omission to be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Hutchison v. Deutsche Bank Secs. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S 438, 449 (1976)).  An actionable misrepresentation claim arises only if the relevant disclosure documents *read as a*

*whole* could have misled a reasonable investor about the securities offered. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). "When there is cautionary language in the disclosure, the Court analyzes 'the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'" *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).

### A. Proshares' Registration Statements Fully Disclosed The Daily Nature Of The Investment Objectives And The Risks Regarding Cumulative Returns Over Longer Periods

Plaintiffs' Section 11 claim fails as a matter of law because the Complaint points to no fact in the Funds' registration statements that is even arguably false or misleading, and asserts no omission of material fact necessary to make the registration statements not misleading. Simply put, the registration statements, read as a whole, could not have misled a reasonable investor about the daily nature of each Fund's investment objective and the risk that cumulative returns for periods longer than a day would not achieve those same objectives. Indeed, the registration statements graphically demonstrated that cumulative returns for the

Funds could move in the opposite direction of the cumulative return of the underlying index over longer periods.

A complaint alleging material misstatements and omissions cannot survive a motion to dismiss if the registration statement amply discloses the risks in question.  The relevant review standard in this Circuit is well established:

> Dismissal under Rule 12(b)(6) is appropriate [where] it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Since the plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus, no set of additional facts could prove the plaintiffs' claims. . . .   This court has consistently affirmed Rule 12(b)(6) dismissal of securities claims where risks are disclosed in the prospectus.

*Olkey*, 98 F.3d at 9 (internal quotation and citations omitted).  Courts routinely dismiss securities claims where the registration statement sufficiently discloses the risks about which plaintiffs claim to have been misled.  *See, e.g.*, *Halperin*, 295 F.3d at 361.

As detailed in the Statement of Facts, the operative registration statements amply disclosed the Funds' characteristics as to which plaintiffs claim to have been misled.  In clear and oft-repeated disclosures, the registration statements explained that:  (i) ProShares' ETFs sought daily investment results; (ii) ProShares' ETFs did not attempt to track their underlying indices for longer than one day; (iii) because of compounding, for time periods longer than one day the percentage increase or decrease of a fund could "diverge significantly" from the percentage decrease or

20

increase in its benchmark index and investors "should not expect" them to match over time; (iv) the use of leverage amplifies the effects of compounding on cumulative returns; (v) increased volatility of the underlying index could also cause a decrease in the Fund's performance relative to the index performance times the fund multiple, including causing opposite direction performance; and (vi) the use of aggressive and speculative investment techniques could cause dramatic changes in the Funds' values. As the district court noted, these disclosures addressed "the precise risk that the plaintiffs allege later materialized." SPA-17-18. The "plain language of the registration statements 'addresse[d] the relevant risk directly,' and a reasonably prudent investor would have understood that the ETFs could not meet their goal for any period longer than one day and might in fact produce very different results if held for a longer period." SPA-18.

### B. Plaintiffs' Arguments Contradict The Plain And Explicit Language Of The Disclosures

Instead of directly addressing these extensive disclosures, plaintiffs attempt to minimize their scope and plain meaning. In a post-hoc attempt to question the adequacy of the disclosures, plaintiffs allege that the Funds did not address what plaintiffs have now dubbed "Inherent Facts" (Appellants' Corrected Brief ("Corr. Br.") 4) and "Materialization Facts." *Id.* These arguments are flatly contradicted by the plain language of the disclosures.

i.    *The Alleged "Inherent Facts" Regarding Potential Investment Losses In The Funds Were Repeatedly Disclosed*

Plaintiffs first repackage a subset of their original allegations as so-called "Inherent Facts" (a term not appearing in the Complaint or the briefing below) and assert that these facts are not adequately addressed.  In particular, plaintiffs allege that ProShares did not disclose that (1) an investor could lose money in the Funds even if "correct" about the direction of market movement and (2) potentially large losses could occur. *See, e.g.*, Corr. Br. 23-24.   Notably, plaintiffs attempt to establish these points by reference to individual disclosures in isolation rather than addressing the disclosures as a whole and in context, as is required.  *See Halperin*, 295 F.3d at 357; *Rombach*, 355 F.3d at 172 n.7.  As the district court correctly held, ProShares' disclosures taken as a whole clearly disclosed the risks relating to the so-called Inherent Facts.

(a)    **A Reasonable Investor Would Have Known That "Opposite Direction" Movement Was Possible**

Plaintiffs' argument that investors were not on notice that they could lose money over time even if they were "correct" about the general direction of the market runs headlong into the Funds' disclosures about cumulative returns for periods longer than a day:

> Over time, the cumulative percentage increase or decrease in the net asset value of the Fund *may diverge significantly* from the cumulative percentage increase or decrease in the multiple of the return of the underlying Index due to the compounding effect of losses and gains

> on the returns of the Fund.  Consequently, for periods greater than one
> day, investors should not expect the return of the Fund to be twice the
> return of the underlying Index.

App-498-499 (12/29/06 RS at 8) (emphasis added).  Investors were further warned

that the compounding effects could be amplified by the use of leverage in the

Funds and by the occurrence of price volatility – resulting in potential investment

losses.  *See* 12/29/06 RS at 317 ("volatility may cause the value of an investment

in a Fund to decrease"); App-515 (11/21/08 RS (PS II) at 4) ("[P]rice volatility,

which is exacerbated by the use of leverage, may possibly cause the total loss of an

investor's investment."); App-515 (11/21/08 RS (PS II) at 22) ("It is possible to

lose money over time when an underlying benchmark is up (down) for the

corresponding Ultra (UltraShort) Fund due to the effects of daily rebalancing,

volatility, and compounding.").  Plaintiffs insist that a reasonable investor could

read these warnings that cumulative returns may "diverge significantly" from those

of the benchmark and not understand that a loss is possible.  The district court

properly rejected this reasoning, concluding that even if "some plaintiffs lost

money while guessing correctly on the direction of the underlying index, this

possibility is plainly consistent with the significant divergence that was disclosed."

SPA-21.

Additionally, the wedge graphs specifically demonstrated with numerical

examples that cumulative returns in the opposite direction from the daily return

objective were possible.  As the district court stated, the wedge graphs show "that at high enough levels of volatility an ETF investor who holds shares for a longer period of time may experience significant losses even when the investor has correctly guessed the direction of the underlying index."  SPA-22.  For example, the wedge graph reproduced below (for an UltraShort ETF) shows opposite direction movement starting at 20% volatility (for a Fund whose index fell 5% and thus had "expected" a 10% return) with the likelihood of opposite direction movement increasing as volatility increases.

**Estimated Fund Return Over One Year When the Fund Objective is to Seek Daily Investment Results, Before Fees and Expenses, that Correspond to Twice (200%) the Inverse of the Daily Performance of an Index.**

| One Year Index Performance | 200% Inverse of One Year Index Performance | Index Volatility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 0% | 5% | 10% | 15% | 20% | 25% | 30% | 35% | 40% |
| -40% | 80% | 177.8% | 175.7% | 169.6% | 159.6% | 146.4% | 130.3% | 112.0% | 92.4% | 71.9% |
| -35% | 70% | 136.7% | 134.9% | 129.7% | 121.2% | 109.9% | 96.2% | 80.7% | 63.9% | 46.5% |
| -30% | 60% | 104.1% | 102.6% | 98.1% | 90.8% | 81.0% | 69.2% | 55.8% | 41.3% | 26.3% |
| -25% | 50% | 77.8% | 76.4% | 72.5% | 66.2% | 57.7% | 47.4% | 35.7% | 23.1% | 10.0% |
| -20% | 40% | 56.3% | 55.1% | 51.6% | 46.1% | 38.6% | 29.5% | 19.3% | 8.2% | -3.3% |
| -15% | 30% | 38.4% | 37.4% | 34.3% | 29.4% | 22.8% | 14.7% | 5.7% | -4.2% | -14.4% |
| -10% | 20% | 23.5% | 22.5% | 19.8% | 15.4% | 9.5% | 2.3% | -5.8% | -14.5% | -23.6% |
| -5% | 10% | 10.8% | 10.0% | 7.5% | 3.6% | -1.7% | -8.1% | -15.4% | -23.3% | -31.4% |
| 0% | 0% | 0.0% | -0.7% | -3.0% | -6.5% | -11.3% | -17.1% | -23.7% | -30.8% | -38.1% |
| 5% | -10% | -9.3% | -10.0% | -12.0% | -15.2% | -19.6% | -24.8% | -30.8% | -37.2% | -43.9% |
| 10% | -20% | -17.4% | -18.0% | -19.8% | -22.7% | -26.7% | -31.5% | -36.9% | -42.8% | -48.9% |
| 15% | -30% | -24.4% | -25.0% | -26.6% | -29.3% | -32.9% | -37.3% | -42.3% | -47.6% | -53.2% |
| 20% | -40% | -30.6% | -31.1% | -32.6% | -35.1% | -38.4% | -42.4% | -47.0% | -51.9% | -57.0% |
| 25% | -50% | -36.0% | -36.5% | -37.9% | -40.2% | -43.2% | -46.9% | -51.1% | -55.7% | -60.4% |
| 30% | -60% | -40.8% | -41.3% | -42.6% | -44.7% | -47.5% | -50.9% | -54.8% | -59.0% | -63.4% |
| 35% | -70% | -45.1% | -45.5% | -46.8% | -48.7% | -51.3% | -54.5% | -58.1% | -62.0% | -66.0% |
| 40% | -80% | -49.0% | -49.4% | -50.5% | -52.3% | -54.7% | -57.7% | -61.1% | -64.7% | -68.4% |

The foregoing tables are intended to isolate the effect of index volatility and index performance on the return of a leveraged fund. The fund's actual returns may be significantly greater or less than the returns shown above as a result of any of factors discussed above or under "Correlation Risk" in the Prospectus.   App-505 (9/28/07 RS at SAI 20).

**(b)    The Registration Statements Adequately Disclosed The Potential Magnitude Of The Divergence**

24

Plaintiffs further complain that the registration statements failed adequately to describe the *probability* and *magnitude* of potential losses to an investor correctly guessing the market's movement.  Corr. Br. 43-45.  As the district court noted, however, the registration statements repeatedly disclosed that a "significant" divergence was possible and that the value of the Funds could be subject to "dramatic changes (losses or gains)."  *See, e.g.*, App-508 (9/28/07 RS at 7-8). Moreover, having disclosed the market conditions that could lead to this significant divergence in cumulative returns (*e.g.*, price volatility), the registration statements were not required to predict in advance the timing and extent to which those market conditions would come to pass.  "[W]hen defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves."  *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 588 (S.D.N.Y. 1993) (citing to *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) and *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir. 1991)); *see also Olkey*, 98 F.3d at 7 (noting that while the prospectuses contained "no specific statement" about the alleged bias, a reasonable investor would not be unaware of the risk based on the other disclosures).

Moreover, as seen above, the wedge graphs reinforced the textual warnings with specific numerical examples of the size of the potential cumulative return divergence (both gains and losses) and the market conditions that could bring them

about.  *See supra* pg. 24; (showing that an UltraShort ETF could lose 38.1% of its value over a one-year period, even if its underlying index was flat (0%), if volatility reached 40%); *see also* App-505 (second graph).  These warnings were clearly sufficient to put the reasonable investor on notice that large losses were possible.  As the district court held, the wedge graphs "illustrate graphically the exact 'must lose' scenarios that form the crux of the plaintiffs' claim" and warned investors that they could experience "significant losses."  SPA-22.

### (c)  The Wedge Graphs Clearly And Accurately Disclosed The Specific Risks That Plaintiffs Allege Occurred

Plaintiffs' criticisms of the wedge graphs  are meritless.  First, plaintiffs assert that the wedge graphs did not disclose that losses could occur quickly, as the examples all utilize a hypothetical one-year period.  Corr. Br. 51.  But plaintiffs do not explain how a reasonable investor could read the wedge graphs and think that such losses could occur over a one-year period but not a shorter or longer one.  And plaintiffs again ignore the textual disclosures which stated that the Funds would not (and could not) track their indices for longer than a single day.  Read as a whole, the disclosures clearly indicated that investors risked a loss once they held the Funds for longer than a day.[7]

---

[7] Plaintiffs observe in passing that the wedge graphs were not part of the registration statements until 2007.  As noted by the district court, however, the rest of the disclosures were sufficient to put a reasonable investor on notice of the risks that plaintiffs allege even before the wedge graphs were added.  SPA-21 ("[I]t is

Second, plaintiffs argue that the wedge graphs should be discounted because they only depicted volatility levels up to 40%.   Corr. Br. 55.   Plaintiffs fail to explain, however, how inclusion of higher volatility levels would materially alter the total mix of information.   Investors were told in textual disclosures that increased volatility risked amplifying the divergence of the Funds' cumulative returns from those of their respective benchmarks. *See* App-503-507 (Discl. App. A at 5A-F); App-515-519 (Discl. App. B at 5A-F). In addition, the wedge graphs depicted that "opposite direction" cumulative returns started at 20% volatility and became more severe as volatility increased. *See, e.g.*, *supra* pg. 24; App-505 (second graph). No reasonable investor could claim to be surprised that this trend would continue if volatility rose even higher.   As the district court noted, "[t]he wedge graphs indicate that, as volatility increases, the potential losses to the ETFs over periods longer than one day increase, even in cases where the underlying index performs as the ETF investor expected over that period."  SPA-9.

Finally, plaintiffs fault the wedge graphs because "only" 19 data points in those graphs showed opposite-direction cumulative returns.  Corr. Br. 52 & n.17. Plaintiffs again offer no explanation as to why those 19 data points would be

---

not possible to read the registration statements – even those issued before the wedge graphs were added in September 2007 – without understanding that the ETFs were particularly risky and speculative and were intended to meet their stated goal only over the course of a single day."). In any event, plaintiffs themselves claim that volatility was not a significant factor in the Funds' performance until June 2008, long after the wedge graphs were added. Corr. Br. 6.

insufficient to notify a reasonable investor that opposite-direction movement was possible.  Moreover, it is the *trend* that the wedge graphs depicted that is most telling.  Using clear color coding, the wedge graphs showed, all other factors being equal, that in periods of low volatility, the Funds are likely to outperform their respective benchmarks (as shown in the highlighted green portions of the wedge graph).  However, as volatility increases, so does the chance that the Funds will underperform their respective benchmarks.   At 40% volatility, as shown in highlighted red portions of the wedge graphs, the Funds are much more likely to underperform their benchmarks (all other factors being equal) including both incurring large losses and opposite direction movement.  *See supra* pg. 24; App-505 (second graph).  That is a clear warning to investors about the potential effects of index volatility.

ii.     ***The Alleged "Materialization Facts" Regarding Supposedly Known And Inevitable Losses Do Not Support Plausible Claims***

Plaintiffs have dubbed certain of their allegations "materialization facts" (another phrase not appearing in the Complaint or prior briefing) and argue that defendants *knew* but failed to disclose that cumulative losses in the Funds were a certainty given the volatility being experienced late in the putative class period.  *See, e.g.*, Corr. Br. 6, 12, 24-25.  According to plaintiffs, the defendants possessed an "undisclosed mathematical formula" that, as of June 2008, "told Defendants to the day when, if current volatility circumstances continued, their ETFs would

28

become dysfunctional and an investor necessarily would lose from a correct judgment about the market." Corr. Br. 24-25. Even taking as true the existence of a mathematical formula that can calculate performance from given inputs, plaintiffs' fanciful theory of the defendants' omniscience does not allege a plausible claim under Section 11, for several reasons.

### (a) Proshares Disclosed The Potential Effects Of Index Volatility

First, as discussed above, ProShares disclosed well before June 2008 the potential effects of index volatility on cumulative returns over time. From the first registration statement in June 2006, investors were told that the value of securities correlated with the equity markets could fluctuate "dramatically" due to volatility and that this "volatility may cause the value of an investment in a Fund to decrease." 6/22/06 RS at 65; *see also* 12/29/06 RS at 317 (same); 9/28/07 RS at 9 (same). In September 2007, ProShares added wedge graphs showing graphically that high levels of volatility could cause large losses and even "opposite direction" cumulative returns. *See, e.g.*, *supra* pg. 24; App-504-505 (Discl. App. A). The district court held that this combination of disclosures put the reasonable investor on notice of the exact risk that plaintiffs claim was "destined" to occur after June 2008. SPA-22-23 (stating that the wedge graphs "literally painted a picture of the possibility of 'must lose' scenarios at high enough levels of volatility before the high volatility period in which the risk actually materialized" and that this

29

"supports the conclusion that, at the time the registration statements were issued, they were candid with respect to the risks that would concern a prudent investor").

Second, in addition to describing the risks posed by volatility, ProShares also disclosed to investors that volatility was increasing over the course of the putative class period. Starting in September 2007, ProShares warned that certain volatility rates were substantially in excess of 15%. App-530 (9/28/07 RS at 8); *see also* 2/28/08 RS at 8. In their certified shareholder report dated May 31, 2008 (and filed with the SEC on August 8, 2008), ProShares told investors the volatility for each of the indices underlying its Funds (the highest being at 37.7%) and warned that "[a]t a given index return level, increased volatility tends to negatively impact performance over time." 5/31/08 N-CSR at 6. ProShares continued to update index volatility levels throughout the rest of the class period. *See, e.g.*, Certified Semi-Annual Shareholder Report dated 11/30/08 (filed with SEC 2/5/09) at 1 (noting that "volatility reached unprecedented levels" and that the volatility for the S&P500 was 50.85% over the past 6 months). Given that ProShares disclosed both the risks of high volatility and that such volatility was occurring, no reasonable investor could claim that she was misled.

### (b)   Plaintiffs Cannot Establish Liability By Alleging Supposed "Must-Lose" Circumstances

Moreover, even if the defendants had a crystal ball and knew each index's future volatility (as plaintiffs implicitly assume), they could not accurately predict

any individual investor's returns.  Plaintiffs' own description of the supposed mathematical formula – a complex quadratic equation with several variables as inputs – demonstrates that the predicted return on any specific investment would also depend on the amount of time the investor held it and the market performance (volatility and index return) *over that time period*.  *See* Corr. Br. 17 n.4.  Using the power of hindsight, plaintiffs purport that they can now plug in the actual index return, the actual leverage ratio, the actual holding period, and the actual annualized volatility of the index into the formula and use the formula to "predict" what actually occurred for a hypothetical investor who held a given Fund over particular dates.  But this exercise ignores the fact that, *at the time ProShares disclosed these risks*, there were an almost infinite number of potential results based on which Fund's shares were purchased, the dates on which they were purchased, how long those were held, the index return over the holding period, and the volatility over that period.  As the district court acknowledged, ProShares could not have known the inputs to the alleged formula in advance.  SPA-23.  It would be impossible for ProShares to disclose every possible permutation of these variables, and the securities laws do not require issuers to see what will happen in the future.  *See, e.g.*, 15 U.S.C. § 77k(a) (providing that liability can attach if the registration statement contained an omission of material fact *at the time the statement became effective*); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials

need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.").

A simplified hypothetical example illustrates the point. Take a fund that has a daily investment objective of doubling the return of its underlying index. Say the underlying index stands at 1000 and Investor A buys $1,000 worth of the fund's shares. As shown in the table below, if the index loses 10% the first day (to 900), Investor A's fund shares, as per the daily objective, will drop 20% that same day (to $800). On day 2, if the index goes up 12% (to 1008), Investor A's shares will go up 24% on that day (to $992).[8] However, due to the combined effects of compounding, leverage, and volatility, the *cumulative* return for Investor A (-.80%) is not equal to twice the *cumulative* return of the Index (.80%), and actually moved in the opposite direction. This pattern continues over the next few days. On day 3, if the index goes down 2.5% (to 982.8), Investor A's fund investment will go down 5% that day (to $942.40). On day 4, if the index goes back up by 2.5% (to 1007.4), Investor A's shares will go up by 5% that day and finish at $989.52, at which point Investor A sells the shares. Even though Investor A's fund shares tracked the index perfectly on each individual day, due to the disclosed effects of compounding, leverage, and volatility, the cumulative return of his fund

---

[8] Due to the effects of leverage, Investor A's principal is significantly reduced by the "wrong bet" on day one. If he simply lets this investment "ride," he has less principal to benefit from a generally positive trend in the underlying index.

investment ($1,000 to $989.52) is -1.05% over those four days while the cumulative return of the index is .74% ($1,000 to $1007.4). Opposite direction movement occurs even though the fund met its daily investment objective.

| | **Index** | **Investor A** | **Investor B** |
|---|---|---|---|
| **Initial Investment** | $1,000 | $1,000 (Purchased beginning of day 1) | $1,000 (Purchased beginning of Day 2) |
| Day 1 Return | $900 (-10%) | $800 (-20%) | |
| Day 2 Return | $1,008 (+12%) | $992 (+24%) | $1,240 (+24%) |
| Day 3 Return | $982.80 (-2.5%) | $942.40 (-5%) | $1,178 (-5%) |
| Day 4 Return | $1,007.40 (+2.5%) | $989.52 (+5%) | $1,236.90 (+5%) |
| **Total Return (Days 1-4)** | +$7.40 (+.74%) | -$10.48 (-1.05%) | |
| **Total Return (Days 2-4)** | +$107.40 (+11.9%) | +189.52 (+23.7%) | +$236.90 (+23.7%) |

This opposite direction movement was not, however, a foregone conclusion. Rather, it was the consequence of individual circumstances, including when Investor A bought and sold the fund, and the fact (unknowable in advance) of how the index performed on each individual day. As shown in the table above, another

investor could have invested during the same period and his cumulative return might actually *outperform* the index. If Investor B bought $1,000 of the same fund's shares one day later than Investor A, and sold the same day as Investor A, her cumulative return would have doubled the cumulative return of the index. On the first day Investor B held the shares, the Index would have gone up 12% from 900 to 1008 and Investor B's fund investment would have gone up 24% to $1,240. The next day, when the index drops 2.5% to 982.8, Investor B's fund shares would have gone down 5% to $1,178. Finally, the index goes up 2.5% to 1007.4 and Investor B's shares would have gone up by 5% to $1,237. By simply buying one day later, Investor B's fund investment would have had a cumulative return of 23.7% compared to 11.9% for the index over those three days. Significantly, Investor A's cumulative return over those three days was also 23.7%, but this was not enough to overcome the loss to Investor A's principal in the first day.

This hypothetical example shows how, even in a volatile market, an investor is not destined to lose money if she holds her investment over a period of time. Rather, the success of her investment will depend on a number of factors, including the precise timing of the initial investment. As demonstrated below, this principle holds true for the Funds at issue in this case. No Fund was a "must lose" investment; rather, any investor's return depended on which Fund she bought,

when she bought, the performance of the underlying index, the amount of time she held the investment, the volatility in the market, *etc*. ProShares could not possibly know any of these variables in advance – thus it warned investors textually and graphically of the risks of holding a Fund for longer than one day.

(c)    **Plaintiffs Cannot Establish Liability By Comparing "Anticipated" And "Actual" Cumulative Returns During Periods Selected With Hindsight**

Plaintiffs erroneously cite "examples" of cumulative returns that diverged from "perfect correlation" over selected time periods as proof that "in certain market circumstances, Defendants' ETFs would *necessarily* produce quick, potentially very large losses from the investor's **correct judgment** about the direction of the market." *See* Corr. Br. 17 (italic emphasis added). Plaintiffs ignore defendants' repeated disclosures that such "perfect correlation" of an index's cumulative return fundamentally *could not* occur over periods longer than one day, and thus failure to achieve such "perfect correlation" is irrelevant.[9] Moreover, plaintiffs engage here in classic and improper hindsight pleading by urging the Court to look at the historical results of cherry-picked hypothetical investments instead of evaluating the forward-looking disclosures based upon what ProShares reasonably could have known at the time of those disclosures. *See, e.g.*,

---

[9] None of plaintiffs' hypothetical examples in their Brief or in the Complaint shows a deviation from "perfect correlation" over a single day. The Funds consistently met their stated daily investment objective, and plaintiffs nowhere allege to the contrary.

15 U.S.C. § 77k(a); *see also*, *Olkey*, 98 F.3d at 8 ("To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted. . . . 'Fraud by hindsight' alone will not sustain a complaint.") (internal citations omitted).  Finally, the fallacy of plaintiffs' argument is exposed by the fact that, even within the plaintiffs' hand-selected timeframes, investors could have *outperformed* the supposed "perfect correlation" depending on the date the investor bought or sold.

Notably, only one of plaintiffs' "examples" is based on the investment results of a named plaintiff, while the remainder are hypothetical investments featuring date ranges evidently chosen for maximum effect.[10]  Indeed, plaintiffs' selection of the date ranges for their examples has very significant consequences for the investment results.  For instance, plaintiffs allege that from January 6, 2009 to April 6, 2009, the Dow Jones U.S. Financials Index ("DJUSFN") fell 22.84% but shares of the SKF Fund (which was designed to track on a daily basis double the inverse of the DJUSFN) fell 17.34% instead of gaining 45.68% as allegedly expected.  Corr. Br. 18, App-932, ¶139.  Had plaintiffs instead used January 6,

---

[10]  For instance, plaintiffs use the EEV Ultra Short Fund as an example.  Corr. Br. 18.  The referenced graph depicts the performance of the EEV Fund from September 9, 2008 to December 8, 2008 (App-933-934, ¶141).  Plaintiffs offer no explanation as to why this time period is relevant, given that no named plaintiff even bought shares of EEV until October 22, 2008.  *See* App-230-234 (Exhibit A to Complaint) (named plaintiff Richard Rhoads first bought EEV shares on October 22, 2008 and named plaintiff Scott Tessler first bought EEV shares on October 31, 2008).

2009 to March 6, 2009 (just as plausible a date range), the DJUSFN would have fallen 47.7% and shares of SKF would have gained 145.2% (more than triple the inverse).[11]  Similarly, plaintiffs allege that from September 11, 2008 to December 10, 2008, the Dow Jones U.S. Oil & Gas Index ("DJUSOG") fell 23.87%, but shares of the DUG Ultra Short Fund (which was designed to track on a daily basis double the inverse of the DJUSOG) fell 24.18% instead of gaining 47.74% as allegedly expected.  Corr. Br. 18, App-934-935, ¶142.  Had plaintiffs used October 10, 2008 as a cut-off instead of December 10, however, the DJUSOG would have fallen 33.9% and shares of DUG would have gained 88.9% (*more* than double the inverse).  Even lead plaintiff Mark Karasick was not "destined" to lose money.  Plaintiffs do not list the precise dates they used to calculate Mr. Karasick's alleged return (Corr. Br. 18, App-931, ¶138) but Exhibit A to the Complaint lists December 22, 2008 as the first day Mr. Karasick purchased shares of the SRS UltraShort Fund (which is designed to track on a daily basis double the inverse of the Dow Jones U.S. Real Estate Index ("DJUSRE")).  Had Mr. Karasick sold these shares on March 6, 2009 (a holding period of almost three months), the DJUSRE

---

[11] These returns are calculated using the same publicly available share and index price data relied upon by plaintiffs in the Complaint, but simply use different end dates.  The Court may take judicial notice of such data.  *See Ganino*, 228 F.3d at 166 n.8.

would have fallen 38.4% and the SRS Fund would have gained 76.0% (almost exactly double the inverse). [12]

Further undermining plaintiffs' conclusory allegations of undisclosed "must-lose" circumstances, some of the named plaintiffs themselves experienced better-than-"expected" cumulative returns on ProShares ETF investments.  For example, named plaintiff Anthony Alexander purchased 100 shares of the ProShares UltraShort Technology (REW) Fund on July 14, 2008 for $67.86 per share, after the volatility comprising the "Materialization Facts" had allegedly begun.  He sold 100 shares on October 10, 2008 for $125.16 per share, making a profit of approximately $5,729 dollars.  *See* App-304-305.  However, had the ETF had "perfect correlation" of cumulative returns as plaintiffs insist was promised, Mr. Alexander would have only made $3,735.  Since the benchmark Dow Jones US Technology Index fell 27.52% during this period, Mr. Alexander would presumably have "expected" his investment to double the inverse, or increase by 55.04%.  Instead, his investment increased by 84.4%.  Mr. Alexander made more money than "expected" despite the fact that the annualized volatility for the Dow

---

[12] Changing the date ranges used in plaintiffs' hypothetical examples results in better-than-"expected" cumulative results, even during the periods of unprecedented volatility upon which plaintiffs focus.  For example, three of the most volatile indexes underlying the ProShares Funds were DJSURE (94.6%), DJUSFN (85.1%), and DJUSOG (62.9%).  *See* 5/31/09 N-CSR at 4.  Despite this high volatility, investments in the three Funds tracking these benchmarks would have *made* money during these volatile periods using the alternate date ranges specified above.

Jones US Technology Index from May 31, 2008 to May 31, 2009 was 45.2%. 5/31/09 N-CSR at 4.

Clearly, ProShares' ETFs were not inevitably going to "lose" or perform opposite the way they were "supposed to." Those cumulative results did "diverge significantly" from their respective benchmarks (both positively and negatively) when held for certain longer time periods, due to a combination of compounding, leverage, and index volatility – just as the registration statements disclosed they could. As demonstrated above, plaintiffs' supposed "must-lose" scenario is simply a feature of their post-hoc selection of particular starting and ending points; such pleading by hindsight does not support plaintiffs' claims. *See  Olkey*, 98 F.3d at 8; *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir 1994). Actual results were, in fact, much more varied, even at different dates within the timeframes selected by plaintiffs. It would be impossible for ProShares to publish a formula predicting future results for every individual investor's portfolio. Instead, ProShares stated repeatedly, in plain English and in numerous illustrative examples, *whenever a Fund is held for more than one day*, there is a risk that its returns will diverge significantly from its benchmark. That way, reasonable investors were on notice of the risks of compounding, leverage, and index volatility and could proceed with their investment decisions accordingly.

    **iii.**    *The So-Called "Contra-Indicators" Alleged By Plaintiffs Did Not Suggest To Investors That Cumulative Returns In The Funds Would Track The Benchmark For Periods Longer Than One Day*

Plaintiffs point to no express statement in any of the registration statements that ProShares' ETFs attempted to track their benchmark indices for more than one day, or any statement that the Funds would in fact achieve this. As discussed above, the registration statements stated flatly the opposite, that investors "should not expect" such results. Faced with the plain language of the disclosures, plaintiffs point to other disclosures they label "contra-indicators," claiming that these statements somehow *imply* that investors could hold the Funds for longer periods without risking a significant divergence in cumulative returns from the underlying benchmarks. No reasonable investor could read the "total mix" of information in the registration statements to mean this.

First, plaintiffs' assertion that the district court failed to consider the alleged contra-indicators (*see, e.g.*, Corr. Br. 10, 38, 50-51) is simply wrong. The decision below specifically references the exact statements plaintiffs cite, acknowledging that the registration statements "did include some material that attempted to explain the effects of investing in the ProShares ETFs for a period of greater than one day." SPA-6. The district court then details at length the express disclosures that belie any supposed implication from plaintiffs' alleged contra-indicators regarding longer-term investment, including: (i) the Funds' daily objective (SPA-

40

6); (ii) that compounding prevented the Funds' cumulative returns from matching the cumulative returns of the underlying index for periods greater than one day (SPA-7); (iii) that these cumulative returns could "diverge significantly" from those of the underlying index (SPA-7); (iv) that leverage could magnify this divergence (SPA-7-8); (v) that the Funds' aggressive techniques could expose them to potentially dramatic losses (SPA-8); and (vi) that volatility could negatively impact the Funds' performance. SPA-8-9. Significantly, as the district court noted, "the ETFs' registration statements did not contain penalties or enticements that would have encouraged investors to hold the ETFs beyond a period of one day." SPA-18.[13]

As one supposed contra-indicator, plaintiffs point to the inclusion in the registration statements of tables showing the fees associated with holding the Funds for periods of one, three, five and ten years. *See, e.g.*, Corr. Br. 31; 9/28/07 RS at 21. These tables, however, are required by SEC Form N-1A. *See infra* pg. 43-44. Moreover, they said nothing to imply that cumulative returns will track those of the benchmark over such periods. For all the reasons cited above, the district court correctly rejected the notion that the fee tables implicitly urged

---

[13] Plaintiffs cite *Rafton v. Rydex Series Funds*, No. 10-cv-01171, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011), as support. *See* Corr. Br. 8. But *Rafton* is inapposite because the funds at issue in that case subjected investors to a sales charge if they sold shares within a certain time of purchase. There is no such allegation of penalty charges here. See SPA-18-19.

longer-term investing and downplayed the cumulative return risk, when the "plain language of the registration statements 'addresse[d] the relevant risk directly.'" SPA-18; *Greenberg v. ProShares Trust*, No. L-1101-09, 2011 WL 2636990, at *6 (N.J. Super. A.D. July 7, 2011) (rejecting a state law misrepresentation claim against ProShares because it was clear from the very first page of the prospectus that the "Funds do not seek to achieve their stated investment objective over a period of time greater than one day"). Investors of course have the freedom to hold the Funds for as long as they choose, and will incur the fees and collect the dividends as described in the registration statements. They do so, however, having been fully apprised of the risk of a significant divergence between the cumulative returns of the Funds and the benchmarks.

Plaintiffs also point to a set of exemplary graphs reflecting a relatively small divergence in cumulative returns and contend that ProShares thereby implied that these are the only possible types of divergence. *See, e.g.*, Corr. Br. 19.[14] As this

---

[14] Plaintiffs also cite language in the registration statements that for periods greater than one day the use of leverage "tends to cause the performance of a Fund to be either greater than or less than the index performance times the stated multiple" Corr. Br. 19 (quoting, with selective emphasis, App-530 (9/28/07 RS at 8)). Plaintiffs fail to explain, however, how that language is misleading. ProShares specifically warned investors that a leveraged fund could underperform its benchmark, which is exactly what plaintiffs allege occurred. ProShares never stated that such "less than" or "underperformance" could not include results in the opposite direction that investors allegedly "expected." Indeed, ProShares showed them explicitly that this was possible through the wedge graphs. *See, e.g.*, *supra* pg. 24; App-504-505 (Discl. App. A).

Court has repeatedly noted, individual statements must be read in the context of the disclosures as a whole. *See Halperin*, 295 F.3d at 357. The graphs cited by plaintiffs simply illustrated one possible divergence that could occur. The language accompanying the graphs clearly told the investor that this divergence was based on one volatility assumption, noted that some of the Funds' benchmark indices had volatility rates substantially in excess of 15%, and directed the investor to the SAI for more information on how volatility could affect the amount of divergence. *See, e.g.*, App-530-531 (9/28/07 RS at 8-9). There, the registration statement showed explicitly (and repeatedly) that the divergence could range widely (including going in the opposite direction from the "expected" returns). *See, e.g.*, App-686-688 (9/28/07 RS at SAI 18-20), App-504-505. There is simply no way a reasonable investor could read the total mix of disclosures and conclude that a minimal divergence was the only possible outcome. *See Olkey*, 98 F.3d at 5 ("Despite these assurances . . . we agree with the district court that the prospectuses when read in their entirety are not overly sanguine but instead 'bespeak caution.' The assurances were balanced by extensive cautionary language.") (internal citations omitted).

Moreover, as the district court noted, many of the alleged contra-indicators were included pursuant to SEC regulatory requirements. SPA-20; *compare* App-920, 958, ¶¶102(g), 174 (allegations regarding illustration of the costs of investing

43

$10,000 for various year periods assuming a 5% annual return) *with* App-544 (9/28/07 RS at 21) *and* App-790 (SEC Form N-1A); *compare* App-919, ¶102(e) (allegations regarding the inclusion of dividend information) *with* App-647 (9/28/07 RS at SAI 124) (providing distribution and dividend information) *and* App-801 (SEC Form N-1A) (requiring distribution and dividend information). Liability cannot attach merely because the issuer included information that the SEC mandates be included. *See, e.g.*, 15 U.S.C. §77s(a) ("No provision of this subchapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission."); *Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88-cv-2139, 1992 WL 380929 at *4 (N.D. Ill. Dec. 10, 1992) (noting that defendant complied with SEC prospectus regulations, and if defendant included language "in good faith reliance on the SEC rule, then no liability follows"). There is no plausible basis to assert that ProShares was sending an implicit message to potential investors by including SEC *mandated* disclosures that appear in virtually identical form and fashion throughout all mutual fund and exchange-traded fund prospectuses.[15]

---

[15] Plaintiffs' citation of *DeMaria v. Anderson*, 318 F.3d 170 (2d Cir. 2003), and 17 C.F.R. § 230.408, Corr. Br. 39, are of no moment, as each stands only for the proposition that a registrant cannot omit information required to make the registration statement not misleading. The district court found that ProShares' ample disclosures more than adequately disclosed the relevant risk. Moreover, *DeMaria* involved allegedly erroneous and stale financial information. *See, e.g.*,

**iv.**   ***Proshares Disclosures Differentiate Its Registration Statements From Those Of Other ETF Companies***

Plaintiffs attempt to bolster their case with a citation to the district court opinion in *In re Direxion Shares ETF Trust*, 279 F.R.D. 221 (S.D.N.Y. 2012) (Forrest, J.), a case involving leveraged and inverse ETFs in which a motion to dismiss was denied.  Corr. Br. 8.  The decision of a district court judge is not, of course, binding on this Court, but the two cases are, in any event, readily distinguishable, a fact that both Judge Koeltl and Judge Forrest recognized.  Indeed, Judge Forrest recently denied the *Direxion* defendants' motion to stay those proceedings pending the outcome of this appeal, precisely because the disclosures in the two cases are too distinct for a ruling on this appeal necessarily to have a bearing on the *Direxion* case.  *See* No. 09–cv-8011, Order, at 2 (Nov. 8, 2012) (attached as an addendum hereto).

First, plaintiffs ignore that ProShares made additional disclosures that Direxion did not, such that the total body of ProShares' disclosures made it unreasonable for any investor to think that ProShares' ETFs would track their investment objective for longer than one day.  In *Direxion*, plaintiffs argued that the Supplement "failed to disclose adequately that the Funds would, because of, inter alia, compounding, be *prevented* from achieving their return objectives if held

---

*DeMaria*, 318 F.3d at 180-181.  Here, there is no allegation that any of the information included pursuant to SEC guidelines was incorrect or out of date.

for longer than a single day." *Direxion*, 279 F.R.D. at 228 (emphasis added). By contrast, ProShares provided investors this precise warning on the very first page of its registration statements (after the Table of Contents), stating that "the Funds do not seek to achieve their investment objective over a period of time greater than one day because mathematical compounding *prevents* the Funds from achieving such results." *See, e.g.,* App-497 (9/28/07 RS at 6) (emphasis added).

Moreover, ProShares, unlike Direxion, also repeatedly told investors that the divergence could be "significant" and "dramatic." App-498-499; App-507-508. Direxion had no such language in its relevant prospectus. Indeed, in her decision, Judge Forrest noted that Direxion's class period disclosures failed to emphasize the magnitude of the risk. *Direxion*, 279 F.R.D. at 232. ProShares, in contrast, warned investors that holding the Funds for longer than a day risked a significant divergence, that the value of the Funds could fluctuate dramatically, and that volatility risked especially large losses (including "opposite direction" losses).

Finally, as the district court properly noted, the supposed "contra-indicators" in *Direxion* are distinct from those here. Both Direxion's and ProShares' disclosures stated at the very beginning of their registration statements that their respective ETFs have daily investment objectives. Direxion, however, followed that statement with a note in the same paragraph that this daily objective meant that "the return of a Fund for a period longer than a single day will be the product of

46

the series of daily leveraged returns for each day during the relevant period." Judge Forrest held that an investor might be confused by this language about cumulative returns. *Direxion*, 279 F.R.D. at 232; SPA-20. ProShares by contrast followed up its statements regarding its daily objective with a further warning in the same paragraph that "the Funds do not seek to achieve their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results." App-528 (9/28/07 RS at 6). As Judge Koeltl noted, none of plaintiffs' alleged contra-indicators in this case appeared near the "clear statements" throughout the registration statement that the Funds only tracked the underlying benchmarks on a daily basis. SPA-20. Thus, the alleged contra-indicators cannot be read to counsel holding ETFs for long periods of time in light of the many disclosures warning of the risks of doing exactly that.

### v. *The 2009 Registration Statement Disclosures Do Not Establish Or Support Liability For Earlier Statements*

Plaintiffs also attempt to discredit the Funds' disclosures during the putative class period by arguing that the language of later disclosures establishes the inadequacy of the earlier disclosures. For all of the reasons discussed above, the disclosures during the class period were more than sufficient to put the reasonable investor on notice of the risks of holding the Funds for periods longer than a day.

The fact that ProShares undertook to further update its disclosures in 2009 – in the midst of the greatest market volatility in a lifetime – does nothing to disprove the adequacy of the prior disclosures.  This Court has rejected attempts to prove the purported inadequacy of certain disclosures from the fact that later disclosures were even clearer.  In *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978), for example, the Court rejected as pleading by hindsight the plaintiffs' allegations that disclosures made in later annual reports should have been made in earlier ones. *Id.* at 470.  "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).  Even if "the quality of the disclosure could have been improved" that "does not render what was done deceptive or misleading." *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 211 (2d Cir. 1980).

Reliance on revised disclosures to prove the inadequacy of those that went before would be contrary to public policy.  If previous disclosures could be found inadequate just because a registrant worked to improve them over time as conditions changed, registrants would have a strong incentive not to continue updating and improving their public filings.  *See, e.g.*, *SEC v. Geon Indus., Inc.*, 531 F.2d 39, 52 (2d Cir. 1976) (noting that the "subsequent taking of measures which would have made a violation less likely normally cannot be considered as proving that failure to take them earlier was negligent") (citing Fed. R. Evid. 407

and *Smyth v. Upjohn Co.*, 529 F.2d 803, 804 (2d Cir. 1975)); *In re CIT Grp., Inc. Secs. Litig.*, 349 F.Supp.2d 685, 691 n.6 (S.D.N.Y. 2004) (inferring liability under Section 11 based on subsequent remedial disclosures would dissuade restatements and corrections); *accord Krouner v. Am. Heritage Fund, Inc.*, 899 F. Supp. 142, 147 (S.D.N.Y. 1995).[16]

Moreover, many of the disclosures that plaintiffs allege were new starting in June 2009 had, in fact, previously been disclosed during the class period. For example, plaintiffs claim ProShares disclosed for the first time after the class period that a fund could move in the "opposite direction." Corr. Br. 27. As explained in more detail above, ProShares disclosed from the beginning of the class period that a significant divergence and dramatic fluctuations were possible. *See* SPA-21. Moreover, starting in September 2007, before the period of volatility that is the focus of plaintiffs' Complaint, the Funds' wedge graphs showed explicitly the possibility of opposite movement.[17] Similarly, plaintiffs allege that

---

[16] Plaintiffs rely on cases concerning use of pre- or post-class period *data* to determine whether a false statement was made during the class period. *See, e.g.*, *In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001). Such use does not implicate the policy concerns noted in the text.

[17] Plaintiffs' also try to claim that the post-class period disclosures show that the class period wedge graphs were inadequate. *See, e.g.*, Corr. Br. 54, 55. As explained in Section I(B)(i)(c)*, supra* (pg. 27), adding volatility levels above 40% to the wedge graphs is not a material change since no reasonable investor could have read the class period wedge graphs and thought that 40% volatility levels could cause large losses and opposite direction movement but that higher volatility levels could not. Similarly, no reasonable investor could have read the disclosures

the post-class period disclosures were the first time investors were warned that the divergences could happen in a matter of days.  Corr. Br. 40.  However, ProShares repeatedly warned investors that compounding prevented the Funds from tracking their benchmarks for longer than a single day and that the Funds' cumulative returns would be greater than or less than (but not equal to) those of the underlying indices.  No reasonable investor could read those warnings and think that a divergence could not occur in a matter of days.[18]  The fact that plaintiffs prefer the wording of ProShares' later disclosures is not enough to attach liability when the previous disclosures clearly warned of the relevant risk.  *See*, *Greenapple*, 618 F.2d at 211.

### vi.    *The Placement Of Certain Disclosures In The Statement Of Additional Information Does Not Negate Their Impact*

Unable to dispute the *substance* of the disclosures, plaintiffs resort to attacking their *placement* within the registration statements.  Plaintiffs argue that the Funds should have disclosed the so-called Inherent and Materialization Facts in

---

regarding the Funds' daily objective and the short-term effects of compounding and thought that a quick divergence was not possible.

[18] Plaintiffs also claim that the post-period disclosures were the first time that the importance of index volatility was elevated (Corr. Br. 27, 40) and that investors were warned they had to monitor or rebalance their portfolios (*id*.).  Investors were warned about index volatility since 2006, with the wedge graphs emphasizing this warning in 2007.  Additionally, plaintiffs were on notice that they "should not expect" the Funds to track their benchmarks for longer than one day.  They were certainly on notice that they should be monitoring their investment if they planned to hold it for longer than a day.

the Principal Risks portion of the prospectus instead of allegedly "bur[ying]" these facts in the SAI.  Corr. Br. 17-18, 41, 48, 50.  This argument fails for a number of reasons.

First, the factual premise of plaintiffs' argument is incorrect.  Many of the Funds' relevant disclosures did appear in the prospectuses.  To the extent placement is relevant, these disclosures in the prospectuses were more than sufficient to warn the reasonable investor of the risks of holding the Funds for longer than one day.  The prospectus disclosed to investors that the Funds had a daily investment objective, employed aggressive techniques, and that compounding, leverage, and volatility would prevent the Funds from tracking their underlying index for a period of time longer than one day.  As the district court noted, "[i]t is not possible to read the registration statements – even those issued before the wedge graphs were added in September 2007 – without understanding that the ETFs were particularly risky and speculative and were intended to meet their stated goal over the course of a single day."  SPA-21.

Second, the wedge graphs were not "buried."  Instead, these prominent full color presentations, although set forth in the SAI, were specifically cross-referenced in the Principal Risks Section of the prospectus.  *See* App-531 (9/28/07 RS at 9) (directing the investor to the SAI for information on how index volatility and index performance could affect Fund performance); *see also* App-529 (9/28/07

51

RS at 7) (directing investor to the SAI for more information about the risks of investing in the Funds).[19]  ProShares can hardly be said to be hiding such information when it specifically told investors to review it.  Significantly, none of plaintiffs' cases regarding allegedly buried disclosures deals with a situation where investors are specifically directed to review those allegedly buried facts.  *See* Corr. Br. 35; *see, e.g.*, *I. Meyer Pincus & Assocs., P.C.*, 936 F.2d at 763 (rejecting allegation of "buried" information that was "explicitly referenced on page 5").

Third, the placement of disclosures in the SAI rather than the prospectus is irrelevant since the SAI is deemed to be part of the Funds' prospectus as a matter of law.  When the SEC adopted Form N-1A, it did so specifically to simplify the prospectus.  *See* SEC, Registration Form Used by Open-End Management Investment Companies; Guidelines ("SEC Guidelines"), 48 Fed. Reg. 37928, 37929 (1983) (noting that mutual fund prospectuses were not effective disclosure documents because they were too long and complex).  Under this system, the SAI was designed to provide more detailed discussions and support the plain English disclosures found in the prospectus.[20]  In order to reassure mutual fund sponsors

---

[19]  The fact that ProShares Trust II placed its wedge graphs in its prospectus is not a reason to attach liability to ProShares Trust I for placing them in its SAI.  As discussed above, a commodity pool like ProShares Trust II files its registration statements on a form that does not feature an SAI.

[20] This is exactly what ProShares did.  The fact that a Fund would likely not track its benchmark over a period longer than one day is disclosed in the Principal Risks

that omitting information from the simplified prospectus would not expose them to liability (as plaintiffs attempt to do here), the SEC authorized funds to incorporate the SAI by reference into the prospectus. The SAI would then be a part of the prospectus as a matter of law. SEC Guidelines at 37930.[21] Moreover, the release proposing Form N-1A assured registrants that no provision of that Act "imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule of the Commission." *Id.*; *see also White v. Melton*, 757 F.Supp. 267, 269, 269 n.3 (S.D.N.Y. 1991) (acknowledging that the SEC authorized the incorporation of the SAI into the prospectus by reference). As a result, courts in this Circuit examine both the prospectus and SAI in evaluating Section 11 claims. *See, e.g.*, *In re AIG Advisor Grp. Secs Litig.*, 309 F. App'x. 495, 498 n.4 (2d Cir. 2009); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730-31 (2d Cir. 1998); *Direxion*, 279 F.R.D. at 225; *Press v. Quick & Reilly*, 1997 WL 458666 *4 n.4 (S.D.N.Y. Aug. 11, 1997).[22]

---

section under Correlation Risk. The SAI is then used to provide additional detail on one of the factors that affects that Correlation Risk: index volatility.

[21] The SEC only requires that the SAI be made available, not that it be delivered with the prospectus. SEC Guidelines at 37930. ProShares nevertheless attached the SAI to the prospectus both on ProShares' website and on the SEC's website. The annual and semi-annual shareholder reports are similarly available for free on both websites and sent to all shareholders free of charge.

[22] None of the cases cited by plaintiffs (Corr. Br. 49, 42) holds that liability attaches because some disclosures occurred in the SAI rather than in the Prospectus. In *In re Morgan Stanley Information Fund Securities Litigation*, 592

## II.    PLAINTIFFS HAVE FORFEITED THEIR BREACH OF CONTRACT CLAIM

The district court also dismissed plaintiffs' breach of contract claim for failure to identify any promise that was breached.  SPA-25.  Plaintiffs have not contested that holding on appeal; as such, the contract claim has been forfeited.  *See, e.g.*, *Retained Realty, Inc. v. McCabe*, 376 F. App'x. 52, 57 (2d Cir. 2010).

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court dismissing the Complaint for failure to state a claim.

---

F.3d 347 (2d Cir. 2010), the Court focuses on what the SEC requires to be disclosed, not whether this disclosure occurs in the prospectus or SAI.  *Id*. at 363. In *In re Oppenheimer Rochester Funds Group Securities Litigation.*, 838 F. Supp. 2d 1148 (D. Col. 2012), the court did not hold that information could not be included in the SAI; rather, the court held that defendants could not require investors to calculate defendants' leverage ratio by performing multiple calculations based on data referenced in various parts of the prospectus and SAI. *Id*. at 1165 n.10. In *In re Charles Schwab Corporation Securities Litigation*, No. 08-cv-01510, 2009 WL 1371409 (N.D. Cal. May 15, 2009) the court did, in fact, consider the prospectus and SAI together.  *Id*. at *3.  Finally, SEC *v. Tecumseh Holdings Corporation*, 765 F.Supp.2d 340 (S.D.N.Y. 2011) does not hold that disclosures in the SAI are to be disregarded.  Rather, the court faulted the company for projecting high profits despite already knowing it was losing money.  *Id*. at 353-354.

Dated:  February 1, 2013

Respectfully submitted,

ROPES & GRAY LLP
By: /s/ Robert A. Skinner
Robert A. Skinner
Nick W. Rose
Prudential Tower
800 Boylston Street
Boston, MA  02199
Tel: (617) 951-7000
Fax: (617) 951-7050
robert.skinner@ropesgray.com
nick.rose@ropesgray.com

Douglas H. Hallward-Driemeier
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948
Tel: (202) 508-4600
Fax: (202) 508-4650
douglas.hallward-driemeier@ropesgray.com

*Attorneys for defendants ProShares Trust,*
*ProShares Trust II, ProShare Advisors LLC,*
*SEI Investments Distribution Co., Michael*
*Sapir, Louis Mayberg, Edward Karpowicz,*
*William Seale, Ph.D., Simon Collier,*
*Charles Todd, and Barry Pershkow*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
By: /s/ Arthur H. Aufses III
Arthur H. Aufses III
Steven S. Sparling
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100
Fax:  (212) 715-8000
aaufses@kramerlevin.com
ssparling@kramerlevin.com

*Attorneys for defendants Russell Reynolds*
*and Michael Wachs*

55

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,635 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Date: February 1, 2013                    Respectfully submitted,


                                          /s/ Robert A. Skinner_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2013, I caused a true and correct copy of the foregoing document to be served upon all counsel of record via the ECF system.

<u>/s/ Robert A. Skinner</u>
Robert A. Skinner

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED **NOV 0 8 2012**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                       :

IN RE DIREXION SHARES ETF TRUST    :
                       :
-------------------------------------------------------------------X

09 Civ. 8011 (KBF)

ORDER

KATHERINE B. FORREST, District Judge:

Currently before the Court is defendants' motion for a stay pending the

outcome of the Second Circuit appeal in In re Proshares Trust Securities Litigation,

---- F. Supp. 2d ---, 2012 WL 3878141 (S.D.N.Y. Sept. 7, 2012), or, in the alternative,

to certify for interlocutory appeal this Court's orders on defendants' motions to

dismiss pursuant to 28 U.S.C. § 1292(b). (See Dkt. No. 160.)

Motion for a Stay

A district court has broad discretion in determining whether or not to stay

proceedings before it. See, e.g., Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). In

deciding whether to exercise that discretion, a court considers: (1) the applicant's

likelihood of success on the merits; (2) irreparable injury sustained by the applicant

if a stay is denied; (3) whether a stay would injure the party opposing the stay; and

(4) where the public interest lies. Hilton v. Braunskill, 481 U.S. 770, 776 (1987); In

re World Trade Center Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007).

Defendants have not offered compelling arguments in support of their

request for a stay--or any persuasive arguments with respect to any of the above

factors.

First, the Court finds that ProShares is not on all fours with this action--and therefore, staying this action pending an appeal in that action is unwarranted. The offering documents (e.g., registration statement and prospectuses) considered by the Court in ProShares are not the same offering documents at issue here. Indeed, in ProShares Judge Koeltl distinguished the basis on which this Court denied defendants' motion to dismiss, finding differences between the offering documents at issue in this action and the ones there. See 2012 WL 3878141, at *8.[1] If the Court were to stay this action based upon the ProShares appeal, it would be equivalent to finding that any section 11 case challenging alleged misrepresentations or omissions in offering documents for an inverse leverage exchange traded fund (or funds) ("ETFs") should be stayed pending the same ProShares appeal. An appeal in an unrelated action dealing with unrelated offering documents cannot warrant the "extraordinary remedy" of a stay.

In addition, the Court will not (as defendants request) delay this action based upon appeals of what the Court perceives as routine orders--e.g., appeal of the denial of a motion to intervene, a potential anticipated Rule 23(f) appeal of the Court's yet-to-be-issued decision on plaintiffs' motion for class certification. The Court will continue to monitor developments in this action resulting from any appeals and take action, if necessary and appropriate.

---

[1] Defendants argue that the ProShares appeal raises a controlling question of law pertinent to this action: whether language required to be included in a registration statement by the Securities and Exchange Commission's regulations (e.g., the "contra-indicators" relied upon by this Court to deny defendants' motion to dismiss) cannot be actionable under section 11 of the Securities Act of 1933. Defendants did not make such an argument on their motion to dismiss, did not seek reconsideration of the Court's motion to dismiss order on that basis, and have not moved for summary judgment on that basis. In other words, defendants only now raise this as an issue pertinent to this action.

Motion for Interlocutory Review

Defendants, in the alternative, request that the Court certify its motion to dismiss orders for interlocutory review pursuant to 28 U.S.C. § 1292. Section 1292(b) grants a district court discretion to certify an order for interlocutory appeal where the order(s) "involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

As discussed above, this Court does not find that the ProShares appeal involves a "controlling question of law" pertinent to this action because it involves an unrelated matter with unrelated offering documents. The "difference of opinion" highlighted by defendants is one of their own making: they argue that because the ProShares and Direxion ETFs are both triple-inverse leveraged ETFs and were sold pursuant to offering documents discussing the "daily" nature of those ETFs, any appeal in that case will impact this one. Although all Second Circuit decisions relating to various aspects of section 11 ultimately may be relevant to the issues in this litigation, that concept is neither novel, nor a basis to certify orders for interlocutory appeal. There is no particular reason why the Second Circuit's opinion in ProShares will "materially advance" this litigation where the ETFs here were sold pursuant to their own, disparate offering documents.

Accordingly, it is hereby

ORDERED that defendants' motion for a stay or, in the alternative, for an order certifying the motion to dismiss orders for interlocutory appeal is DENIED.

The Clerk of the Court is directed to terminate the motion at Docket No. 160.

SO ORDERED:

Dated:      New York, New York
            November 8, 2012

KATHERINE B. FORREST
United States District Judge