**12-3981**
*In Re ProShares Trust Sec. Litig.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————————

August Term, 2012

(Argued: May 2, 2013          Decided: July 22, 2013)

Docket No. 12-3981

————————————————

IN RE PROSHARES TRUST SECURITIES LITIGATION

————————————————

MARK KARASICK, STEVEN S. NOVICK, SUSAN ASAI, STEPHEN C. HERMAN, CHARLES SANKOWICH, MICHAEL A. HYMAN, HOWARD SCHWACK, FRANCISCO JAVIER DE LION DIAZ, RENE LACROIX, ANTHONY KOURI, ANTHONY ALEXANDER, JAY BILYEU, JUDY BILYEU, MICHAEL ERIC CODLIN, WENDY ROCKWELL-GOFF, ROBERT SCHUMACHER, JAMES HERSHMAN, DOROTHY HERSHMAN, SCOTT TESSLER, RICHARD RHOADS, MARTIN GARY NORRIS, DOROTHY LOWELL, NANCY HITCHINS, THOMAS TRUONG, EDWARD CISNEROS, CHRIS HONCIK, STEPHEN SHOAP, DMITRI ROUTSKI, ELENA LAVENDER-BOWEN, DAVID BOWMAN, DAVID CHOW, MARK EVERETT BROWN, JONATHAN DEAN, LAWRENCE LEWIS SINSEL, JR., KENNETH L. KRAMER, LAWRENCE I. WEINER, JOHN E. KILLOUGH, ALAN PARKER, SCOTT A. SMELTZ, HOWARD SCHWACK, DOUGLAS JONES, STEPHEN HERMAN, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, STEVEN SCHNALL, SHERRI SCHNALL, ON BEHALF OF THEMSELVES,

*Plaintiffs-Appellants,*

–v.–

PROSHARES TRUST, PROSHARE ADVISORS LLC, SEI INVESTMENTS DISTRIBUTION CO., MICHAEL L. SAPIR, LOUIS M. MAYBERG, RUSSELL S. REYNOLDS, III, MICHAEL WACHS, SIMON D. COLLIER, PROSHARES TRUST II, EDWARD KARPOWICZ, WILLIAM E. SEALE, CHARLES TODD, BARRY PERSHKOW,

*Defendants-Appellees.*

————————————————

Before:

WESLEY, CARNEY, WALLACE,[*] *Circuit Judges*.

Appeal from an order of the United States District Court for the Southern District of New York (John G. Koeltl, *Judge*), entered on September 12, 2012, dismissing Plaintiffs-Appellants' third amended complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs complain that Defendants offered investments in forty-four leveraged exchange-traded funds ("ETFs") through prospectuses that failed to warn them about the magnitude and probability of loss in beyond-a-day investments even when investors correctly predicted the overall direction of the ETFs' underlying index. Furthermore, Plaintiffs allege that Defendants included various contra-indicators of successful long-term investments in the prospectuses which the alleged omissions made misleading. Accordingly, Plaintiffs seek to hold Defendants liable for the alleged omissions and misleading statements pursuant to sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k & 77o. After a comprehensive review of the relevant prospectuses, the district court concluded that the alleged omissions were immaterial as a matter of law because the prospectuses warned of the risks that materialized and no reasonable investor who read them would have been misled about the risks of leveraged-ETF investments. After our own review of the complaint and of the prospectuses, we agree with that conclusion.

**AFFIRMED.**

_____

CHRISTOPHER LOVELL, Lovell Stewart Halebian
        Jacobson LLP, New York, NY (Jacob H. Zamansky,
        Zamansky & Associates LLC, New York, NY, *on
        the brief*), *for Plaintiffs-Appellants*.

ROBERT A. SKINNER, Ropes & Gray LLP, Boston, MA
        (Nick W. Rose, Ropes & Gray LLP, Boston, MA;

[*] The Honorable J. Clifford Wallace, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Douglas H. Hallward-Driemeier, Ropes & Gray
LLP, Washington, D.C.*, on the brief*), *for
Defendants-Appellees ProShares Trust,
ProShares Trust II, ProShare Advisors LLC, SEI
Investments Distribution Co., Michael Sapir,
Louis Mayberg, Edward Karpowicz, William
Seale, Simon Collier, Charles Todd, and Barry
Pershkow.*

Arthur H. Aufses III, Steven S. Sparling,
Kramer Levin Naftalis & Frankel LLP, New York,
NY, *for Defendants-Appellees Russell Reynolds
and Michael Wachs.*

─────────────────────────

WESLEY, *Circuit Judge*:

In this putative class action, Plaintiffs collectively purchased shares in forty-four leveraged ProShares exchange-traded funds ("ETFs") during the August 6, 2006 through June 23, 2009 class period.  Third Amended Complaint ("TAC") ¶¶ 1-2.  They seek to hold Defendants-Appellees ProShares Trust and ProShares Trust II (collectively, "ProShares") liable for material omissions and misrepresentations in the prospectuses for those ETFs pursuant to sections 11 and 15 of the Securities Act of 1933 ("'33 Act"), 15 U.S.C. §§ 77k & 77o.[1]

─────────────────────

[1] Defendant-Appellee ProShares Trust ("ProShares I") registered with the Securities and Exchange Commission ("SEC") as an open-end management investment company under the Investment Company Act of 1940.  TAC ¶ 62(a).  Defendant-Appellee ProShares Trust II ("ProShares II," collectively with ProShares I "ProShares") registered with the Commodity Futures Trading

1       **A.   Exchange-Traded Funds**

2           In a series of press releases, ProShares indicated

3   that their ETFs were for "investors interested in pursuing

4   more sophisticated" trading strategies.  *See* TAC ¶¶ 104-08

5   (internal quotation marks omitted).  With ProShares ETFs,

6   investors could hedge and manage risk without having "'to go

7   through the process of setting up margin accounts or

8   covering margin calls - they [could] simply trade

9   ProShares.'"  TAC ¶ 104 (quoting June 21, 2006 Press

10  Release).  "'And unlike a margin account,[an investor] can't

11  lose more than [she] invest[s].'"  TAC ¶ 106 (quoting Feb.

12  1, 2007 Press Release). This is because ETFs operate like

13  indexed mutual funds but trade like stocks.  TAC ¶ 82.

14          "ETFs frequently track an index, a sector of stocks, or

15  a commodity or currency."  TAC ¶ 81.  They are considered to

16  be "indexed mutual funds that trade like stocks," TAC ¶ 82,

17  but they differ from mutual funds because they are generally

18  sold to institutional investors in large blocks of shares,

_____

Commission as a commodity pool.  TAC ¶ 62(b).  ProShares I
offered thirty-eight of the ETFs underlying this action;
ProShares II offered six.  TAC ¶ 62(a), (b).  Plaintiffs have not
identified any meaningful distinction between ProShares I's and
ProShares II's securities or registration statements such that
one of the fund defendants would be subject to liability while
the other would not.

1  called Creation Units.  These investors generally purchase

2  Creation Units in exchange for "baskets" of securities that

3  mirror the securities in the ETF portfolio.  Investors who

4  purchase Creation Units often split up the Units into

5  individual shares and sell them on a secondary market to

6  retail investors who otherwise might not be able to access

7  ETFs because of the cost of Creation Units.  These retail

8  investors are then able to sell shares of ETFs on the

9  secondary market, but they generally cannot redeem shares

10 with the ETFs because the ETFs often redeem shares only when

11 they are packaged in Creation Units.  TAC ¶ 82.

12      ProShares offered three types of ETFs: (1) an Inverse

13 ETF, (2) an Ultra Long ETF, and (3) an Ultra Short ETF.  TAC

14 ¶ 93(a)-(c).  An Inverse ETF aimed to "replicate the inverse

15 movement of the specified index over one day."  TAC ¶ 93(a).

16 An Ultra Long ETF tried to "double the performance of the

17 underlying index or benchmark on a daily basis."  TAC ¶

18 93(b).  And an Ultra Short ETF was designed to "double the

19 inverse of the performance of the underlying index or

20 benchmark on a daily basis."  TAC ¶ 93(c).  Accordingly, if

21 the "specific index, benchmark, sector or commodity on which

22 an ETF [was] based[] increase[d] by 1% on a given day, then

5

[the Inverse ETF] would decrease by 1%; the [Ultra Long ETF] would increase by 2%; and [the Ultra-Short ETF] would decrease by 2%." TAC ¶ 94. Each one of the ETFs in this case is leveraged.

**B.   Registration Statements**

ProShares I filed its registration statement on SEC Form N-1A. TAC ¶ 89. ProShares II filed its registration statement on Forms S-1 and S-3. TAC ¶ 91. The registration statements consisted of, *inter alia*, a prospectus and a statement of additional information ("SAI"). Though ProShares I and ProShares II provided investors with several different offering documents relevant to this appeal, ProShares' key disclosures relating to the ETFs at issue here were materially consistent across all of the documents.

All relevant ProShares registration statements disclosed that the ETFs pursued daily investment objectives and daily investment results. *See* Skinner Decl., App'x A, Item 1; App'x B, Item 1. ProShares I's offering documents make clear that these daily objectives were bets that it could return a stated multiple of an ETF's underlying index each day by investing in different components of the underlying index through various financial instruments. For

example, "principal investment strategies include[d i]nvesting in equity securities and/or financial instruments (including derivatives) that ProShare Advisors believe[d], in combination, [w]ould have similar daily price return characteristics" of a stated multiple of the ETF's underlying index.  June 19, 2006 ProShares I Reg. Stmt at 7.

To achieve the predicted daily investment results, ProShare Advisors or a Sponsor would determine the type, quantity, and mix of investment positions that an ETF should hold.  In addition, ProShares reserved the right to substitute a different index or security for an ETF's underlying index and disclosed that it might over-weight or under-weight certain components contained in the underlying index.  *See, e.g.*, *id.* at 59-60; *see also*, *e.g.*, Nov. 17, 2008 ProShares II Reg. Stmt. at 33-34.  Furthermore, the ETFs never took a defensive position and would remain "fully invested at all times in securities and/or financial instruments that provide exposure to its [u]nderlying [i]ndex without regard to market conditions, trends, or direction."  June 19, 2006 ProShares I Reg. Stmt at 60; *see also* Nov. 17, 2008 ProShares II Reg. Stmt. at 33.  The ETFs' views were expressly myopic: long-term objectives were

7

blurred because they were focused only on meeting a benchmark tied to an underlying index one day at a time with a portfolio of different securities.

Moreover, ProShares warned that its decision to invest in a particular stock or financial instrument was not based on the "investment merit of a particular security, instrument, or company" and that it did not use "conventional stock research or analysis, or forecast stock movement or trends" in managing the assets of the funds. June 19, 2006 ProShares I Reg. Stmt at 60; *see also* Nov. 17, 2008 ProShares II Reg. Stmt. at 34.  Instead, ProShares ETFs pursued daily results through aggressive investment techniques.  For ProShares I, each registration statement warned that the ETFs used financial instruments and "investment techniques . . . that may be considered aggressive, including the use of futures contracts, options on futures contracts, securities and indices, forward contracts, swap agreements, and similar instruments." *See* Skinner Decl., App'x A, Item 6.  ProShares I also disclosed that use of these techniques and financial instruments exposed the ETFs to "potentially dramatic" losses.  *Id.* Similarly, each relevant ProShares II prospectus warned that

8

1  the aggressive financial instruments had "volatile [trading

2  prices, and that] even a small movement in market prices

3  could cause large losses" because an ETF investment was

4  "speculative" and involved a high degree of risk.  *See id.*,

5  App'x B, Item 6.

6      ProShares also warned that ETFs could not pursue their

7  stated objectives for beyond-a-day periods because

8  mathematical compounding and leveraging prevented the ETFs

9  from reaching those results.  *See id.*, App'x A, Item 2;

10  App'x B, Item 2.  In that regard, ProShares disclosed that

11  "[o]ver time, the cumulative percentage increase or decrease

12  in the net asset value of the [ETFs] may diverge

13  significantly from the cumulative percentage increase or

14  decrease in the multiple of the return of the Underlying

15  Index" due to a compounding effect of daily gains and

16  losses.[2]  For ProShares II, the warning was even more

17  direct: "[u]sing leverage . . . should be considered . . .

18  speculative and could result in the total loss of an

19  investor's investment."  *See id.*, App'x B, Item 6.  In its

20  brief, ProShares provided a hypothetical illustration of two

---

[2]Beginning with its September 2007 registration statement, this information was moved to the SAI.

1 investors who invested in an Ultra Long ETF at separate

2 times to illustrate the effect an index's volatility would

3 have on those investments' returns.  We have provided that

4 example in Appendix A.

5    **C.  Alleged Omissions and Misstatements**

6    Plaintiffs principally complain that ProShares failed

7 to disclose the magnitude and probability of loss for

8 beyond-a-day investments in ProShares ETFs despite

9 investors' correct predictions regarding the overall

10 movement of the indices underlying the ETFs.  Furthermore,

11 Plaintiffs allege that the registration statements contained

12 various "contra-indicators" of successful long-term

13 investments which the above omissions made materially

14 misleading.  The district court rejected these arguments and

15 dismissed the complaint with prejudice pursuant to Federal

16 Rule of Civil Procedure 12(b)(6).  *In re ProShares Trust*

17 *Sec. Litig.*, 889 F. Supp. 2d 644 (S.D.N.Y. 2012).  In sum,

18 the district court concluded that ProShares warned of the

19 risks that materialized.  For the reasons that follow, we

20 agree.

21

22

10

**DISCUSSION**

1   The standard of review is neither contested nor determinative.[3]

**A.  Alleged Omissions**

Liability attaches to a security's issuer, its underwriter, and certain other statutorily enumerated parties pursuant to section 11 of the `33 Act if "any part" of the operative registration statements "omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  To state a plausible section 11 claim based on an alleged omission, a complaint must pass two distinct hurdles: it must identify an omission that is (1) unlawful and (2) material.  *See Morgan Stanley*, 592 F.3d at 360.  In other words, "[m]ateriality alone does not demand disclosure, nor does the duty to disclose encompass non-material information."

---

[3]"We review *de novo* the dismissal of a complaint under [Federal] Rule [of Civil Procedure] 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (internal quotation marks omitted).

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538
F.Supp.2d 662, 668 (S.D.N.Y. 2008).

A plaintiff who plausibly pleads an unlawful omission
comes close to stating a section 11 claim because
materiality "will rarely be dispositive in a motion to
dismiss." *See Morgan Stanley*, 592 F.3d at 360.
Nevertheless, the materiality hurdle remains a meaningful
pleading obstacle, and we will dismiss a section 11 claim
where the alleged omission was "so obviously unimportant to
a reasonable investor" that reasonable minds would agree on
that omission's unimportance. *Id.* (internal quotation marks
omitted). In fact, the Supreme Court has been "'careful not
to set too low a standard of materiality,' for fear that
management would 'bury the shareholders in an avalanche of
trivial information.'" *Matrixx Initiatives, Inc. v.
Siracusano*, 131 S.Ct. 1309, 1318 (2011) (quoting *Basic
Inc. v. Levinson*, 485 U.S. 224, 231 (1988)).

In judging whether an alleged omission was material in
light of the information already disclosed to investors, we
consider whether there is "'a *substantial* likelihood that
the disclosure of the [omitted material] would have been
viewed by the *reasonable* investor as having *significantly*

12

altered the total mix of information [already] made
available.'" *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d
Cir. 2003) (emphasis added) (quoting *TSC Indus., Inc. v.
Northway, Inc.*, 426 U.S. 438, 449 (1976)). "It is not
sufficient to allege that the investor might have considered
the misrepresentation or omission important." *Ganino v.
Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).
While the "objective of a prospectus is to solicit
investment by the general public" and "the intended audience
. . . encompasse[s] both sophisticated financial analysts
and untutored lay persons," *Greenapple v. Detroit Edison
Co.*, 618 F.2d 198, 210 (2d Cir. 1980), the prospectuses are
not "'required to address [reasonable investors] as if they
were children in kindergarten,'" *id.* (quoting *Richland v.
Crandall*, 262 F. Supp. 538, 554 (S.D.N.Y. 1967)). In the
words of the district court below, "[w]hen a registration
statement warns of the exact risk that later materialized, a
[s]ection 11 claim will not lie as a matter of law."
*ProShares*, 889 F. Supp. 2d at 653.

Here, the district court concisely summarized
Plaintiffs' allegations: the "thrust of the [P]laintiffs'
[s]ection 11 claim is that the registration statements

1    omitted the risk that the ETFs, when held for a period of

2    greater than one day, could lose substantial value in a

3    relatively brief period of time, particularly in periods of

4    high volatility." *Id.* at 654.  The district court dismissed

5    that claim in equally concise language: "the disclosures in

6    the registration statements accurately conveyed the specific

7    risk that the [P]laintiffs assert materialized: when

8    investors held the ETFs for periods longer than one day the

9    funds' performance widely diverged from the performance of

10   the underlying indices sometimes resulting in losses despite

11   the overall direction of the underlying indices." *Id.* at

12   656.  We agree that the relevant prospectuses adequately

13   warned the reasonable investor of the allegedly omitted

14   risks.

15           **1.   The Magnitude of Beyond-A-Day Losses**

16       Plaintiffs allege that the registration statements

17   omitted the risk that correctly predicting the long-term

18   movement in an ETF's underlying index could result in a

19   substantial loss in their investment over that same period

20   of time.  Plaintiffs acknowledge that the prospectuses

21   warned that the value of long-term ETF investments "may

22   diverge significantly" from that ETF's underlying index.

14

1    Pls. Br. at 42.  The complaint even recognizes that the

2    ProShares ETFs "did not seek to achieve long[-]term

3    cumulative investment returns in their ETFs" and that they

4    "could not seek such returns."  TAC ¶ 100.  Plaintiffs

5    assert, however, that the "diverge significantly" disclosure

6    does not speak to a divergence that results in actual,

7    substantial loss.

8        "In evaluating a prospectus, we read it as a whole."

9    *DeMaria*, 318 F.3d at 180 (internal quotation omitted).  As

10   we read the prospectus cover-to-cover, we consider whether

11   the disclosures and representations, "taken together and in

12   context, would have misl[ed] a reasonable investor about the

13   nature of the [securities].'"  *Id.* (quoting *McMahan & Co. v.*

14   *Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).

15   "As we have explained, '[a] prospectus will violate federal

16   securities laws if it does not disclose material objective

17   factual matters, or buries those matters beneath

18   information, or treats them cavalierly.'"  *DeMaria*, 318 F.3d

19   at 180 (quoting *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98

20   F.3d 2, 5 (2d Cir. 1996) (internal quotation marks

21   omitted)).

22

15

1        Here, the district court concluded that it was "not

2   possible to read the registration statements . . . without

3   understanding that the ETFs were particularly risky and

4   speculative and were intended to meet their stated goal only

5   over the course of a single day." *ProShares*, 889 F. Supp.

6   2d at 656.  The district court reasoned that while "some

7   [P]laintiffs lost money while guessing correctly on the

8   direction of the underlying index, this possibility is

9   plainly consistent with the significant divergence that was

10  disclosed in the registration statements." *Id.*  On appeal,

11  Plaintiffs maintain that the district court overvalued the

12  "diverge significantly" disclosure because "'[d]iverge

13  significantly' is not a synonym for 'loss'" and "refers only

14  to [an ETFs'] outperforming or underperforming" a perfect

15  long-term correlation with its index.  At the very least,

16  they argue, "diverge significantly" does not include large,

17  rapid losses.  Pls. Br. at 42-43.

18       We are unpersuaded by this argument, and Plaintiffs'

19  efforts to find a meaningful distinction between "diverge

20  significantly" and "actual loss" strains the plain meaning

21  of the former phrase.  Because one might expect the long-

22  term value of an ETF to correlate with the long-term value

16

of its underlying index, ProShares warned that the actual
results might diverge significantly from that prediction.
"Significant" means large or important; in the context of
the offering documents, "divergence" means the opposite from
one's expectation.  ProShares' "significant divergence"
disclosures, fairly read, put investors on notice that an
ETF's value might move in a direction quite different from
and even contrary to what an investor might otherwise
expect.

     Plaintiffs use a linguistic preference to read out of
the prospectuses a scenario which the ProShares disclosures
clearly contemplate.  Time and again, we have said that
"disclosure is not a rite of confession or exercise in
common law pleading." *Morgan Stanley*, 592 F.3d at 365
(internal quotation marks omitted).  Because the "role of
the materiality requirement is not to attribute to investors
a child-like simplicity," we presume that a reasonable
investor can comprehend the basic meaning of plain-English
disclosures and will not credit Plaintiffs' narrow reading
of "diverge significantly." *See Basic*, 485 U.S. at 234
(citations omitted).

     Perhaps more importantly, the "diverge significantly"
disclosure takes on additional meaning within the context of

17

1   the prospectus as a whole.  The earliest relevant

2   prospectuses make absolutely clear that the ETFs operated

3   pursuant to daily investment objectives, that they utilized

4   leveraged investment techniques to achieve those objectives,

5   and that mathematical compounding combined with leveraging

6   prevented the ETFs from achieving their stated objectives

7   over a period of time greater than one day.  All the

8   ProShares I prospectuses make clear that ETFs used

9   aggressive financial instruments and investment techniques

10  that exposed the ETFs to potentially "dramatic" losses "in

11  the value of its portfolio holdings and imperfect

12  correlation to the index underlying"; ProShares II warned

13  that volatility could result in a "total loss of an

14  investor's investment."  *See* Skinner Decl., App'x A, Item 6;

15  App'x B, Item 6.

16      Accordingly, we conclude that it is implausible that

17  substituting "actual loss" for "diverge significantly" is a

18  change substantially likely to be viewed by a reasonable

19  investor as having significantly altered the import of the

20  total mix of information ProShares made available.

21  *See Basic*, 485 U.S. at 232.

22          **2.  The Probability of Long-Term Loss**

23      Plaintiffs also complain that ProShares omitted that

18

1   certain market circumstances would "*necessarily* [cause]

2   quick and potentially large losses" despite an investor's

3   correct prediction of the overall, beyond-a-day direction of

4   an ETF's underlying index.  Pls. Br. at 1 (emphasis added);

5   *see also id*. at 24-25; TAC ¶¶ 12-26.  The complaint further

6   asserts that ProShares possessed an "undisclosed

7   mathematical formula" which "very accurately predicted and

8   described the relationship between the movements in each

9   type of ETF's price and the movements in the index

10  underlying the ETF in any market scenario."  *See* TAC ¶ 13.

11  Based on this formula, Plaintiffs allege that ProShares knew

12  and omitted that certain market conditions could materialize

13  that would put investors "who held ProShares products for

14  extended periods of more than a day" in "a 'must lose'

15  position."  TAC ¶ 15.  These market conditions existed,

16  Plaintiffs maintain, when "the volatility (*i.e.*, the day-to-

17  day changes in prices) of the underlying index significantly

18  exceeded its performance over time."  TAC ¶ 16.

19      The district court concluded that the existence of the

20  undisclosed mathematical formula was implausible on its

21  face. *ProShares*, 889 F. Supp. 2d at 656.  In the

22  alternative, the district court concluded that such a

23  formula would "rely on inputs from the underlying index or

benchmark, that those inputs could not be known in advance," and that failure to predict future market performance was an immaterial omission. *Id.*

Here, Plaintiffs continue to pursue the argument and allege that ProShares "knew and could simulate from their mathematical formula exactly what was going to happen to investors **for each market scenario**, including the continuation of the actual, existing current daily volatility circumstances." Pls. Br. at 11 (emphasis in original) (complaint citations omitted). According to Plaintiffs, ProShares knew "to the day when, if current actual volatility circumstances continued, their ETFs would become dysfunctional and an investor necessarily would lose from a correct judgment about the market." Pls. Br. at 24–25 (complaint citations omitted).

We remain unpersuaded. Assuming, *arguendo*, that ProShares possessed an undisclosed mathematical formula that accurately predicted potential market conditions and the effect market volatility would have on ETF shares, Plaintiffs' argument amounts to nothing more than an allegation that ProShares failed to disclose that the more an ETF's underlying index changed value day-to-day for a particular investor, the more likely it became that the

1    investor would experience long-term losses depending on when

2    she invested.  That does not constitute an actionable

3    omission of an objective fact, but rather a general omission

4    regarding the risks associated with (1) hypothetical

5    investments over (2) hypothetical periods of time during (3)

6    hypothetically volatile market conditions.  ProShares cannot

7    be expected to predict and disclose all possible negative

8    results across any market scenario.  Appendix A illustrates

9    this point.

10        In tandem with this argument, Plaintiffs assert that

11   ProShares failed to disclose the risks of "excess daily

12   index volatility" which its mathematical formula predicted

13   and that eventually materialized.[4]  ProShares, however,

14   consistently disclosed the effect market volatility had on

15   ETFs.  The first relevant ProShares I prospectus warned,

16   under Principal Risk Considerations, that the "equity

17   markets are volatile, and the value of securities, futures,

18   options, contracts and other instruments correlated with the

19   equity markets may fluctuate dramatically from day-to-day."

---

[4]Plaintiffs make a distinction between "inherent facts" and "materialization facts."  For example, Plaintiffs argue that ETFs were subject to an inherent risk of excess market volatility which ProShares omitted and that once the markets became excessively volatile those inherent risks became materialized risks.  For the purpose of our analysis, this distinction is without a difference.

1    June 19, 2006 ProShares I Prospectus at 8, 64. "This

2    volatility may cause the value of an investment in a[n ETF]

3    to decrease." *Id.* at 65. ProShares also warned that the

4    net asset value of an ETF and its market price would be made

5    more volatile than its underlying index on account of

6    leveraged investment techniques that magnify exposure to the

7    underlying index. Finally, ProShares highlighted and

8    bullet-pointed the risk: "**Volatility Risk –** [Leveraged ETFs]

9    seek to achieve a multiple of an index and therefore will

10   experience greater volatility than the index underlying its

11   benchmark and consequently ha[ve] the potential for greater

12   losses." *Id.* at 9. In addition, the earliest ProShares II

13   prospectus warned that price "volatility, which is

14   exacerbated by the use of leverage, may possibly cause the

15   total loss of an investor's investment." Nov. 17, 2008

16   ProShares II Reg. Stmt. at 4.

17        While "it is not sufficient that overtones might have

18   been picked up by the sensitive antennae of investment

19   analysts," *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281,

20   1297 (2d Cir. 1973) (Friendly, *Judge*), no reasonable

21   investor could read these prospectuses without realizing

22   that volatility, combined with leveraging, subjected that

23

22

investment to a great risk of long-term loss as market
volatility increased.

**B.   Misleading Statements**

"Our conclusion that the ['33 Act] did not directly
require defendants to disclose the allegedly omitted
information does not mark the end of our inquiry." *Morgan
Stanley*, 592 F.3d at 365.  "Section 11 [also] call[s] for
the disclosure of information that is necessary to avoid
rendering misleading the representations in prospectuses."
*Id.* (citing 15 U.S.C. § 77k(a)).  Our inquiry here is the
same as it was above: "we review documents holistically and
in their entirety." *Id.* (citing *Olkey*, 98 F.3d at 5).  "The
literal truth of an isolated statement is insufficient; the
proper inquiry requires an examination of defendants'
representations, taken together and in context." *Id.*
(quotation marks and citation omitted).

Plaintiffs complain that ProShares prospectuses
included "numerous" misleading statements about the positive
results of 1, 3, 5, and 10 year investments in ProShares
ETFs. *See* Pl. Br. at 38 (complaint citations omitted).
Indeed, Plaintiffs provide us with a string citation to the
complaint outlining at least eight categories of misleading
statements across various prospectuses. *See, e.g.*, TAC ¶

102(a)-(h).  Plaintiffs' appeal, however, focuses on only three specific alleged misrepresentations.  *See Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation omitted)).

### 1.    1, 3, 5, and 10 Year Cost Projections

Plaintiffs contend that ProShares provided tables which illustrated the hypothetical costs of investing in ProShares I ETFs for 1, 3, 5, and 10 year periods, which misleadingly implied that ProShares ETFs were suitable 1, 3, 5, and 10 year investments.  *See* TAC ¶ 102(a).  The district court dismissed the argument for two reasons.  First, it reasoned that the "various projections . . . fall far short of undercutting the emphasis on the daily nature of the ETFs." *ProShares*, 889 F. Supp. 2d at 655.  Second, it concluded that because Form N-1A required disclosure of that exact information, ProShares could not expect that the SEC would require that information be specifically "identified, qualified, or tempered." *Id.*  We agree with the first half of the district court's analysis and affirm its conclusion.

The contested tables are presented as an example of the costs of investing in ProShares I ETFs assuming a $10,000

24

investment for time periods spanning 1, 3, 5, and 10 years -
assuming a 5% return each year.  Form N-1A requires those
assumptions.  This makes sense because the example is
intended to help investors compare the cost of investing in
ProShares with the cost of investing in other funds.  It
would be difficult to cross-compare the costs of investing
in different funds were prospectuses to use different time
periods, different assumptions about annual returns, and
different assumptions about the amount invested.  The
ProShares I prospectuses also tie cautionary language to the
tables, which Form N-1A does not expressly require: the
table was for "illustration purposes only" and was not
"meant to suggest actual or expected fees and expenses or
returns, all of which may vary." *See, e.g.,* Sept. 28, 2007
Reg. Stmt. at 20.

We conclude that the cost tables, placed in context,
would not lead a reasonable investor into thinking that
ProShares I ETFs were safe 1, 3, 5, and 10 year investments.
We also agree with the district court that the tables do not
undercut the disclosures regarding the ETFs' daily
objectives with all the attendant warnings already described
in this opinion.  Accordingly, we are unpersuaded by
Plaintiffs' attempt to isolate and construe a single element

25

1   of ProShares I's prospectuses.  *See DeMaria*, 318 F.3d at

2   180.  It is therefore implausible that a reasonable investor

3   would have been misled by the cost tables.[5]

4              **2.  Correlation Risks and Line Graphs**

5         Beginning with the September 28, 2007 ProShares I

6   prospectus, Plaintiffs assert that ProShares I included

7   correlation-risk disclosures which included line-graph

8   examples that misled them into thinking that an ETF's

9   divergence from its underlying index would be somewhere in

10  the ballpark of 0.6%-2.2%.  TAC ¶¶ 29-43, 102, 203-220.

11        The correlation-risk disclosure expressly warns that

12  there is no guarantee that an ETF will achieve a high degree

13  of correlation with its benchmark and lists factors that

14  prevent perfect correlation.  For Plaintiffs' leveraged

15  funds "there [was] a special form of correlation risk[:] for

16  periods greater than one day, the use of leverage tends to

---

[5]   The district court also commented that the tables did not create liability because the "plaintiffs point[ed] to no case that holds that information that the SEC requires must be specifically identified, qualified, or tempered."  *ProShares*, 889 F. Supp. 2d at 655.  While Form N-1A requires the allegedly misleading table, it also requires this information to be "in plain English under rule 421(d) under the Securities Act."  *See* Skinner Decl. Ex. 5 at 11 (SEC Form N-1A).  Rule 421(d) requires that financial data be presented in "an understandable manner" and that any information provided "must not be misleading."  17 C.F.R. § 230.421(d)(3).  Accordingly, there remains a possibility that an issuer might present required information in a misleading manner.  That, however, is not this case.

cause the performance of an [ETF] to be either greater than or less than the index performance." *See* Sept. 28, 2007 ProShares I Reg. Stmt at 8.

To "illustrate" how leveraging increases correlation risk, the prospectus included three line graphs that "simulated [a] hypothetical one year performance of an index compared with the performance of a fund that perfectly achieved its investment objective of twice (200%) the daily index return." *Id.* "Each of the graphs [assumed] a volatility rate of 15%, which [was] an approximate average of the five-year historical volatility rate" of certain indices. *Id.* But, "[o]ther indexes to which the [ETFs] are benchmarked ha[d] different historical volatility rates; certain of the [ETFs] historical volatility rates [were] substantially in excess of 15%." *Id.*

The line graphs show that where a leveraged ETF meets its daily objectives each day, with the above assumptions, its value could diverge from the index's performance by 2.2% in a flat market, 0.7% in an upward-trending market, and 0.6% in a downward-trending market. After the presentation of the graphs, the prospectus referred potential investors to the SAI "for a further discussion of how both index volatility and index performance can impact" ETF performance. The SAI includes a "wedge graph" that

27

1    represents the effect market volatility would have on a

2    leveraged ETFs' annual correlation with index volatility

3    ranging from 0%-40% at 5% intervals.  The wedge graphs

4    clearly demonstrate that at high levels of volatility an

5    ETF's value could move in the opposite direction from its

6    underlying benchmark.  We have included an example wedge

7    graph in Appendix B.

8        Plaintiffs complain that the line graphs misled them

9    into believing that annual ETF returns ran the risk of only

10    a slight disconnection (.6% - 2.2%) from an index's

11    performance.  We have already concluded that the ProShares

12    prospectuses, absent the wedge graphs, clearly described the

13    daily investment objectives, the nature of ETFs, and, in

14    plain English, warned that leveraging, volatility, and

15    compounding could cause an ETF's performance to

16    significantly diverge from its underlying index.  We have

17    also already concluded that the relevant prospectuses

18    disclosed that aggressive investment techniques exposed the

19    ETFs to dramatic losses and an imperfect correlation with

20    its index.

21        The addition of the line graphs does not alter those

22    conclusions, and we agree with the district court that this

23    one-year representation does not undercut the

24    representations throughout the rest of the prospectuses.

1    This is especially true because the disclosure introducing

2    the line graphs clearly explained that the line graphs

3    assumed 15% volatility and that many of the ETF indices have

4    historically experienced volatility substantially in excess

5    of 15%.  It is therefore implausible that a reasonable

6    investor would expect that an ETF's divergence from its

7    underlying index would be only minimal.

8              **3.  SAIs and Wedge Graphs**

9         Plaintiffs argue that the district court impermissibly

10   relied upon the wedge graphs to dilute their cost-table and

11   line-graphs arguments and to bolster ProShares' disclosures.

12   *See* Pls. Br. at 46-47.  That argument is misplaced, however,

13   because the district court concluded, as we do here, that it

14   was "not possible to read the registration statements - even

15   those issued before the wedge graphs were added in September

16   2007 - without understanding that the ETFs were particularly

17   risky and speculative and were intended to meet their stated

18   goal only over the course of a single day."  *ProShares*, 889

19   F. Supp. 2d at 655.  Moreover, the district court also

20   concluded that the "diverge significantly" disclosures

21   plainly contemplated the possibility that certain investors

22   would lose money despite correctly predicting the direction

23   of an underlying index.  Accordingly, the district court did

24

not rely on the wedge graphs to reach its conclusions; nor do we.

Plaintiffs also contend that the wedge graphs constitute a unique principal-risk disclosure that ProShares impermissibly buried in the SAI.  Plaintiffs' argument, however, merely repackages what they argued earlier: ProShares failed to disclose the effect of excess daily volatility in the principal-risk portion of the prospectuses.  Because we concluded that ProShares' volatility disclosures and prospectuses sufficiently warned of the effects excess market volatility would have on an ETF, spelling out the details of those disclosures in the SAI does not violate the securities laws.  As we have recognized: "to avoid prospectus disclosures that are too long and complex, Form [N-1A] calls for a streamlined, simplified prospectus" and an SAI which "offer[s] issuers the opportunity to provide more detailed discussions of matters required to be in the prospectus." *Morgan Stanley*, 592 F.3d at 352 n.2 (quotation marks and citations omitted).[6]

---

[6]ProShares asserts that the law of this Circuit permits reliance on information contained in the SAI in evaluating section 11 claims.  *See* ProShares' Br. at 53 (citing *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730-31 (2d Cir. 1998)).  *Hunt*, however, only looked at an SAI to

1      Finally, Plaintiffs allege that the wedge graphs

2  themselves were materially misleading for not contemplating

3  the effects of volatility above 40% and the effect

4  volatility would have on short-term investments.[7]  But, as

5  the district court concluded, no reasonable investor could

6  read the prospectuses without understanding beyond-a-day

7  risk exposure or that risks increased as volatility

8  increased above 40%.  In fact, the complaint itself

9  acknowledges that ProShares could not meet its objectives

10  beyond a day,  TAC ¶ 100, and all of the ProShares

11  prospectuses made clear that leveraging, compounding,

12  volatility, and aggressive investment techniques subject the

13  ETFs to high degrees of risk.[8]  Accordingly, it is

---

contextualize a prospectus' disclosures.  *Id.*  Accordingly,
*Hunt* does not permit relegating to the SAI material risk
disclosures that Form N-1A requires to be in the prospectus; nor
could it.

   [7]We note a bit of an internal inconsistency in Plaintiffs'
theories of liability: Plaintiffs argue that the district court
impermissibly relied upon the wedge graphs "buried" in the SAI in
analyzing the complaint while simultaneously maintaining that
this same buried information misled them about ETF risks.
Plaintiffs' complaint actually presents the point heading
"Additional Misleading Statements in the SAI."  TAC ¶¶ 44-47.
It's curious that Plaintiffs could not find this information to
get a more in-depth understanding of the funds but have no
trouble using that same information to shoulder ProShares with
liability.

   [8]Plaintiffs argue that *In re Direxion Shares ETF Trust*
counsels against reliance on the "daily objective" disclosures.
279 F.R.D. 221 (S.D.N.Y. 2012).  The district court here,

1    implausible that a reasonable investor would read these

2    offering documents without understanding the potential for

3    rapid, substantial loss.

4    **C.  Corrective Disclosures**

5         Plaintiffs allege that ProShares made new disclosures

6    beginning on the last day of the class period, thereby

7    tacitly conceding that the class-period disclosures failed

8    to reveal critical facts.  These new disclosures include,

9    *inter alia*, (1) acknowledging that volatility could cause an

10   ETF to "move in [the] opposite direction as the index," TAC

11   ¶ 181 (quoting July 31, 2009 Am. No. 16 of Reg. Stmt. at

12   410); (2) stating that an "investor's views on the future

13   direction and volatility of the markets can be useful tools

14   for investors," TAC ¶ 185-186 (quoting July 31, 2009

15   Amendment No. 16 of Reg. Stmt. at 410); and (3) advising

16   that investors should be willing to "monitor and/or

17   periodically rebalance their portfolios," *id.*

18        We have previously noted that where the "quality of [a]

19   disclosure could have been improved[,] the advisability of

20   revision does not render what was done deceptive or

_____

however, relied on the total mix of ProShares' disclosures and
correctly identified significant differences between *Direxion*'s
offering documents and ProShares' offering documents.  Without
commenting on *Direxion*'s merits, Plaintiffs have not persuaded us
that the district court erred in parsing these differences.

misleading." *Greenapple*, 618 F.2d at 211.  The question
always remains "whether the prospectuses, as written,
adequately apprise the reader of the essential nature" of
the securities.  *See id.*  Accordingly, these revisions do
not alter our conclusion that the earlier ProShares
prospectuses adequately warned of volatility's effect on the
magnitude and probability of loss.  It is of no matter that
ProShares came to use different, arguably clearer language.
To hold an issuer who alters disclosures deemed adequate in
the first instance suddenly liable because it found a better
way to say what has already been said would perversely
incentivize issuers not to strive for better, clearer
disclosure language.  Accordingly, the "corrective
disclosures" do not alter our conclusions.

**D.   Section 15**

Plaintiffs also brought claims under section 15 of the
`33 Act against the individual defendants.  "To establish
[section] 15 liability, a plaintiff must [first] show a
'primary violation' of [section] 11 . . . ."  *Hutchinson v.
Deutsche Bank Secs. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011)
(internal quotation marks omitted).  Having affirmed the
dismissal of Plaintiffs' section 11 claims, we also affirm
the dismissal of their section 15 claims.  *See id.*

33

**CONCLUSION**

The order of the United States District Court for the Southern District of New York (John G. Koeltl, *Judge*.), entered on September 12, 2012, dismissing Plaintiffs-Appellants' third amended complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6), is hereby AFFIRMED.

1                                        **APPENDIX A**

2      **Hypothetical ETF Investments Seeking to Double the Daily Return of its Underlying Index**

|  | **Index** | **Investor A** | **Investor B** |
|---|---|---|---|
| **Initial Investment** | $1,000 | $1,000 (Purchased beginning of day 1) | $1,000 (Purchased beginning of Day 2) |
| Day 1 Return | $900 (-10%) | $800 (-20%) | |
| Day 2 Return | $1,008 (+12%) | $992 (+24%) | $1,240 (+24%) |
| Day 3 Return | $982.80 (-2.5%) | $942.40 (-5%) | $1,178 (-5%) |
| Day 4 Return | $1,007.40 (+2.5%) | $989.52 (+5%) | $1,236.90 (+5%) |
| **Total Return (Days 1-4)** | +$7.40 (+.74%) | -$10.48 (-1.05%) | |
| **Total Return (Days 2-4)** | +$107.40 (+11.9%) | +189.52 (+23.7%) | +$236.90 (+23.7%) |

3

4

5

6

1 **APPENDIX B**

2 **Example Wedge Graph**

**Estimated Fund Return Over One Year When the Fund Objective is to Seek Daily Investment Results, Before Fees and Expenses, that Correspond to Twice (200%) the Inverse of the Daily Performance of an Index.**

| One Year Index Performance | 200% Inverse of One Year Index Performance | Index Volatility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 0% | 5% | 10% | 15% | 20% | 25% | 30% | 35% | 40% |
| -40% | 80% | 177.8% | 175.7% | 169.6% | 159.6% | 146.4% | 130.3% | 112.0% | 92.4% | 71.9% |
| -35% | 70% | 136.7% | 134.9% | 129.7% | 121.2% | 109.9% | 96.2% | 80.7% | 63.9% | 46.5% |
| -30% | 60% | 104.1% | 102.6% | 98.1% | 90.8% | 81.0% | 69.2% | 55.8% | 41.3% | 26.3% |
| -25% | 50% | 77.8% | 76.4% | 72.5% | 66.2% | 57.7% | 47.4% | 35.7% | 23.1% | 10.0% |
| -20% | 40% | 56.3% | 55.1% | 51.6% | 46.1% | 38.6% | 29.5% | 19.3% | 8.2% | -3.3% |
| -15% | 30% | 38.4% | 37.4% | 34.3% | 29.4% | 22.8% | 14.7% | 5.7% | -4.2% | -14.4% |
| -10% | 20% | 23.5% | 22.5% | 19.8% | 15.4% | 9.5% | 2.3% | -5.8% | -14.5% | -23.6% |
| -5% | 10% | 10.8% | 10.0% | 7.5% | 3.6% | -1.7% | -8.1% | -15.4% | -23.3% | -31.4% |
| 0% | 0% | 0.0% | -0.7% | -3.0% | -6.5% | -11.3% | -17.1% | -23.7% | -30.8% | -38.1% |
| 5% | -10% | -9.3% | -10.0% | -12.0% | -15.2% | -19.6% | -24.8% | -30.8% | -37.2% | -43.9% |
| 10% | -20% | -17.4% | -18.0% | -19.8% | -22.7% | -26.7% | -31.5% | -36.9% | -42.8% | -48.9% |
| 15% | -30% | -24.4% | -25.0% | -26.6% | -29.3% | -32.9% | -37.3% | -42.3% | -47.6% | -53.2% |
| 20% | -40% | -30.6% | -31.1% | -32.6% | -35.1% | -38.4% | -42.4% | -47.0% | -51.9% | -57.0% |
| 25% | -50% | -36.0% | -36.5% | -37.9% | -40.2% | -43.2% | -46.9% | -51.1% | -55.7% | -60.4% |
| 30% | -60% | -40.8% | -41.3% | -42.6% | -44.7% | -47.5% | -50.9% | -54.8% | -59.0% | -63.4% |
| 35% | -70% | -45.1% | -45.5% | -46.8% | -48.7% | -51.3% | -54.5% | -58.1% | -62.0% | -66.0% |
| 40% | -80% | -49.0% | -49.4% | -50.5% | -52.3% | -54.7% | -57.7% | -61.1% | -64.7% | -68.4% |

The foregoing tables are intended to isolate the effect of index volatility and index performance on the return of a leveraged fund. The fund's actual returns may be significantly greater or less than the returns shown above as a result of any of factors discussed above or under "Correlation Risk" in the Prospectus.    App-505 (9/28/07 RS at SAI 20).

3